IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

CAMERON STRASSER,

                     Plaintiff,

                                     Civ. Action No.
      v.                        9:10-CV-0141 (FJS/DEP)

STATE OF NEW YORK, *et al.,*

                     Defendants.

_____

APPEARANCES:              OF COUNSEL:

FOR PLAINTIFF:

AGOLA LAW OFFICE       CHRISTINA A. AGOLA, ESQ.
2100 First Federal Plaza
28 East Main Street
Rochester, NY 14614

FOR DEFENDANTS:

HON. ANDREW M. CUOMO    CHRISTOPHER W. HALL, ESQ.
Attorney General of             Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

    Plaintiff Cameron Strasser, a New York State prison inmate, has

commenced this action pursuant to 42 U.S.C. § 1983, *inter alia*, alleging

that his civil rights have been violated by the defendants during the course of his incarceration.  In his complaint plaintiff asserts that while in the custody of the New York State Department of Correctional Services ("DOCS") he was sexually assaulted by a prison guard, and that after reporting the incident he was harassed by other prison workers and was issued a misbehavior report accusing him of misconduct, resulting in a lengthy sentence of disciplinary confinement and the loss of two years worth of good time credits.  As defendants, plaintiff's complaint names several state agencies and officials as well as three corrections officers, and asserts claims under the Fourth, Eighth, and Fourteenth Amendments.

Currently pending before the court is defendants' pre-answer motion for partial summary judgment seeking dismissal of all but one of plaintiff's causes of action.  In their motion, defendants assert that three of plaintiff's claims are barred due to his failure to exhaust available administrative remedies before commencing suit and that Strasser's claims against the various state agencies, purportedly asserting *Monell*[1] liability, are barred by sovereign immunity.  In response to defendants'

---

[1]    *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S. Ct. 2018, 2035-36 (1978).

motion plaintiff argues that his claims are adequately pleaded and that the entry of summary judgment is premature since he has not had a fair opportunity to engage in pretrial discovery.

For the reasons set forth below, I find that the plaintiff has failed to demonstrate that he qualifies for the narrow exception under former Rule 56(f) of the Federal Rules of Civil Procedure for denial of a summary judgment pending pretrial discovery, and therefore do not recommend denial of defendants' motion on this basis.[2]  Turning to the merits, I find that certain of plaintiff's claims are legally deficient, and therefore recommend that defendants' motion be granted, in part.

## I.    BACKGROUND[3]

Plaintiff is a prison inmate entrusted to the care and custody of the DOCS as a result of a 2006 conviction for burglary.  Complaint (Dkt. No.

---

[2]      As will be seen, Rule 56(f) has been replaced by Rule 56(d), effective on December 1, 2010.  *See* pp. 11 - 12 n.8, *post*.

[3]      In light of the procedural posture of the case the following recitation is derived from the record now before the court with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).  It should be noted, however, that when responding to the pending motion plaintiff failed to answer defendants' Local Rule 7.1(a)(3) statement of material facts not in dispute.  *See* Dkt. No. 26-1. With that failure, plaintiff is deemed to have admitted the facts set forth in the statement.  *See* N.D.N.Y.L.R. 7.1(a)(3) ("the Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert); *see also Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing cases).

3

1) ¶ 17.  At the times relevant to his claims Strasser was designated first to the Franklin Correctional Facility ("Franklin"), followed by the Bare Hill Correctional Facility ("Bare Hill"), which is located in the same general vicinity as Franklin, and ultimately the Southport Correctional Facility ("Southport").[4]  *Id.* at ¶¶ 21, 39.

Plaintiff alleges that on June 9, 2009 he was sexually assaulted by defendant Robar, a corrections officer at Franklin.  Complaint (Dkt. No. 1) ¶¶ 21-29.  Plaintiff reported the assault to his teacher, Ms. LePage, and an investigation into the matter was thereafter conducted by the office of the DOCS Inspector General ("IG") and the New York State Police.  *Id.* at ¶¶ 33-38.  As a result of the investigation plaintiff was accused of fabricating the incident and was charged with several prison rule violations, including interference with an employee, harassment, making false statements or providing false information, being out of place, leaving an assigned area, placing telephone calls utilizing call-forwarding and third-party calling, and non-compliance with a hearing disposition.  *Id.* at ¶ 49; Prack Aff. (Dkt. No. 26-6) ¶ 8 and Exh. D.

---

[4]    According to his inmate records, plaintiff was transferred into Bare Hill on June 10, 2009, and from there into Southport on July 24, 2009.  *See* Peary Aff. (Dkt. No. 26-2) ¶ 8

A Tier III hearing was conducted on July 8 and 9, 2009 to address the charges lodged against Strasser.[5]  Complaint (Dkt. No. 1) ¶¶ 50-51. At the conclusion of that hearing, during which confidential testimony was accepted by the hearing officer outside of Strasser's presence, plaintiff was found guilty and was sentenced to thirty months of disciplinary SHU confinement at Southport, together with a recommended two-year loss of good time credits.  *Id.* at  ¶ 53.  Prack Aff. (Dkt. No. 26-6) ¶ 6 and Exh. C. Plaintiff's Tier III hearing determination was affirmed on appeal on September 9, 2009 by Norman R. Bezio, the DOCS Director of Special Housing/Inmate Disciplinary Program.   Prack Aff. (Dkt. No. 26-6) ¶ 7 and Exh. A.  A subsequent request by Strasser for reconsideration of that determination was denied by Director Bezio on December 18, 2009.  *See id.* Exh. B.

Shortly after the alleged assault plaintiff was transferred into Bare Hill.  Complaint (Dkt. No. 1) ¶ 39.  There, Strasser asserts, he was

----

[5]        The DOCS conducts three types of inmate disciplinary hearings.  See 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU").  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

constantly harassed by corrections officers. *Id.* at ¶¶ 40, 42.  While at

Bare Hill plaintiff received a misbehavior report authored by Corrections

Officer Fluman, also a named defendant in this action, accusing him of

soliciting a friend to smuggle contraband into the prison.  Complaint (Dkt.

No. 1) ¶ 57.  Following a Tier II hearing plaintiff was found guilty of the

charge set forth in the misbehavior report; that determination, however,

was overturned on appeal.  Complaint (Dkt. No. 1) ¶¶ 59-60.

II.    PROCEDURAL HISTORY

Strasser, who is represented by counsel, commenced this action in

the United States District Court for the Western District of New York on or

about December of 2009.  Dkt. No. 1.  In his complaint plaintiff has named

as defendants the State of New York; the DOCS and its Commissioner,

Brian Fischer; DOCS Inspector General Joseph Fisch and IG Investigator

General A. Misercola; the New York State Police Department and its

Superintendent, Harry J. Corbitt; and DOCS Corrections Officers Robar,

Smith, and Fluman.  *Id.*  Plaintiff's complaint sets forth five causes of

action, alleging 1) the use of excessive force; 2) an Eighth Amendment

violation stemming from the use of force and plaintiff's subsequent

disciplinary confinement; 3) a violation of plaintiff's procedural due

process rights and unlawful retaliation arising out of plaintiff's disciplinary

confinement sentence; 4) violation of plaintiff's right to substantive due

process; and 5) *Monell* liabilty on the part of the various municipal

defendants.  The action was transferred to this district pursuant to 28

U.S.C. § 1404(a) by decision and order issued by Senior District Judge

Michael A. Telesca on January 19, 2010.  Dkt. No. 2.

On June 4, 2010, in lieu of answering, certain of the defendants

moved for summary judgment seeking dismissal of four of plaintiff's five

claims.[6,7]  Dkt. No. 26.  In their motion, defendants argue that 1) plaintiff's

---

[6]      Unlike its Rule 12(b) dismissal motion counterpart, a summary judgment motion does not have the effect of automatically staying the requirement of answering a plaintiff's complaint.  *Compare* Fed. R. Civ. P. 12(b)(6) with Fed. R. Civ. P. 56. Despite the lack of a specific rule recognizing such a stay, some courts have deemed the interposition of a pre-answer summary judgment motion as an act of defending in the case, negating a finding of a default, while others have not.  *Compare Rashidi v. Albright,* 818 F. Supp. 1354, 1355-56 (D. Nev. 1993) *with Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D. Del. 1953).  In this instance, exercising my discretion, I will *sua sponte* order a stay of the moving defendants' time to answer plaintiff's complaint until twenty days after a final determination is issued with respect to their motion, in the event that the action survives. *See Snyder v. Goord,* 9:05-CV-01284, 2007 WL 957530, at * 5 (N.D.N.Y. Mar. 29, 2007) (McAvoy, S. J. and Peebles, M. J.).

[7]      It is not clear from their motion papers which of the defendants are participants in the pending motion.  Returns of service have been filed by the plaintiff reflecting that the DOCS, Corrections Officer Robar, Commissioner Fischer, the State of New York, the Office of the IG, IG Investigator Misercola, IG Fisch, the New York State Police, and New York State Police Superintendent Corbitt have been served, to date.  Dkt. Nos. 7-20.  On May 4, 2010 Assistant New York State Attorney General Christopher W. Hall, Esq. wrote to the court on behalf of Commissioner Fischer, the DOCS, and Corrections Officer Robar, requesting an extension of time to answer plaintiff's complaint.  Dkt. No. 23.  In a subsequent letter dated May 17, 2010, Assistant Attorney General Hall requested a similar extension on behalf of the Office of

first, second, and fourth causes of action are barred based upon his

failure to exhaust available internal administrative remedies prior to

commencing suit; 2) plaintiff's Eighth Amendment claim is legally

deficient; 3) plaintiff's complaint does not state a cognizable due process

claim in light of his failure to first successfully overturn the disciplinary

hearing result underlying this cause of action; and 4) plaintiff's *Monell*

claims against the state defendants are barred by the doctrine of

sovereign immunity.  Dkt. No. 26.  Plaintiff has responded in opposition to

defendants' motion, arguing that pursuant to Rule 56(f) of the Federal

Rules of Civil Procedure he should be permitted to engage in pretrial

discovery before having to oppose defendants' motion.  Dkt. No. 28.

---

the IG and IG Fisch.  Dkt. No. 24.

Defendants' motion papers announce that the motion is being made on behalf of "defendants" without specifying which among them.  Dkt. No. 26.  In a letter dated July 6, 2010 Assistant Attorney General Hall clarified that the original motion was filed on behalf of the Office of the IG, IG Fisch, the DOCS, DOCS Commissioner Fischer, and Corrections Officer Robar, and that additionally his office also represents the State.  Dkt. No. 31.  By letter dated July 7, 2010 defendants' counsel has requested that the New York State Police and former New York State Superintendent Corbitt be considered to have joined in the pending motion.  Dkt. No. 32.

Based upon this chronology the court deems the pending summary judgment motion to have been made on behalf of defendants New York State, Fischer, Robar, the DOCS, the Office of the IG, IG Fischer, the New York State Police, and former New York State Commissioner Corbitt, leaving Investigator General A. Misercola, who has been served, *see* Dkt. Nos. 13, 14, and appears to be in default, and Corrections Officers Smith and Fluman, neither of whom appear to have been served, as not having joined in the pending motion.

Defendants have since filed papers in reply to plaintiff's opposition and in further support of their motion.  Dkt. No. 29.

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at

248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).   A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.   *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.   In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.   Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.   *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).   The entry of summary judgment is warranted only in the event of a finding that no reasonable

trier of fact could rule in favor of the non-moving party.  *See Building*

*Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d

Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.

Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

     B.    <u>Plaintiff's Rule 56(f) Objection</u>

     Plaintiff argues that defendants' summary judgment motion is

premature and that he should be afforded an opportunity to engage in

meaningful pretrial discovery before having to respond to defendants'

arguments.  Plaintiff's objection is predicated upon Rule 56(f) of the

Federal Rules of Civil Procedure.  That rule provides that

> [s]hould it appear from the affidavits of a party opposing the
> motion [for summary judgment] that the party cannot for
> reasons stated present by affidavit facts essential to justify
> the party's opposition, the court may refuse the application
> for judgment or may order a continuance to permit affidavits
> to be obtained or depositions to be taken or discovery to be
> had or may make such order as is just.

Fed. R. Civ. P. 56(f).[8]  As can be seen from the text of the rule itself,

---

     [8]    Effective December 1, 2010, Rule 56 was amended.  Subsection (d) now
provides:

> d) When Facts Are Unavailable to the Nonmovant. If a
> nonmovant shows by affidavit or declaration that, for
> specified reasons, it cannot present facts essential to justify

former Rule 56(f) provided a narrow exception to the availability of

summary judgment in instances where a party simply could not fairly

respond to a summary judgment motion because of the inability, through

no fault of that party, to acquire evidence which is available and would

preclude the entry of summary judgment.  *See Burlington Coat Factory*

*Warehouse Corp. v. Esprit de Corp.,* 769 F.2d 919, 925-27 (2d Cir. 1985);

*Crystalline H$_2$O, Inc. v. Orminski*, 105 F.Supp.2d 3, 6-9 (N.D.N.Y. 2000)

(McAvoy, J.).

In order to successfully assert a Rule 56(f) defense to a summary

judgment motion a litigant must provide specific indication, in affidavit

form, of the evidence sought, its relevance to the issues underlying the

motion, the efforts that were made to obtain that evidence, and why those

efforts have been unsuccessful.  *Hudson River Sloop Clearwater, Inc. v.*

─────────────────────

its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Despite the change in the form of the rule, its substance does not appear to have been
changed significantly.

*Department of Navy,* 891 F.2d 414, 422 (2d Cir. 1989) (citing *Burlington*,

769 F.2d at 926-27); s*ee also Trebor Sportwear Co., Inc. v. The Limited*

*Stores, Inc.*, 865 F.2d 506, 512 (2d Cir. 1989); *Young v. Corbin*, 889

F.Supp. 582, 584-85 (N.D.N.Y. 1995) (McAvoy, C.J.).

The affidavit submitted by Strasser's counsel in opposition to

defendants' motion falls short of carrying this burden.  Plaintiff's position

regarding the discovery necessary to meaningfully oppose the defendants'

exhaustion argument is summarized in two paragraphs of an affidavit

provided by his counsel, in which she states the following:

> 75.   With regard to Plaintiff's claims, Plaintiff has been unable to
> conduct any discovery to determine the policies, procedures,
> and practices of Defendants with regards to his claims.
> Specifically, Plaintiff is further entitled to Defendants' records
> of all grievances filed by Plaintiff, all records of disciplinary
> actions taken against Plaintiff, the personnel files of the
> Correctional Officers who had access to Plaintiff, and other
> such evidence pertinent to Plaintiff's claims.

> 76.   Further, it is imperative that Plaintiff depose Defendants' [sic]
> so that he can determine the timing of events, and discover
> the underlying purpose and processes that resulted in
> Defendants' actions as well as what communications that
> Defendants had with each other which are facts he is not
> privy to and has been unable to obtain pre-discovery.

Agola Aff. (Dkt. No. 28-1) ¶¶ 75-76.  These conclusory allegations are

insufficient to establish what evidence is sought, and, importantly, how it is

potentially relevant to the issues raised in the pending motion.  The

exhaustion portion of the motion, for example, focuses on plaintiff's filing

of grievances and pursuit of those grievances through to completion.  It

seems clear that plaintiff must have knowledge and access to information

concerning what efforts he made to complain internally regarding the

relevant requirements.

It is true, as will be seen, that plaintiff could successfully defeat

defendants' exhaustion of remedies affirmative defense by establishing a

basis to estop defendants from asserting the defense or showing that

prison officials impeded his ability to pursue grievances regarding the

matters now in issue.[9]  Once again, however, these potential counters to

the exhaustion defense are dependent upon facts presumably well within

plaintiff's knowledge and do not require discovery in order to be

developed.

Because I find plaintiff has failed to carry his burden of

demonstrating a basis for delaying adjudication of defendants' summary

judgment motion and first afford him an opportunity to engage in pretrial

discovery, I recommend rejection of his Rule 56(f) opposition to plaintiff's

---

[9]     *See* pp. 21-22, *post.*

14

motion.

C.   Failure to Exhaust

In their motion, defendants argue that plaintiff's excessive force, Eighth Amendment, and substantive due process claims are precluded by virtue of his failure to exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S. Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007).[10]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive

---

[10]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.

Ct. 983, 992 (2002) (citation omitted).  In the event a defendant named in

such an action establishes that the inmate plaintiff failed properly to

exhaust available remedies prior to commencing the action, his or her

complaint is subject to dismissal.  *See Pettus v. McCoy*, No. 04-CV-0471,

2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also

Woodford*, 548 U.S. at 94-95, 126 S. Ct. at 2387-88 (holding that the

PLRA requires "proper exhaustion" of available remedies).  "Proper

exhaustion" requires a plaintiff to procedurally exhaust his or her claims by

"compl[ying] with the system's critical procedural rules."  *Woodford*, 548

U.S. at 95, 126 S. Ct. at 2388; *see also Macias v. Zenk*, 495 F.3d 37, 43

(2d Cir. 2007) (citing *Woodford*).

     In a series of decisions rendered since the enactment of the PLRA,

the Second Circuit has crafted a three-part test for determining whether

dismissal of an inmate plaintiff's complaint is warranted for failure to

satisfy the PLRA's exhaustion requirement.[11]  *Macias*, 495 F.3d at 41; *see

Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir. 2004).  Under the

---

[11]     The question of whether the *Hemphill* test survives following the
Supreme Court's decision in *Woodford*, has been a matter of some speculation.  *See,
e.g.*, *Newman v. Duncan,* NO. 04-CV-395, 2007 WL 2847304, at * 2 n.4 (N.D.N.Y.
Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.) .

prescribed sequence, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times.  *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.  If such a remedy existed and was available, the court must next examine whether the defendants have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it or whether, through their own actions preventing the exhaustion of plaintiff's remedies, they should be estopped from asserting failure to exhaust as a defense.  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.  In the event the proffered defense survives these first two levels of scrutiny, the court lastly must examine whether special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[12]  *Macias*, 495 F.3d at 41; *Hemphill*, 380 F.3d at 686.

> a)   <u>Availability of Remedy</u>

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an

---

[12]    In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap.  *See Hargrove*, 2007 WL 389003, at *8 n.14); *see also Giano v. Goord*, 380 F.3d 670, 677 n.6 (2d Cir. 2004).

"available" remedy for purposes of the PLRA. *See Mingues v. Nelson*, No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)).  The IGP consists of a three-step review process.  First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[13]  7 N.Y.C.R.R. § 701.5(a).  The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance.  *Id.* §§ 701.4(b), 701.5(b).  If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision.  *Id.* § 701.5(c).  The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision.  *Id.* § 701.5(d).  Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court.  *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*,

---

[13]     The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances."  7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

Plaintiff's claims in this case implicate misconduct on the part of corrections officials.  In addition to the established IGP described above, the DOCS has implemented an expedited grievance process to address complaints of alleged staff harassment.[14]  7 N.Y.C.R.R. § 701.8; *see Perez v. Blott,* 195 F. Supp. 2d 539, 543 (S.D.N.Y. 2002) (describing expedited grievance process under prior relevant regulation, 7 N.Y.C.R.R. § 701.11, which has since been re-codified).  This expedited process is not exclusive, and does not preclude the filing of an ordinary grievance in the event of perceived staff harassment or retaliation.  *See* 7 N.Y.C.R.R. § 701.8(a).[15]  An inmate claiming harassment by a DOCS worker must file a grievance, which is then assigned a grievance number and, in the event of allegations of staff harassment, forwarded to the superintendent of the facility.  7 N.Y.C.R.R. § 701.8(b).  If, after reviewing the grievance, the superintendent finds it not to be facially meritorious, the matter reverts back to the IGRC for review.  7 N.Y.C.R.R. § 701.8(c).  If, on the other

---

[14]     Before utilizing this procedure, an inmate generally should first report any incident to an employee's supervisor.  7 N.Y.C.R.R. § 701.8(a).

[15]     The regulations pertaining to the grievance process describe harassment as any allegation involving "[e]mployee misconduct met to annoy, intimidate, or harm an inmate . . ."  7 N.Y.C.R.R. § 701.2(e); *see also* DOCS Directive No. 4040.

hand, the superintendent believes that an investigation is warranted, he or she may initiate an in-house investigation, or instead request investigation by the Inspector General's office.  7 N.Y.C.R.R. § 701.8(d).  Once the grievance is determined, which must occur within twenty-five business days of filing, *see*  7 N.Y.C.R.R. § 701.8(f), the inmate may appeal to the CORC, a step ordinarily required in order to satisfy the exhaustion requirement.  *See Singh v. Goord*, 520 F. Supp. 2d 487, 495 (S.D.N.Y. 2007) (indicating that appeal to the CORC is required to exhaust a prisoner's administrative remedies in New York State); *Sulton*, 2000 WL 1809284, at *4 (granting summary judgment for failure to exhaust administrative remedies where prisoner neglected to appeal to the CORC).

Despite an inmate's entitlement, in most instances, to file and pursue a grievance in accordance with the IGP, there are circumstances under which the grievance procedure nonetheless is deemed not to have been available to an inmate plaintiff.  *See Hemphill*, 380 F.3d at 687-88. Thus, for example, "[e]xhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, . . . or where defendants' behavior prevents plaintiff

20

from seeking administrative remedies." *Hargrove,* 2007 WL 389003, at *8

(citations omitted) (noting, for example, that a defendant's failure to

advance plaintiff's grievances or the issuance of threats against an inmate

to deter the filing of a grievance may effectively render the administrative

process unavailable).  When testing the availability of administrative

remedies in the face of claims that undue influence from prison workers

has caused a plaintiff inmate to forego the formal grievance process,

courts employ an objective test, examining whether "a similarly situated

individual of ordinary firmness [would] have deemed them available." *Id.*

at 688 (quotations and citations omitted); *see Hargrove,* 2007 WL 389003,

at *8.

<p style="text-align:center;">b)   <u>Presentation of Defense/Estoppel</u></p>

The second prong of the *Hemphill* analysis focuses upon "whether

the defendants may have forfeited the affirmative defense of non-

exhaustion by failing to raise or preserve it, or whether the defendants'

own actions inhibiting the inmate's exhaustion of remedies may estop one

or more of the defendants from raising the plaintiff's failure to exhaust as a

defense." *Hemphill,* 380 F.3d at 686 (citations omitted).

<p style="text-align:center;">c)   <u>Special Circumstances</u></p>

<p style="text-align:center;">21</p>

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676-77 (2d Cir. 2004); *Hargrove,* 2007 WL 389003, at *10.  Among the circumstances potentially qualifying as "special" under this prong of the test includes where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano*, 380 F.3d at 676-77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano*).

At first blush, defendants' exhaustion of remedies defense appears to be well-supported.  Based upon defendants' submissions, augmented by plaintiff's admission of facts set forth in defendants' Local Rule 7.1(a)(3) Statement, the record establishes that plaintiff did not file any grievances related to the events giving rise to his claims while at Franklin or at Bare Hill; and, while Strasser did later file a grievance concerning the matter while housed at the Southport Correctional Facility, it was rejected

22

as being almost ten months late.  Peary Aff. (Dkt. No. 26-2) ¶ 6; Boyea

Aff. (Dkt. No. 26-3) ¶ 6; Sabrina von Hagn Aff. (Dkt. No. 26-4) ¶¶ 6-9 and

Exhs. A, B; Defendants' Local Rule 7.1(a)(3) Statement of Facts (Dkt. No.

26-1) ¶¶ 19-21.  The record also reflects that no grievance appeals were

filed by plaintiff with the CORC.  Bellamy Aff. (Dkt. No. 26-5) ¶¶ 6-7;

Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 26-1) ¶ 23.

     Plaintiff contends that he complained to his teacher regarding the

initial sexual assault, and that because of his report an investigation was

conducted and the matter was the subject of a hearing.  Complaint (Dkt.

No. 1) ¶ 9; *see also* Plaintiff's Memorandum (Dkt. No. 28-2) at p. 4.  It is

clear that plaintiff is referring to is a Tier III hearing stemming from the

misbehavior report lodged against him by IG Investigator A. Misercola.

*See* Prack Aff. (Dkt. No. 26-6) Exh. D.  Plaintiff apparently argues that this

should have sufficed to place prison officials on notice of his claims.

     It is well-established that ordinarily, while placing prison officials on

notice of a complaint regarding prison conditions through less formal

channels may in appropriate circumstances constitute claim exhaustion

"in a substantive sense", an inmate plaintiff nonetheless must meet the

procedural requirements for exhausting his or her available administrative

remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)). Ordinarily, "[a]n appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for a [constitutional] claim, even if the hearing is based on the same set of facts underlying the grievance." *LaBounty v. Johnson*, 253 F. Supp.2d 496, 501-502 (W.D.N.Y. 2003) (citing *McNair v. Sgt. Jones*, No. 01 Civ. 3253, 2002 WL 31082948, *7 (S.D.N.Y. Sept. 18, 2002) (dismissing § 1983 where plaintiff failed to exhaust administrative remedies despite having appealed from disciplinary hearing on the same facts alleged in support of his excessive force claim). The focus of a disciplinary hearing is upon the conduct of the inmate and not that of prison officials. *Hairston v. LaMarche*, No. 05 Civ. 6642, 2006 WL 2309592, at *10 (S.D.N.Y. Aug. 10, 2006).

Under the special circumstances exception to exhaustion, however, "under certain circumstances, an inmate may exhaust his administrative remedies by raising his claim during a related disciplinary proceeding."[16] *Murray v. Palmer*, No. 9:03-CV-1010, 2010 WL 1235591,

---

[16]    It should be noted that "'an individual decision or disposition resulting from a disciplinary proceeding . . . is not grievable.'" *Murray*, 2010 WL 1235591, at * 3

at *3 (Mar. 31, 2010) (Suddaby, D.J.) (emphasis omitted) (citing *Giano*,

380 F.3d at 678-79; *Johnson*, 380 F.3d at 697).   In order to satisfy the

special circumstances exception, assuming its continued vitality

subsequent to the Supreme Court's decision in *Woodford*, plaintiff must

establish both a reasonable belief that his only available remedy was to

raise the claim as part of a tier disciplinary proceeding, and his claim must

have been articulated and pursued in such a manner that prison officials

were afforded the opportunity to thoroughly investigate the claim.  *Murray*,

2010 WL 1235591, at * 3 (citing *Giano*, 380 F.3d at 678-79).

    The circumstances of this case present a close question on

whether plaintiff can meet these two requirements.  Addressing the first

element, there is nothing in the record to reflect plaintiff's reasonable

belief that he had no alternative but to pursue the matters set forth in this

complaint through the disciplinary hearing process and could not file a

grievance regarding the matter.  Indeed, plaintiff in fact did file a grievance

regarding the alleged assault, although it was ultimately rejected as

untimely.  Since defendants initially moved for summary judgment and

carried their burden of demonstrating the lack of genuinely disputed

---

(quoting 7 N.Y.C.R.R. § 701.(3)(e)(2)).

material facts regarding their affirmative defense of exhaustion, it was incumbent upon plaintiff to come forward with proof regarding the reasonableness of his beliefs.  Plaintiff's opposition papers, however, fail even suggest that plaintiff thought that the assault by defendant Robar was not grievable under New York's IGP.

The second prong of the *Murray* exception, on the other hand, weighs heavily in favor of the finding of special circumstances.  In this instance, the question of whether plaintiff was sexually abused by Corrections Officer Robar, as alleged in his complaint, or instead fabricated the incident, was the subject of a thorough investigation leading up to the Tier III disciplinary hearing, and was the precise point of focus of the hearing as well as the hearing officer's determination.  Because it appears that little more could have been done by prison officials to address the situation had the plaintiff grieved the matter, I recommend a finding of special circumstances excusing the exhaustion requirement with regard to plaintiff's use of excessive force claim.[17]

---

[17]     Plaintiff's disciplinary hearing does not appear to have involved the alleged harassment and acts of retaliation he claims to have endured following the incident and his reporting of it, including after his transfer into Bare Hill.  Accordingly, to the extent that the claims in his complaint could be construed as arising in part from those acts, plaintiff has not fulfilled his obligation to exhaust administrative remedies and has failed to demonstrate the existence of special circumstances warranting that

D.    Eleventh Amendment

In their motion defendants contend that plaintiff's claims against the state and its three agencies – the DOCS, the office of the IG, and the New York State Police – are subject to dismissal based upon sovereign immunity.  In response plaintiff counters with his belief that he may properly assert claims under those municipal entities under *Monell*.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought.  *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978).  This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[18]

*Richards v. State of New York Appellate Division, Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S.

---

the exhaustion requirement be excused.  Those claims are therefore subject to dismissal on this procedural basis.

[18]    In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State.  As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment.  *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

27

85, 89-91, 102 S. Ct. 2325, 2328-29 (1982)).  To the extent that a state official is sued for damages in his official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[19] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Plaintiff contends that *Monell* directs a contrary result.  That position, however, is not well-taken.  *Monell* dealt with claims against local municipalities not covered by the Eleventh Amendment, as distinct from a state and its agencies.  *Fox v. Poole*, No.06CV148, 2008 WL 1867939, at *7 (W.D.N.Y. Apr. 24, 2008).  The Supreme Court's decision in that case thus provides no basis to permit plaintiff to assert claims against the state or its agencies, and all such claims should therefore be dismissed. *Id.* Similarly, to the extent that plaintiff has named the various individual defendants in their official capacities, his damage claims are also subject to dismissal since, in reality, they are damages claims the State of New York. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).

---

[19]     By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983.  *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

I therefore recommend dismissal of all claims brought by the plaintiff against the State of New York, the DOCS, the Office of the IG, and the New York State Police Department, as well as all claims against the individual defendants in their official capacities.

### E.    Plaintiff's Second Cause of Action

In his first cause of action plaintiff complains regarding Corrections Officer Robar's use of excessive force.  Though denominated as a claim brought under 42 U.S.C. § 1983 for excessive force without reference to the Eighth Amendment, instead citing the Fourth and Fourteenth Amendments, plaintiff's first cause of action is clearly bottomed principally on the Eighth Amendment's proscription against cruel and unusual punishment.[20]  Because plaintiff's second cause of action appears to be directed toward the same conduct and purports to allege a claim for

---

[20]      The constitutional provision typically cited as giving rise to an excessive force claim is the Eighth Amendment.  Here, plaintiff also raises the claim under the Fourteenth Amendment.  "The Second Circuit has found that . . . while the 'Fourteenth Amendment substantive due process [has] survived as a source of a federal right to be free from excessive force[,]' it does so only in the 'relatively unusual excessive force cases falling beyond the ambit of the Fourth and Eighth Amendments[,]' ... 'and [only] in the non-seizure, non-prisoner context.'"  *Molina v. New York*, 697 F.Supp.2d 276, 285 (N.D.N.Y. 2010) (citing and quoting *Rodriguez v. Phillips*, 66 F.3d 470, 477 (2d Cir.1995) (emphasis added)); *see also Blake v. Base*, No. 90-CV-0008, 1998 WL 642621, at *11 n. 22 (N.D.N.Y. Sept. 14, 1998) (McCurn, S.J.).  In any event, the standard to be applied in analyzing excessive force claims under the Fourteenth Amendment claim does not materially differ from that application under the Eighth Amendment. *See United States v. Walsh*, 194 F.3d 37, 47-48 (2d Cir. 1999).

"Deprivation of Plaintiff's Eighth Amendment Rights", though once again referencing the Fourteenth Amendment, defendants argue that it is duplicative of the First Cause of Action and should be dismissed on that basis.[21]

The precise nature of plaintiff's second cause of action is unclear. While its principal thrust appears to be directed toward defendant Robar's alleged use of excessive force, it has earmarks of a claim for the deprivation of procedural due process, as guaranteed under the Fourteenth Amendment, and a claim of negligence.  To the extent that the cause of action relates to plaintiff's allegations of excessive force and asserts a cause of action under the Eighth Amendment, it is duplicative of the first cause of action.  Any claim of violation of procedural due process under the Fourteenth Amendment embedded within plaintiff's second cause of action similarly is duplicative of his third cause of action.  And, as

---

[21]     In his second cause of action plaintiff also makes reference to the Fourth Amendment.  *See* Plaintiff's Complaint (Dkt. No. 1) ¶ 67.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ."  U.S. Const. Amend. IV. The basis for plaintiff Fourth Amendment claim in the first two causes of action is not illuminated.  Plaintiff's second cause of action specifies that it relates to the "Deprivation of Plaintiff's Eighth Amendment Right", and makes reference to both the use of excessive force, the disciplinary hearing and its result, and a "special duty of care" allegedly owed by the defendants to the plaintiff has a prisoner.  *Id.* at ¶¶ 70-81. There is no allegation in plaintiff's complaint of any unlawful search or seizure sufficient to support a Fourth Amendment claim.

defendants correctly note, a claim of negligence is not cognizable under section 1983.  *Medeiros v. O'Connell*, 150 F.3d 164, 170 (2d Cir. 1998) (citing *Daniels v. Williams*, 474 U.S. 317, 328, 106 S. Ct. 662, 663 (1986)); *see also Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 295, 292 (1976).

Based upon these considerations I recommend dismissal of plaintiff's second cause of action as failing to add a cognizable claim not otherwise appearing elsewhere in plaintiff's complaint.

F.    Procedural Due Process: Tier III Hearing

Plaintiff's third cause of action attacks a disciplinary hearing which resulted in both a finding of guilt and a penalty including, *inter alia*, a recommended twenty-four-month loss of good time credits.  Defendants challenge the legal sufficiency of that claim in light of the good time credit loss and plaintiff's failure to first challenge and successfully overturn the hearing result, relying principally upon Supreme Court's decision in *Muhammad v. Close*, 540 U.S. 749, 124 S. Ct. 1303 (2004).

In 1997, the Supreme Court issued its decision in *Edwards v. Balisok*, 520 U.S. 641, 117 S. Ct. 1584 (1997), in which it held that a claim for damages for a violation of procedural due process in the context of a

31

prison disciplinary hearing is not cognizable under section 1983 where the nature of the challenge to the procedures followed necessarily implies the invalidity of the judgment and/or punishment imposed, unless the disciplinary disposition has already been reversed through a state administrative or judicial proceeding or a habeas proceeding.  *Balisok*, 520 U.S. at 645, 117 S. Ct. at 1588-89.  Since that decision was rendered, the Second Circuit has interpreted it to differentiate between those cases involving challenges to disciplinary penalties that only affect the conditions of an inmate's confinement – including disciplinary segregation such as keeplock and solitary confinement – and those resulting in imposition of sanctions impacting upon an inmate's good-time credits.  *Jenkins v. Haubert*, 179 F.3d 19, 22-23 (2d Cir. 1999).  Applying *Balisok*, the Second Circuit concluded in *Jenkins* that a plaintiff challenging only the conditions of his or her confinement, where no good time credits have been lost as a result of the disciplinary hearing, need not show as a threshold matter that the disciplinary hearing decision and sentence were reversed or invalidated.  *Id.* at 27.  Since the plaintiff in *Jenkins* was not attacking the fact or length of his confinement, either directly or indirectly, it was not necessary for him to invalidate the prison hearing officer's judgment

32

against him prior to bringing a section 1983 claim for damages.  *Id.*

Notwithstanding the rule announced in *Edwards* and carried over into the Supreme Court's later decision in *Muhammad,* the Second Circuit has clarified that if, as a prerequisite for maintaining his or her section 1983 action, a prisoner agrees to and can successfully abandon once and for all the portion of a challenge directed to the duration of incarceration, then his or her success in the section 1983 action would have no affect on the sanctions that relate to the length of time served in prison, and accordingly the inmate can proceed with pursuit of a due process claim. *Peralta v. Vasquez*, 467 F.3d 98, 105 (2d Cir. 2006).  Under *Peralta's* limited exception to the rule in *Edwards*, in order to pursue his section 1983 due process claim the plaintiff must therefore abandon, not just now but for all time, any claims he may have with respect to the duration of his confinement that arise out of the proceeding now challenged.  *Id.* at 104.

To date, plaintiff has not manifested any willingness to forego any challenge to any sanctions resulting from the hearing determination that potentially affect the duration of his confinement.  Unless and until that occurs, his procedural due process claim is barred by the rule enunciated in *Muhammad* and *Edwards*.  Accordingly, I recommend that unless

33

plaintiff definitively indicates to the court, in filing objections to this report or otherwise, that he intends to forego all such claims affecting the duration of his confinement, his procedural due process cause of action as set forth in third claim should be dismissed, without prejudice.

### G.   Procedural Due Process: Tier II Hearing

Although this is not entirely clear from plaintiff's complaint, the procedural due process claim set forth in his third cause of action could be construed to also challenge the issuance of a misbehavior report in or about October 2009, and leading to a Tier II hearing.  Defendants also seek dismissal of this claim.

At the outset, it should be noted that to successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  In this case, pursuant to DOCS regulations, a Tier II hearing cannot result in the imposition of more disciplinary confinement than thirty days.  7 N.Y.C.R.R.

§§ 253.7, 270.3.  It is well established that standing alone, absent more, a period of keeplock or SHU disciplinary confinement of thirty days or less does not rise to a constitutionally significant level.  *Rodriguez v. McGinnis*, 1 F. Supp.2d 244, 248 (S.D.N.Y. 1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock . . . confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin*.") (quoting *Williams v. Keane*, No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)).  I note further that plaintiff's complaint does not reveal whether he served any time in disciplinary confinement as a result of the Tier II hearing prior to administrative reversal of its disposition.  Although it is doubtful that he did, given that at the time of the hearing he was already serving a thirty-month period of disciplinary SHU confinement as a result of his Tier III hearing held in July of 2009.  In the face of defendants' summary judgment motion plaintiff has thus failed to establish the deprivation of a cognizable liberty interest sufficient to trigger due process protection with respect to his Tier II hearing.

Additionally, the only allegation associated with that Tier II hearing is against defendant Fluman, who is alleged to have authored what

35

plaintiff claims is a false misbehavior report.  There is no cognizable claim, under the Eighth Amendment or otherwise, based solely upon the issuance of a false misbehavior report.[22]  *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986), *cert. denied*, 485 U.S. 982, 108 S. Ct. 1273 (1988)).  Accordingly, this being the only claim against him, defendant Fluman is entitled to dismissal from the action.

IV.    SUMMARY AND RECOMMENDATION

The centerpiece of plaintiff's complaint in this action is his claim that he was sexually assaulted by a corrections officer and that thereafter officials within the DOCS, and the IG's office and the New York State Police conducted a sham investigation which resulted not only in a failure to adduce the officer's misbehavior, but in the pursuit of criminal and disciplinary charges against Strasser for allegedly fabricating the incident.  While plaintiff plainly did not file and pursue to completion a grievance

---

[22]    A false misbehavior report issued in retaliation for protected activity, on the other hand, can give rise to a claim under the First Amendment.  *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).  There is no allegation in plaintiff's complaint, however, that the misbehavior report involved was issued in retaliation for constitutionally protected activity.  Moreover, any such claim would be barred based upon plaintiff's failure to exhaust available administrative remedies before asserting the claim in this action, *see* pp. 15 - 26, *ante*.

arising from that incident, I find the existence of special circumstances warranting that he be excused from that requirement with regard to the claim of the abuse, though not as to ancillary claims that he was subsequently harassed by other prison officials.

Turning to the merits of plaintiff's claims, I find that his second cause of action is duplicative of the first and third and further asserts a claim of negligence not cognizable under section 1983, and therefore recommend that it be dismissed. I similarly recommend that plaintiff's due process cause of action be dismissed based upon his failure to successfully overturn the results of the Tier III hearing involved unless he informs the court, in writing, that he agrees not to pursue any due process claims stemming from the loss of good time credits potentially affecting the length of his incarceration.  Additionally, I recommend dismissal of all of plaintiff's claims against the state and its various agencies, as well as the defendants in their official capacities, on the basis of sovereign immunity.   Finally, I recommend dismissal of all claims against defendant Fluman, who has not yet appeared in the action, without prejudice, since the only claim against him stems from the alleged issuance of a false misbehavior report, a claim not cognizable under section 1983.

37

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 26) be GRANTED, in part, and that plaintiff's second cause of action be DISMISSED, all claims against defendant corrections officer Fulman be DISMISSED, and additionally that plaintiff's third cause of action be DISMISSED unless he submits to the court within fourteen (14) days of the date of this report and recommendation a written statement that he is willing to forego any potential claim arising out of the Tier III hearing determination that might affect the length of his incarceration, and further that all claims against defendant New York State, the DOCS, the Office of the IG, and the New York State Police as well as all claims against the remaining defendants in their official capacities be DISMISSED, and further that plaintiff's first and fourth causes of action be limited to claims surrounding the alleged sexual abuse by defendant corrections officer Robar, but that defendants' motion otherwise be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

ORDERED that the clerk is also serve a copy of the Report and

Recommendation upon the parties in accordance with this court's local

rules.

Dated:        December 17, 2010
              Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Shawn Michael SNYDER, Plaintiff,
v.
Glenn S. GOORD, et al., Defendants.
**Civil Action No. 9: 05-CV-01284.**

March 29, 2007.

Shawn Michael Snyder, Pro Se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Christopher W. Hall, Esq., Assistant Attorney
General, of counsel, Albany, NY, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred by this Court to the Hon. David E.
Peebles, United States Magistrate Judge, for a
Report-Recommendation pursuant to 28 U.S.C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). The Report,
Recommendation and Order dated February 27, 2007
recommended

that defendants' motion for summary judgment
dismissing plaintiff's complaint (Dkt. No. 20) be
GRANTED, in part, and that plaintiff's legal mail claim
be DISMISSED in its entirety, and further that all
remaining claims be DISMISSED as against defendants
Goord, Roy, Plescia and Miller, but that it otherwise be
DENIED, and that the matter proceed with regard to

plaintiff's constitutional claims against defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility.

Rep., Rec. & Ord., p. 33.

Plaintiff and Defendants have filed objections to the
Report-Recommendation. When objections to a magistrate
judge's Report-Recommendation are lodged, the Court
reviews the record *de novo. See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or
recommendations made by the magistrate [judge]. The
[Court] may also receive further evidence or recommit the
matter to the magistrate [judge] with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Peebles for the reasons stated in the
February 28, 2007 Report-Recommendation with one
modification as set forth below.

In this regard, it is hereby

**ORDERED** that Defendants' motion for summary
judgment [dkt. No. 20] is **GRANTED in part and
DENIED in part.** Plaintiff's legal mail claim is
**DISMISSED in its entirety.** Further all remaining claims
against Defendants Goord, Roy, Plescia and Miller are
**DISMISSED.** The motion is denied with regard to
Plaintiff's constitutional claims against Defendants
Whittier and Funnye based upon events occurring at the
Washington Correctional Facility, but Defendants are
**granted leave to renew** the motion following a period of
discovery. Accordingly, Defendants may assert in their
renewed motion, should they decide to file one, that
Plaintiff failed to exhaust his administrative remedies by
failing to promptly file a grievance once at Groveland
Correctional Facility.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

**IT IS SO ORDERED.**

*REPORT, RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Shawn Michael Snyder, an openly gay New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 to complain principally of a series of occurrences which he attributes to his sexual orientation, including harassment by prison workers and fellow inmates and, in one instance, an assault by a corrections officer. Plaintiff's complaint, which is comprehensive, asserts constitutional claims under the First, Fourth, Eighth and Fourteenth Amendments arising out of those incidents as well as his apparently unsuccessful efforts to contact the National Gay and Lesbian Task Force to elicit that agency's assistance.

*2 In lieu of answering his complaint, defendants have instead moved for summary judgment dismissing plaintiff's claims based upon his failure to exhaust available administrative remedies before commencing suit and, in the case of some of the defendants and one entire claim, plaintiff's failure to allege and establish their personal involvement in the constitutional deprivations at issue. For the reasons set forth below I recommend that plaintiff's claims against defendants Goord, Roy, Miller and Plescia, as well as his cause of action for alleged interference with his legal mail, be dismissed on the basis of a lack of sufficient personal involvement in the constitutional violations alleged. Finding the existence of a genuine issue of material fact surrounding plaintiff's efforts to exhaust administrative remedies, however, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's remaining claims on this procedural basis be denied.

I. *BACKGROUND* [FN1]

> FN1. The vast majority of the information serving as a backdrop for the court's decision is

drawn from plaintiff's complaint which, as notarized, qualifies as a functional equivalent of an affidavit for purposes of the pending motion. 28 U.S.C. § 1746 (1994); Fed.R.Civ.P. 56(e); *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1998) (citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir .1995); *Yearwood v. LoPiccolo,* No. 95 CIV. 2544, 1998 WL 474073, at *5-*6 & n. 2 (S.D.N.Y. Aug. 10, 1998); *Ketchmore v. Gamache,* No. 96 CIV. 3004, 1997 WL 250453, at *4 n. 1 (S.D.N.Y. May 12, 1997). As required, for the purpose of analyzing defendants' arguments I have drawn all inferences, and resolved any ambiguities, in favor of the plaintiff, as the non-moving party. See *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Plaintiff, who at the times relevant to his claims was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), has over time been confined in various DOCS facilities. Complaint (Dkt. No. 2) at 2. The bulk of plaintiff's claims were precipitated by events which transpired while he was housed in the Washington Correctional Facility ("Washington") although, as will later be seen, certain of the occurrences which followed his transfer out of Washington and ultimately into the Groveland Correctional Facility ("Groveland") are relevant to some of his claims, as well as to the issue of whether he properly exhausted available administrative remedies before commencing this action. *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 4. The plaintiff is gay, a fact which according to him was common knowledge within Washington during the time of his confinement within that facility. Complaint (Dkt. No. 2) ¶ 2.

The circumstances giving rise to plaintiff's centerpiece claim date back to May of 2005, when he was transferred from another location within Washington into the prison's B-2 housing dormitory. Complaint (Dkt. No. 2) ¶ 1. Immediately following that transfer Snyder began to experience verbal threats and abuse, attributed by the plaintiff to his sexual orientation, at the hands of defendant Whittier, a corrections officer. *Id.* ¶ 1. According to Snyder the abuse spread, fueled by encouragement from defendant Whittier, resulting in harassment from fellow

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

inmates, who engaged in a variety of abusive and hostile acts which included the throwing of trash, objects, debris and body fluids at him. *Id.* ¶¶ 2-27.

Defendant Whittier's ongoing harassment of the plaintiff led to a confrontation between the two on June 1, 2005, during the course of which Snyder was physically assaulted by the officer, who thrust his elbow and forearm into plaintiff's throat, forcing him to the floor. *Id.* ¶¶ 24-36. Once plaintiff was on the floor, defendant Whittier placed his knees on Snyder's middle back area and neck, and pulled his left arm up behind his back. *Id.* Toward the end of the encounter defendant Whittier pulled the plaintiff up by his arm and hair and dragged him out of the area, pushing him into a wall and punching his kidney area several times in the process. *Id.* ¶ ¶ 33-39.

*3 On June 3, 2005 plaintiff was treated for injuries sustained during the encounter with Corrections Officer Whittier, and was transferred into the E-1 dormitory within Washington. Complaint (Dkt. No. 2) ¶¶ 47, 51. While housed in that unit Snyder was approached and advised by several inmates that they had been encouraged by other inmates, as well as by defendant Whittier, to assault him. *Id.* ¶¶ 51-54.

Plaintiff was again transferred within Washington on or about June 20, 2005, on this occasion having been re-assigned to the D-1 housing dormitory. Complaint (Dkt. No. 2) ¶ 57. While residing within that unit, plaintiff had his locker broken into and some of his personal property stolen, an event for which he blames fellow inmates. *Id.* ¶¶ 70.

Out of concern over reprisals which could result from his taking such action, plaintiff did not file a formal grievance regarding the assault by Corrections Officer Whittier while at Washington. Complaint (Dkt. No. 2) ¶¶ 51-54. As justification for that fear, plaintiff cites defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which Whittier was assigned. *Id.* Plaintiff did, however, take other steps while at Washington to lodge complaints regarding defendant Whittier's actions. After earlier complaints registered verbally to other prison employees,

including Corrections Officers Funnye and Graves, went unaddressed, *see* Complaint (Dkt. No. 2) ¶¶ 21, 42, plaintiff sent a letter dated July 7, 2005 to Corrections Lieutenant Greene, complaining of the assault by defendant Whittier and expressing fear of retribution at the hands of that corrections officer; a copy of that letter was forwarded by Snyder to Corrections Lieutenant Hopkins.[FN2] Complaint (Dkt. No. 2) ¶ 60 & Exh. 1. Five days later, apparently precipitated by his letter to Lieutenant Greene, plaintiff was asked by Corrections Sergeant Belden to provide a formal, written statement regarding the assault, and was taken by Sergeant Belden to the prison infirmary for a medical evaluation. Complaint (Dkt. No. 2) ¶ 61.

> FN2. Plaintiff's complaint does not provide specifics regarding the official positions of Lieutenants Greene and Hopkins including, notably, whether either could properly be characterized as Corrections Officer Whittier's supervisor, nor does he indicate whether those individuals were officially designated by prison officials at Washington to receive inmate complaints regarding the actions of corrections workers.

On July 14, 2005, plaintiff was transferred temporarily into the Great Meadow Correctional Facility, where he was interviewed on the following day by defendant Miller, an Assistant Deputy Inspector General for the DOCS, regarding the alleged assault by defendant Whittier. Complaint (Dkt. No. 2) ¶¶ 62-64. During that session, defendant Miller advised Snyder that he had been transferred out of Washington for his safety, and that in light of his sexual orientation and the significant probability that similar acts would recur in the future, his contemplated transfer into the Greene Correctional Facility had been rescinded, and instead he would be moved "West and closer to home [.]" *Id.* ¶ 66. Later that day, plaintiff was transferred into the Groveland Correctional Facility. *Id.* ¶ 67.

Plaintiff reiterated his interest in pursuing his claims against Corrections Officer Whittier by letter dated July 22, 2005 sent to Investigator Miller. Complaint (Dkt. No. 2) Exh. 3. Despite sending subsequent written

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

communications to defendant Miller and others, however, as of the time of commencement of this action plaintiff still had not been apprised of the status of the Inspector General's investigation into his allegations regarding Corrections Officer Whittier. *Id.* ¶¶ 67-69; *see also* Complaint (Dkt. No. 2) Exhs. 9, 17.

**\*4** On August 24, 2005, while at Groveland, plaintiff filed a formal grievance regarding the physical assault involving Corrections Officer Whittier. Complaint (Dkt. No. 2) ¶ 76 and p. 60, ¶ B. That grievance was rejected, however, based upon the fact that it was filed beyond the fourteen day deadline for initiating such grievances, and did not recite any mitigating circumstances which would provide a ground for overlooking its lateness.[FN3] *Id.; see also* O'Brien Aff. (Dkt. No. 20) ¶ 8 & Exh. 2; Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 22) ¶ 27. Plaintiff did not appeal that determination, or any other grievance alleging harassment, excessive force, or other similar claims arising out of events at Washington, to the Central Officer Review Committee ("CORC"). Eagan Aff. (Dkt. No. 20) ¶¶ 5-6.

> **FN3.** DOCS Directive 4040, which governs the filing of inmate grievances, permits an Inmate Grievance Program Supervisor ("IGPS") to permit the late filing of grievances when presented with "mitigating circumstances." *See* O'Brien Aff. (Dkt. No. 20) ¶ 12.

On August 19, 2005 plaintiff endeavored to send a letter to the National Gay and Lesbian Task Force seeking the assistance of that organization; claiming that it qualified as legal mail, Snyder attempted to forward that communication without paying for postage. Complaint (Dkt. No. 2) ¶ 71. Prison officials rejected plaintiff's efforts, however, concluding that the communication did not fall within the prevailing definition of legal mail, and returned it to the plaintiff on August 22, 2005. *Id.* Plaintiff thereafter resent the letter on August 23, 2005, with proper postage affixed. *Id.* ¶ 72. The letter was later returned to the plaintiff on September 2, 2005, marked as "undeliverable". *Id.* ¶ 73. When the letter was returned plaintiff found that it had been opened, apparently by personnel within the Groveland mailroom. *Id.*

On August 29, 2005 plaintiff filed a grievance at Groveland seeking, as relief, a determination that the National Gay and Lesbian Task Force constituted a legal entity and that, as such, he should be permitted to send and receive correspondence from that organization as "legal mail". *Id.* ¶ 74 & Exh. 16. Plaintiff's grievance was denied at the local level, including by the facility superintendent, and that unfavorable determination was upheld on appeal to the CORC. *Id.* ¶ 75 & Exh. 16.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about September 27, 2005.[FN4] Dkt. No. 2. Named as defendants in Snyder's complaint are DOCS Commissioner Glenn S. Goord; Richard Roy, the DOCS Inspector General; Assistant Deputy Inspector General Mark Miller; James Plescia, the Superintendent at Washington; and Corrections Officers Whittier and Funnye. *Id.* Plaintiff's complaint asserts a variety of claims growing out of the events at Washington and Groveland, alleging deprivation of his rights under the First, Fourth, Eighth and Fourteenth Amendments to the United States Constitution, as well as a host of pendent state statutory and common law claims.[FN5] As relief, plaintiff seeks both the entry of an injunction and awards of compensatory and punitive damages.

> **FN4.** This action was initially filed in the United States District Court for the Western District of New York, but was transferred here by order issued by District Judge David G. Larimer on September 29, 2005. *See* Dkt. No. 4.

> **FN5.** Plaintiff's complaint, which is comprised of seventy-two typewritten pages and several attached exhibits, is not lacking in detail. Despite its refreshing clarity, however, plaintiff's complaint is in many respects repetitive and fails to comply with the governing provisions of the Federal Rules of Civil Procedure which require, *inter alia,* that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed.R.Civ.P. 8(a). This requirement is more than merely technical, and instead is designed to permit a responding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

party and the court to accurately gauge the allegations of a complaint and permit the issues in a case to be properly framed. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103 (1957); *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988); *In re Ferro Corp. ERISA Litig.,* 422 F.Supp.2d 850, 857 (N.D.Ohio 2006); *Rashidi v. Albright,* 818 F.Supp. 1354, 1355-56 (D.Nev.1993).

**\*5** In lieu of answering plaintiff's complaint, defendants instead have chosen to interpose a motion seeking the entry of summary judgment. Dkt. No. 20. In that motion, which was filed on March 9, 2006, defendants assert that plaintiff's harassment and excessive force claims are procedurally barred based upon his failure to file and pursue to completion an internal grievance regarding those matters before commencing suit. *Id.* Defendants also argue that defendants Goord, Ray, Plescia, and Miller were not personally involved in any of the violations asserted, and that all of the defendants lack personal involvement with regard to plaintiff's legal mail cause of action. *Id.* Plaintiff responded in opposition to defendants' motion on April 12, 2006, Dkt. No. 23, and defendants have since filed a reply in further support of their motion. Dkt. No. 23.

Defendants' motion, which is now ripe for a determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Consequences of Defendants' Failure to Answer or Move to Dismiss*

While plaintiff has not raised this issue, one could argue that by their failure either to answer or to interpose a motion cognizable under Rule 12(b) of the Federal Rules of Civil Procedure within the allotted time, defendants are in default. Defendants' motion is brought under Rule 56 of the Federal Rules of Civil Procedure and does not, as an

alternative, seek dismissal under Rule 12(b). While Rule 12(b) of the Federal Rules of Civil Procedure contains a specific provision in effect staying the requirement of answering a complaint during the pendency of a motion brought under its provision, Rule 56 does not contain a parallel provision.

Some courts confronted with this procedural setting have concluded that the interposition of a motion for summary judgment qualifies as otherwise defending against a complaint, and that as such no default is presented under the circumstances. *See, e. g., Rashidi,* 818 F.Supp. at 1355-56. Other courts, however, have noted that there is no automatic entitlement to a delay of the time to answer as a result of the filing of a summary judgment motion, the matter instead being addressed to the discretion of the court to extend that period, as authorized under Rule 6(b) of the Federal Rules of Civil Procedure.[FN6] *See, e.g., Poe v. Cristina Copper Mines, Inc.,* 15 F.R.D. 85, 87 (D.Del.1953).

> FN6. That rule provides, in relevant part, that

> > [w]hen by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion (1) with or without motion or notice order the period enlarged.

> Fed.R.Civ.P. 6(b).

Since this is not a situation where a motion to dismiss was initially filed but converted by the court to a summary judgment motion, a circumstance which would warrant a finding that the stay provisions of Rule 12 apply, *see Brooks v. Chappius,* No. 05-CV-6021, 2006 WL 559253, at \*1 (W.D.N.Y. Mar. 1, 2006), defendants are technically in default. In light of the circumstances presented, however, I find that the defendants have demonstrated their intention to defend against plaintiff's claims and, concluding that there is good cause for doing so, will order a stay of their time to answer plaintiff's complaint until ten days after a determination by the assigned district judge in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

connection with the pending motion. *See Rashidi,* 818
F.Supp. at 1355-56.

B. *Summary Judgment Standard*

**\*6** Summary judgment is governed by Rule 56 of the
Federal Rules of Civil Procedure. Under that provision,
summary judgment is warranted when "the pleadings,
depositions, answers to interrogatories, and admissions on
file, together with the affidavits ... show that there is no
genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law."
Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S.
317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505,
2509-10 (1986); *Security Ins. Co. of Hartford v. Old
Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d
Cir.2004). A fact is "material", for purposes of this
inquiry, if "it might affect the outcome of the suit under
the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct.
at 2510; *see also Jeffreys v. City of New York,* 426 F.3d
549, 553 (2d Cir.2005) (citing *Anderson). A material fact
is genuinely in dispute "if the evidence is such that a
reasonable jury could return a verdict for the nonmoving
party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.
Though *pro se* plaintiffs are entitled to special latitude
when defending against summary judgment motions, they
must establish more than merely "metaphysical doubt as
to the material facts." *Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348,
1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168
F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court
to consider whether *pro se* plaintiff understood nature of
summary judgment process).

When summary judgment is sought, the moving party
bears an initial burden of demonstrating that there is no
genuine dispute of material fact to be decided with respect
to any essential element of the claim in issue; the failure to
meet this burden warrants denial of the motion. *Anderson,*
477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,*
391 F.3d at 83. In the event this initial burden is met, the
opposing party must show, through affidavits or otherwise,
that there is a material issue of fact for trial. Fed.R.Civ.P.
56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553;
*Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must
resolve any ambiguities, and draw all inferences from the
facts, in a light most favorable to the nonmoving party.
*Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d
133, 137-38 (2d Cir.1998). Summary judgment is
inappropriate where "review of the record reveals
sufficient evidence for a rational trier of fact to find in the
[non-movant's] favor." *Treglia v. Town of Manlius,* 313
F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also
Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary
judgment is appropriate only when "there can be but one
reasonable conclusion as to the verdict.").

C. *Failure to Exhaust Administrative Remedies*

**\*7** In their motion defendants assert that plaintiff's
harassment and assault claims growing out of events which
occurred at Washington are procedurally barred, based
upon his failure to file and pursue to completion a timely
grievance relating to those claims. Plaintiff responds by
asserting that his failure to file a grievance regarding the
matter while at Washington was the product of his fear of
retaliation, and further argues that the requirement of
exhaustion should be excused based upon the fact that his
claims were, in fact, investigated by the DOCS Inspector
General.

The Prison Litigation Reform Act of 1996 ("PLRA"),
Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the
inmate litigation landscape considerably, imposing several
restrictions on the ability of prisoners to maintain federal
civil rights actions. One such restriction introduced by the
PLRA requires that "[n]o action shall be brought with
respect to prison conditions under section 1983 of this
title, or any other Federal law, by a prisoner confined in
any jail, prison, or other correctional facility until such
administrative remedies as are available are exhausted."
42 U.S.C. § 1997e(a). The Supreme Court has held that
the "PLRA's exhaustion requirement applies to all inmate
suits about prison life, whether they involve general
circumstances or particular episodes, and whether they
allege excessive force or some other wrong." *Porter v.
Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).
The PLRA's exhaustion requirement thus applies to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

plaintiff's excessive force claims absent a finding of sufficient basis to find that plaintiff's failure to exhaust was justified or should be excused. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

> FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

**\*8** The record before the court confirms Snyder's awareness of New York's IGP. Plaintiff in fact grieved the failure of prison officials at Groveland to treat his correspondence to the National Gay and Lesbian Task Force as legal mail and unsuccessfully pursued that grievance through to a determination by the CORC. Accordingly-and defendants do not argue otherwise-plaintiff has fulfilled his obligation to exhaust

administrative remedies with regard to his legal mail claim before commencing this action.

Distinctly different circumstances obtain with regard to plaintiff's claims of the use of excessive force and harassment by prison officials and fellow inmates. While plaintiff did file a grievance regarding those matters, the grievance was rejected as untimely, and that determination was neither appealed to the CORC, nor did plaintiff commence a second grievance challenging the untimeliness rejection, a course which was apparently available to him under the IGP.[FN8]

> FN8. Although there is no need to address this argument since plaintiff failed to pursue the matter through to the CORC, had he done so with regard to the excessive force and harassment grievance filed at Groveland, he nonetheless would have failed to satisfy the PLRA's exhaustion requirement since, as the Supreme Court has now made clear, the filing and pursuit to completion of an untimely grievance does not satisfy the Act's exhaustion requirement. *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2382 (2006).

This is not to say that plaintiff cannot be said to have exhausted available administrative remedies. It should be noted that the three tiered IGP set forth in the controlling regulations does not describe the sole method for a New York State prison inmate to complain of prison conditions including, notably, the use of excessive force. *Heath v. Saddlemire,* No. 9:96-CV-1998, 2002 WL 31242204, at *4 (N.D.N.Y. Oct. 7, 2002). Indeed, the IGP regulations themselves provide that the three tiered mechanism " 'is intended to supplement, not replace, existing formal or informal channels of problem resolution.' " *Id.* (quoting 7 N.Y.C.R.R. § 701.1(a)). One of those alternative methods is a process for informal, expedited review of allegations of harassment by prison officials. 7 N.Y.C.R.R. § 701.11; *Perez,* 195 F.Supp.2d at 543. In this instance, an issue of fact exists surrounding whether plaintiff complied with section 701.11 by submitting a letter regarding Corrections Officer Whittier's actions to Lieutenant Greene. *See Perez,* 195 F.Supp.2d at 543.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Even assuming that plaintiff's efforts to address Corrections Officer Whittier's actions by writing to Lieutenant Green did not suffice to exhaust available remedies, the court must determine whether there is a basis to overlook this deficiency and permit the plaintiff to nonetheless proceed with his excessive force and harassment claims. The situations under which courts have excused an inmate's failure to comply with the IGP's three tier system generally one or more of the categories, including when 1) administrative remedies are not in fact available to the prisoner; 2) the defendants have either waived the defense or engaged in conduct which should estop them from raising it; and 3) other special circumstances, including a reasonable misunderstanding of the grievance procedure, which justify the inmate's failure to comply with the applicable administrative procedural requirements.[FN9] *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also Ruggiero,* 467 F.3d at 175 (citing *Hemphill* ). If the court deems any of these three categories applicable, then plaintiff's claims may be considered exhausted and should not be dismissed.[FN10] *Hemphill,* 380 F.3d at 690-91.

FN9. As this case aptly illustrates, many of the typical fact patterns presented in cases involving an inmate's failure to exhaust do not fit neatly into any single category, but instead may overlap into two, or potentially even all three, of the groupings identified in *Hemphill. See Giano v. Goord,* 380 F.3d 670, 677 n. 6. This fact may well account for a blurring of these categories in a large share of Second Circuit PLRA cases. *Id.*

FN10. Relying upon case law which has since been supplanted in light of the Supreme Court's contrary decision in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983 (2002), plaintiff argues that he was not required to exhaust administrative remedies in light of the nature of his claim. The case upon which Snyder principally relies, however, *Lawrence v. Goord,* 238 F.3d 182 (2d Cir.2001), has since been vacated, 535 U.S. 901, 122 S.Ct. 1200 (2002), and the Court has now made it clear in *Porter* that PLRA's exhaustion requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and

whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992; *Ruggiero,* 380 F .3d at 173 (citing *Porter* ). The contention implicit in plaintiff's argument, to the effect that his reliance upon pre-*Porter* case law as a basis for not filing a formal grievance was appropriate, citing *Rodriguez v. Westchester County Jail Correctional Dept.,* 372 F.3d 485 (2d Cir.2004), is misplaced, since *Porter* was decided some three years prior to the events at issue.

*1. Availability Of Administrative Remedies*

**\*9** Under certain circumstances the behavior of prison officials may have the legal affect of rendering administrative remedies functionally unavailable. *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). In such cases, the finding that the three tiered IGP was open to the plaintiff inmate does not necessary end the inquiry. *Hemphill,* 380 F.3d at 686-88. Like the plaintiff in *Hemphill,* Snyder argues that he was deterred from filing a grievance while at Washington in light of threats made against him, principally by Corrections Officer Whittier. As was also the situation in *Hemphill,* however, plaintiff did avail himself of other avenues of recourse including to write a letter of complaint to a corrections lieutenant, thereby potentially signaling that his claims of fearing retribution are less than genuine.

When, as in this case, an inmate asserts that his or her resort to the grievance process was deterred based upon conduct such as threats by prison officials, the question of whether a sufficient basis to negate a finding of "availability" has been established entails an objective inquiry, focusing upon whether " 'a similarly situated individual of ordinary firmness' [would] have deemed them available." *Id.* at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). Plaintiff's complaint and papers in opposition to defendants' motion, in which he asserts that his fears of retribution were based in part upon defendant Whittier's reported efforts to have him harmed by other inmates following his transfer out of the dormitory to which he had been assigned, raises genuine issues of material fact in connection with the objective test to be applied under *Hemphill,* thus precluding the entry of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

summary judgment.

Urging the court to disregard the strictures associated with evaluation of a summary judgment motion and to proceed to assess plaintiff's credibility, in reliance upon the Second Circuit's decision in *Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (characterizing plaintiff's version of the events as so wholly credible that no reasonable jury could believe it), defendants contend that plaintiff's claimed fear of retribution does not suffice under *Hemphill* to serve as a counterweight to the availability of the IGP in New York. I recommend that the court decline defendants' invitation to assure the role of factfinder, and instead find that plaintiff's assertion that he feared reprisal is sufficient to raise a genuine issue of material fact regarding whether administrative remedies were available to him.

2. *Waiver and Estoppel*

Since defendants have raised exhaustion of remedies, an affirmative defense, at the earliest available opportunity, they have not waived the defense. The circumstances now presented, however, do provide a basis upon which an estoppel could potentially be predicated.

Prison officials may be estopped from defending against an inmate civil rights action based upon the plaintiff's failure to exhaust available administrative remedies, including when "(1) an inmate was led to believe by prison officials that his alleged incident was not a 'grievance matter' and assured that his claims were otherwise investigated ... (2) an inmate makes a 'reasonable attempt' to exhaust his administrative remedies, especially where it is alleged that corrections officers failed to file the inmate's grievances or otherwise impeded or prevented his efforts, and (3) the state's time to respond to the grievance has expired." *Martinez v. Williams,* 349 F.Supp.2d 677, 683 (S.D.N.Y.2004) (citing and quoting, *inter alia, O'Connor v. Featherston,* No. 01 Civ. 3251, 2002 WL 818085, at *2-*3 (S.D.N.Y. Apr. 29, 2002)). Thus, for example, a defendant who fails to forward an inmate's complaint to a grievance officer in a timely manner may be estopped from invoking the defense. *Hemphill,* 380 F.3d at 688-89. Similarly, an estoppel may be found where

a defendant's use of force or threats inhibit an inmate's ability to utilize grievance procedures. *Ziemba v. Wezner,* 366 F.3d 161, 162-64 (2d Cir.2004).

**\*10** In this instance there is a potential basis for finding an estoppel. Plaintiff's complaints against Corrections Officer Whittier were the subject of an investigation by the DOCS Inspector General, a fact of which the plaintiff was keenly aware. Plaintiff's apparent belief that this investigation obviated the need for him to file a grievance regarding the issue was in all likelihood fortified when, in response to his grievance filed at Groveland, he was advised by the IGP Supervisor at that facility that if the matter had previously been brought "to some administration's attention [,] ... it is not necessary to have this matter readdressed." *See* Complaint (Dkt. No. 2) Exh. 12. This response may well have dissuaded the plaintiff from pursuing the matter further, including to press his otherwise untimely grievance to the CORC or to attempt to convince officials at Groveland that mitigating circumstances existed to accept his otherwise untimely grievance. *See* 7 N.Y.C.R.C. § 701.7(a)(1). Accordingly, in my view a reasonable factfinder could conclude that defendants should be estopped from asserting a defense based upon failure to exhaust.[FN11]

> FN11. It should be noted that fear of retribution can also provide a basis for finding that a defendant should be estopped from asserting failure to exhaust as a defense. *See Hemphill,* 380 F.3d at 688-89.

3. *Special Circumstances*

The third category of circumstances under which an inmate's failure to exhaust may be excused was addressed by the Second Circuit in *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004). In *Giano,* the court rejected the concept of a categorical statement regarding the "special circumstances" exception, instead, determining that the court should "[look] at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." 380 F.3d at 678.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

Defendants claim that plaintiff has not shown special circumstances which might explain why his grievance was late. Plaintiff counters that he should be entitled to the benefit of this special circumstances exception for two reasons. First, Snyder again asserts that his failure to file a grievance was motivated out of fear of retribution, based upon his efforts to seek review of the matter by the Inspector General's office. Additionally, plaintiff notes that his complaint regarding Corrections Officer Whittier was the subject of at least one letter to prison officials, resulting in an investigation by the DOCS Inspector General. Such efforts can provide a basis for finding exhaustion notwithstanding the technical failure of a prisoner to avail himself or herself of the three tiered IGP set forth in the governing regulations. See *Heath,* 2002 WL 31242204, at *4-*5; *Perez,* 195 F.Supp.2d at 545-46; *see also Marvin v. Goord,* 255 F.3d 40, 43 n. 3 (2d Cir.2001) ("Resolution of the matter through informal channels satisfies the exhaustion requirement, as, under the administrative scheme applicable to New York prisoners, grieving through informal channels is an available remedy."). In order to avail himself of this exception, however, plaintiff must demonstrate that his informal complaints led to a favorable resolution in communication with his charges of misconduct. *Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (rejecting plaintiff's argument that defendants' motion for summary judgment for failure to exhaust should be denied because although plaintiff complained to the Inspector General's Office, there were no allegations that his complaints resulted in a favorable resolution); *Grey v. Sparhawk,* No. 99 CIV. 9871, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) (complaint filed directly with the Inspector General found insufficient to fulfill exhaustion requirement); *cf. Giano,* 380 F.3d at 679 (finding that plaintiff's attempt to expose allegedly retaliatory behavior during a disciplinary hearing which centered upon the same retaliatory act which he complains provided a basis to find justification for plaintiff's failure to exhaust). While plaintiff is unable to make this claim, it is purely the product of the failure of prison officials to notify him of the results of the Inspector General's investigation despite his written requests for this information. I am therefore unable to state with certainty that plaintiff is not entitled to the benefit of the special circumstances exception to the PLRA's exhaustion requirement.

*11 In sum, applying the tripartite test announced in the Second Circuit's August, 2004 collection of exhaustion cases and their progeny, I find genuine issues of fact including summary judgment on the issue of plaintiff's alleged failure to exhaust available administrative remedies, and therefore recommend denial of defendants' motion to dismiss on this procedural basis.

### C. *Personal Involvement*

Turning to the merits of plaintiff's claims, defendants allege that Snyder's complaint discloses potential personal involvement in the events occurring at Washington on the part of only defendants Whittier and Funnye, and that none of them are implicated in the legal mail claims stemming from plaintiff's incarceration in Groveland. This, defendants argue, provides a basis for dismissal of certain of plaintiff's claims.

Personal involvement of a defendant in alleging a constitutional deprivation is a prerequisite to an award of damages against that person under section 1983 against that person. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

### 1. *Events at Washington*

The only defendants alleged by the plaintiff to have had direct involvement in or knowledge of the events at Washington are two corrections officers directly implicated, defendants Whittier and Funnye, as well as the Assistant Inspector General involved in the investigation of those matters, Mark Miller. Nothing in the record now before the court suggests any actual involvement of or awareness by DOCS Commissioner Goord, Inspector General Roy, or Washington Superintendent Plescia, in any of the relevant events. Instead, plaintiff's claims

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

against those defendants appear to be based purely upon their supervisory positions and Snyder's contention that by virtue of their roles, they must have known about the incident, or the very least should be charged with constructive knowledge of the constitutional violations alleged. These allegations are insufficient to implicate those defendants in the matters involved; it is well established that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501.

It is true that a supervisory official can be found liable in a civil rights setting such as that now presented in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986). The plaintiff, however, has failed to present any evidence which tends to establish a basis for finding liability on the part of defendants Goord, Roy, or Plescia under any of those theories. Accordingly, I recommend a finding that claims against them based upon lack of personal involvement.

**\*12** Plaintiff's claims against defendant Miller present a slightly different situation. Defendant Miller was charged with investigating the incident implicated in plaintiff's excessive force claims. At the time of the investigation, however, any harassment of him by Whittier had ended, and plaintiff had been transferred out of Washington. Plaintiff does not allege the existence of any lingering effects of the events at Washington, following his transfer out of that prison, which could have been prevented had defendant Miller acted to end the constitutional violations involved. Plaintiff's only quarrel with defendant Miller appears to be his failure, and the failure of his office, to notify him of the status of the investigation conducted in

response to his communications inquiring in that regard. This fact alone, however, provides no basis for a finding that defendant Miller was involved in the constitutional violations alleged. *Cf. Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citing *Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)).

2. *Plaintiff's Legal Mail Claims*

Plaintiff's legal mail claims involve actions taken by prison officials at Groveland, including those working in the prison mail room. None of the individuals named in plaintiff's complaint, however, was employed at Groveland, and plaintiff has identified no basis to conclude that any of them, including particularly DOCS Commissioner Goord, had any awareness of or involvement in the decision to deny legal mail status to his communications to the National Gay and Lesbian Task Force or to open his returned mail sent to that agency. Plaintiff's legal mail claim is subject to dismissal for failure to name, as a defendant, anyone proven to have been personally involved in that deprivation. *Bass,* 790 F.2d at 263.

IV. *SUMMARY AND RECOMMENDATION*

While plaintiff failed to file a grievance, and thereby avail himself of the comprehensive inmate grievance program offered to him as a New York State prisoner, to address the harassment allegedly endured at Washington at the hands of defendant Whittier and fellow inmates, in light of the existence of genuine issues of material fact I am unable to state that no reasonable factfinder could discern a proper basis exists to excuse this failure and find that plaintiff should not be barred on this procedural basis from pursuing his claims surrounding the events at Washington. I therefore recommend that defendants' motion for summary judgment dismissing plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)
(Cite as: 2007 WL 957530 (N.D.N.Y.))

excessive force and harassment claim on this procedural ground be denied. I do find, however, that plaintiff has failed to demonstrate the personal involvement of any of the defendants in his legal mail claim, and of defendants Goord, Roy, Plescia and Miller in connection with the claims growing out of events occurring at Washington, and therefore recommend that defendants' motion for summary judgment dismissing all claims against those defendants be granted.

**\*13** Based on the foregoing, it is hereby

ORDERED that the time within which defendants must answer plaintiff's complaint in this matter is hereby stayed and extended until ten days following the issuance of a decision by Senior District Judge Thomas J. McAvoy deciding the present summary judgment motion, or such other time as Judge McAvoy shall direct; and it is further

RECOMMENDED that defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 20) be GRANTED, in part, and that plaintiff's legal mail claim be DISMISSED in its entirety, and further that all remaining claims be DISMISSED as against defendants Goord, Roy, Plescia and Miller, but that it otherwise be DENIED, and that the matter proceed with regard to plaintiff's constitutional claims against defendants Whittier and Funnye based upon events occurring at the Washington Correctional Facility.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; Roldan v. Racette, 984 F.2d 85 (2d Cir.1993).

The clerk is directed to promptly forward copies of this order to the parties in accordance with this court's local rules.

N.D.N.Y.,2007.
Snyder v. Goord
Not Reported in F.Supp.2d, 2007 WL 957530 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C  Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski, 430 F.3d 560, 562 (2d
Cir.2005)*(deeming *pro* se prisoner's
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.FN4 Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.FN5 Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

**\*4** A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

**\*5** Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

(3)

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

*7 Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> **FN12.** Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams,* 418 F.Supp.2d at 101, 102 (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams,* 418 F.Supp.2d at 101 (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

### (4)

### No Grounds to Excuse Plaintiff's Failure to Exhaust

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14]*Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey*, 2006 WL 2109465, at *3-5. *See also Hemphill*, 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins*, No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord*, No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot*, No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen*, 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill*, 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane*, 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord*, No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero*, 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane*, 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez*, 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

**c. Special circumstances**

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8;Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests are given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

*12 Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### *DECISION and ORDER*

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

FN1. The following facts are taken from
Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
LaCream NEWMAN, Plaintiff,
v.
George B. DUNCAN, Superintendent of Great Meadow
Correctional Facility; David Carpenter, Deputy
Superintendent; Patrick Vanguilder, Deputy
Superintendent of Security; William Mazzuca,
Superintendent of Fishkill Correctional Facility; R.
Ercole, Deputy Superintendent of Security; J. Conklin,
Corrections Sergeant; and John Doe, Corrections
Officer, Defendants.
**No. 04-CV-395 (TJM/DRH).**

Sept. 26, 2007.

LaCream Newman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Charles J. Quackenbush, Esq., Assistant
Attorney General, of Counsel, Albany, NY, for
Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District
Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. §
1983 was referred to the Hon. David R. Homer, United
States Magistrate Judge, for a Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). No objections to the

Report-Recommendation and Order dated September 6,
2007 have been filed. Furthermore, after examining the
record, this Court has determined that the
Report-Recommendation and Order is not subject to attack
for plain error or manifest injustice. Accordingly, the
Court adopts the Report-Recommendation and Order for
the reasons stated therein.

It is therefore,

**ORDERED** that

(1) Defendants' motion for summary judgment (Docket
No. 36) is **GRANTED** as to defendants Duncan,
Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and
as to all of Newman's causes of action;

(2) The complaint is **DISMISSED** without prejudice as to
defendant John Doe; and

(3) This action is **TERMINATED** in its entirety as to all
defendants and all claims.

**IT IS SO ORDERED**

**REPORT-RECOMMENDATION AND ORDER**[FN1]

> FN1. This matter was referred to the undersigned
> for report and recommendation pursuant to 28
> U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se LaCream Newman ("Newman"), an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action
pursuant to 42 U.S.C. § 1983 alleging that defendants,
seven DOCS employees, violated his constitutional rights
under the Eighth and Fourteenth Amendments. [FN2] *See*
Compl. (Docket No. 1). Presently pending is defendants'

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

motion for summary judgment pursuant to Fed.R.Civ.P. 56. Docket No. 36. Newman opposes the motion. Docket No. 41. For the following reasons, it is recommended that defendants' motion be granted.

FN2. Newman's Fourteenth Amendment claims were previously dismissed. *See* Docket No. 28.

### I. Background

The facts are presented in the light most favorable to Newman as the non-moving party. *See Ertman v. United States,* 165 F.3d 204, 206 (2d Cir.1999).

On October 23, 2002, Newman was being transferred from Great Meadow Correctional Facility ("Great Meadow") to Fishkill Correctional Facility's ("Fishkill") Special Housing Unit ("SHU").[FN3] *See* Pelc. Aff. (Docket No. 36), Ex. B. Before arriving at Fishkill, Newman was temporarily housed at Downstate Correctional Facility ("Downstate"). *Id.* While being housed at Downstate, an inmate attempted to sexually assault Newman. *See* Compl. at ¶ 7. On October 24, 2002, Newman was transferred from Downstate to Fishkill. *See* Pelc. Aff., Ex. B. Upon arrival at Fishkill, Newman was assigned to a double occupancy cell. *See* Compl. at ¶ 10. On October 29, 2002, an inmate again attempted to sexually assault Newman. *See* Compl. at ¶ 12; *see also* Harris Aff. (Docket No. 36) at Ex. A. On November 15, 2002, Newman was transferred to Clinton Correctional Facility ("Clinton"). *See* Pelc. Aff., Ex. B. This action followed.

FN3. SHUs exist in all maximum and certain medium security facilities. The units "consist of single-or double-occupancy cells grouped so as to provide separation from the general population ...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2004). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

### II. Discussion

Newman asserts six causes of action, each alleging that defendants' failure to house Newman in a single occupancy cell constituted cruel and unusual punishment under the Eighth Amendment. Defendants seek judgment on all claims.

### A. Standard

*2 A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Id.; see also Treistman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U .S. at 247-48.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

### B. Exhaustion

Defendants contend that Newman has failed to demonstrate any reasonable excuse for failing to exhaust his administrative remedies as to his Eighth Amendment claim. *See* Defs. Mem. of Law (Docket No. 36) at 6-11. Newman contends that he failed to exhaust his administrative remedies after the attempted sexual assaults because (1) he was threatened by John Doe; (2) he was in transit between DOCS facilities; and (3) he was dealing with the mental and emotional effects of the attempted assaults. *See* Pl. Reply Mem. of Law (Docket No. 41) at 1-3.

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), subjects suits concerning prison conditions brought under federal law to certain prerequisites. Specifically, the PLRA dictates that a prisoner confined to any jail, prison, or correctional facility must exhaust all available administrative remedies prior to bringing any suit concerning prison life, " 'whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. 516, 532 (2002)); *see also Jones v. Bock,* 127 S.Ct. 910, 918-19 (2007) ( "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.") (citation omitted)); *Woodford v. Ngo,* 126 S.Ct. 2378, 2382-83 (2006). Administrative remedies include all appellate remedies provided within the system, not just those that meet federal standards. *Woodford,* 126 S.Ct. at 2382-83. However, the Second Circuit has recognized three exceptions to the PLRA's exhaustion requirement:[FN4]

> FN4. It is unclear whether *Woodford* has overruled the Second Circuit's exceptions to the exhaustion requirement. *See Miller v. Covey,* No. Civ. 05-649 (LEK/GJD), 2007 WL 925054, at *3-4 (N.D.N.Y. Mar. 29, 2007). However, it is not necessary to determine what effect *Woodford* has on the Second Circuit's exceptions to the exhaustion requirement because Newman's contentions cannot prevail even under pre-*Woodford* case law. *See Ruggiero v. County of Orange,* 467 F.3d 170, 176 (2d Cir.2006)

*3 when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement.

*Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)

"The PLRA's exhaustion requirement is designed to 'afford [ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524-25)). " '[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.' " *Id.* (quoting *Strong v. David,* 297 F.3d 646, 650 (7th Cir.2002)). Inmates must provide sufficient information to "allow prison officials to take appropriate responsive measures." *Id.*

DOCS has established a grievance procedure which includes a three-stage review and appeal process. *See* N.Y. Correct. Law § 139 (McKinney 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.1-.16 (2003);[FN5] *Hemphill,* 380 F.3d at 682-83. When an inmate files a grievance, it is investigated and reviewed by an Inmate Grievance Resolution Committee ("IGRC"). If the grievance cannot be resolved informally, a hearing is held. The IGRC decision may be appealed to the Superintendent of the facility. Finally, an inmate may appeal the Superintendent's decision to the Central Office Review Committee ("CORC"). N.Y. Comp.Codes R. & Regs. tit.7, § 701.7(c).

> FN5. The Court is aware that the sections governing the Inmate Grievance Program procedures in the Official Compilation of Codes, Rules & Regulations of the State of New York were re-numbered in June 2006. *See Bell v. Beebe,* No. Civ. 06-544 (NAM/GLD), 2007 WL 1879767, at *3 n. 4 (N.D.N.Y. June 29, 2007). However, in the interests of clarity, the Court will cite the section numbers of the provisions

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

that were in effect at the time Newman filed his complaint.

Here, it is undisputed that Newman's first attempt to file a grievance regarding the alleged sexual assaults did not occur until September 21, 2003, nearly one year after the alleged assaults. *See* Pl. Reply Statement of Material Facts (Docket No. 41) at Ex. 2; *see also* Newman Dep. (Ullman Decl. at Ex. 1, Docket No. 36) at 85-87. In his complaint, Newman contends that he failed to file a timely complaint due to "fear." *See* Pl. Reply Statement of Material Facts at Ex. 2. However, the Inmate Grievance Program ("IGP") supervisor at Clinton rejected Newman's attempt to file his complaint as a grievance because Newman failed to "expand on what/who caused the 'fear.' " *Id.* The IGP supervisor also noted that Newman had been housed at Clinton for the previous nine months and, thus, had "ample opportunity to file [his] complaint before [September 2003]." *Id.* Newman attempted to file an appeal of the IGP supervisor's decision to the Superintendent, but the supervisor advised Newman "[t]here is no provision to appeal the IGP Supervisors decision (to not accept a grievance) to the Superintendent. You may file a separate grievance on the determination by submitting it to the IGRC office." *Id.*

**\*4** On or about October 15, 2003, Newman filed a grievance requesting that the October 10, 2003 decision of the IGP supervisor be reversed. *See* Ullman Decl. (Docket No. 36) at Exs. 5 & 6. Newman alleged that the following "mitigating circumstances" prevented him from filing a timely grievance regarding the October 2002 sexual assaults: "1. I was in transit within the 14 days of the incident; to a number of correctional facilities; in addition to MHU within NYS DOCS; 2. I was confronted with fear (threats); which was made by CO's at Fishkill SHU 200 which I wasn't to make mention of the situation and that he could cause me to be placed in the same situation again and no on[e] would help me." *Id.* The IGRC denied Newman's grievance, finding that "[Newman] has been in [Clinton] since Dec. 2002 which gave him adequate time to file complaint which would have been accepted if filed then. Grievant did not provide mitigating circumstances to warrant the acceptance of complaint." Ullman Decl., Ex. 5 at 4. The Superintendent and CORC both denied Newman's appeals, finding that Newman had failed to present mitigating circumstances to excuse his delay in submitting the complaint. *See* Ullman Decl, Exs. 7 & 8.

In claiming that his non-exhaustion should be excused, Newman makes three arguments. First, he contends that a corrections officer at Fishkill (John Doe) threatened him, warning that if Newman reported the October 29, 2002 sexual assault then he would be placed back in the "same predicament" he was in before. *See* Newman Dep. at 83. However, Newman was transferred to Clinton in November 2002 and, thus, could have immediately filed a grievance now that he was separated from the officer who threatened him. *See* Pelc Decl. (Docket No. 36) at Ex. B. Further, Newman testified that he felt "safe" while at Clinton, demonstrating that any fear he may have had surrounding the filing of a grievance was left behind at Fishkill. *See* Newman Dep. at 66. Moreover, Newman ultimately did file a grievance while at Clinton. *See* Ullman Decl., Exs. 5 & 6. Thus, Newman's first argument for failure to properly exhaust is not persuasive.

Second, Newman contends that his frequent transfers between DOCS facilities within fourteen days of the sexual assaults prevented him from timely filing a grievance. However, this argument is not persuasive because DOCS regulations state that "[e]ach correctional facility housing a reception/classification/transit inmate population shall insure all inmates access to the IGP." N.Y. Comp.Codes R. & Regs. tit.7, § 701.14. Further, Newman arrived at Clinton on November 15, 2003 and was not moved to another DOCS facility until November 19, 2003, thus affording him nearly a year where he was not "in transit." *See* Pelc. Decl. at Ex. B.

Third, Newman contends that this Court should apply the "special circumstances" exception under *Hemphill* because he was dealing with the mental and emotional effects of the sexual assaults, thus preventing his filing of a grievance. *See* Newman Dep. at 83-84; Pl. Reply Mem. of Law at 2-3; *see also Hemphill,* 380 F.3d at 686. However, the special circumstances exception under *Hemphill* concerned an inmate's justifiable confusion regarding the proper DOCS procedure for filing an expedited grievance, not an inmate's mental or emotional condition. *See Hemphill,* 380 F.3d at 689-91. Thus, absent any documented mental illness that prevented Newman from filing a grievance, his third argument excusing his failure to timely exhaust his administrative remedies is not persuasive.[FN6]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

FN6. Moreover, shortly after the second assault, Newman wrote a letter to his counselor requesting that he be able to correspond with another inmate. *See* Newman Dep. at 42-43. Thus, in light of his ability to correspond with his counselor shortly after the incident, Newman's contention that he was too emotionally distraught to file a grievance is without merit.

*5 Therefore, it is recommended that defendants' motion on this ground be granted.

**C. Eighth Amendment**[FN7]

FN7. In his complaint, Newman contends that defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment because their failure to comply with DOCS regulations "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23. Therefore, Newman's cause of action is best addressed under the Eighth Amendment's failure to protect standard.

Newman contends that defendants knew or should know that he was a homosexual and that his placement in a double occupancy cell "facilitated ... the cause for the incident of attempted rape/physical assault that occurred to plaintiff therein at Fishkill SHU 200, on or about 10/29/02." Compl. at ¶¶ 15, 17, 19, 21, 23.

Prison officials have a duty to protect inmates from violence by other inmates. *See Farmer v. Brennan,* 511 U.S. 825, 833 (1994). When asserting a failure to protect claim, an inmate must establish that he was "incarcerated under conditions posing a substantial risk of serious harm" and that the defendants acted with deliberate indifference to the inmate's safety. *Id.* at 834. Deliberate indifference is established when the official knew of and disregarded an excessive risk to inmate health or safety. *Id.* at 837. However, "the issue is not whether [a plaintiff] identified

his enemies by name to prison officials, but whether they were aware of a substantial risk of harm to [him]." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 621 (2d Cir.1991).

Here, Newman contends that on two separate occasions, fellow inmates "attempted to rape/physical[ly] assault" him. *See* Compl. at ¶¶ 7, 11, 15, 17, 19, 21, 23. However, it is undisputed that Newman did not suffer any actual injury [FN8] from these attempted assaults. *See* Defs. Statement of Material Facts (Docket No. 36) at ¶¶ 71-76; Pl. Reply Statement of Facts at ¶¶ 71-76; *see also* Newman Dep. at 31-32, 35-37, 41-42, 68-74, 95-96; Harris Aff. at Ex. A. The law is clear that an inmate must demonstrate an "actual injury" when alleging a constitutional violation. *See Brown v. Saj,* No. Civ. 06-6272(DGL), 2007 WL 1063011, at *2 (W.D.N.Y. Apr. 5, 2007) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). These two isolated incidents, coupled with Newman's failure to allege any injury resulting from the attempted sexual assaults, fail to demonstrate a constitutional violation under the Eighth Amendment. *See Boddie v. Schnieder,* 105 F.3d 857, 861-62 (2d Cir.1997) (holding that isolated incidents of sexual assault, without any injury, fail to state an Eighth Amendment claim); *see also Brown,* 2007 WL 1063011, at *2 (dismissing inmate's failure to protect claim for failure to demonstrate an actual injury).

FN8. To the extent that Newman contends that the attempted assaults caused him any mental or emotional injury, this claim must fail because "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2003); *see also Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that § 1997e(e) "applies to claims in which a plaintiff alleges constitutional violations so that the plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury").

Therefore, in the alternative, it is recommended that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)
(Cite as: 2007 WL 2847304 (N.D.N.Y.))

defendants' motion on this ground be granted.

### D. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct does not violate clearly established constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Newman's allegations as true, he has not shown that defendants violated his constitutional rights.

**\*6** Therefore, in the alternative, defendants' motion for summary judgment on this ground should be granted.

### E. Failure to Serve Defendant John Doe

Newman's complaint asserts a claim against John Doe, a defendant who has neither been identified nor served with the complaint. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of process be effectuated within 120 days of the date of the filing of the complaint. *See also* N.D.N.Y.L.R. 4.1(b). Because defendant John Doe has not been identified by Newman or timely served with process, it is recommended that the complaint be dismissed without prejudice against this defendant.

### III. Conclusion[FN9]

FN9. Defendants also contend that Newman failed to demonstrate that they were personally involved in the alleged constitutional violations. *See* Defs. Mem. of Law at 11-14. However, it is recommended herein that defendants' motion

should be granted as to all of Newman's claims on other grounds. Thus, this argument need not be addressed.

For the reasons stated above, it is hereby

**RECOMMENDED** that:

1. Defendants' motion for summary judgment (Docket No. 36) be **GRANTED** as to defendants Duncan, Carpenter, VanGuilder, Mazzuca, Ercole, and Conklin and as to all of Newman's causes of action;

2. The complaint be **DISMISSED** without prejudice as to defendant John Doe; and

3. This action therefore be **TERMINATED** in its entirety as to all defendants and all claims.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2007.
Newman v. Duncan
Not Reported in F.Supp.2d, 2007 WL 2847304 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

H
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⟨key⟩ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
        78k1395 Particular Causes of Action
            78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

FN3. The amended complaint reads as follows:

That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See, Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

*4 In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

OPINION

SWEET, J.

*1 Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin,* 922 F.2d 152, 154 (2d Cir.1991); *Fonte v.
Board of Managers of Continental Towers Condominium,*
848 F.2d 24, 25 (2d Cir.1988). The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

*2 At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at *2- *3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to

find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Larry McNAIR, Plaintiff,
v.
SGT. JONES, C.O. Shepherd, C.O. Zoufaly, Registered
Nurse Matthews, C.O. K. Koenig, Sick Call Nurse for
Shu, Dr. Supple, Capt. Lowry, Superintendent Strack,
Jose Pico, Nurse Daly and Lieutenant A. Caves,
Defendants.
**No. 01 Civ. 3253(RCC)(GWG).**

Sept. 18, 2002.

State prisoner brought § 1983 action against prison
officials alleging claims such as excessive force,
unsanitary conditions, conspiracy, and denial of medical
needs. Prison officials moved to dismiss. The District
Court, Gorenstein, J., recommended that: (1) prisoner
failed to exhaust his administrative remedies pursuant to
Prison Litigation Reform Act (PLRA) regarding certain
claims or justify such failure, and (2) allegations that
conduct of prison disciplinary hearings was procedurally
flawed and that inappropriate penalties were imposed did
not state a claim under § 1983.

Report and recommendation issued.

West Headnotes

**[1] Civil Rights 78 ☞ 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner did not file grievance through state
administrative prison grievance process regarding his §
1983 claims of excessive force, unsanitary conditions,
conspiracy, and denial of medical needs, and, thus, failed
to exhaust his administrative remedies pursuant to Prison
Litigation Reform Act (PLRA) regarding these claims. 42
U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

**[2] Civil Rights 78 ☞ 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner's verbal complaints of confinement
conditions, letters to legal aid organization for indigent
litigants, and letters to offices for prison superintendent
and inspector general were not sufficient to satisfy
requirement of Prison Litigation Reform Act (PLRA) that
he exhaust his administrative remedies before bringing §
1983 action; prisoner was required to go through prison
administrative process requiring written grievances and
setting forth procedure for such grievances which did not
allow submission of letters directly to prison management.
42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

**[3] Civil Rights 78 ☞ 1319**

78 Civil Rights
    78III Federal Remedies in General
        78k1314 Adequacy, Availability, and Exhaustion
of State or Local Remedies
            78k1319 k. Criminal Law Enforcement; Prisons.

Most Cited Cases
    (Formerly 78k209)
State prisoner's general allegations of conspiracy by prison
officials, and his claims that he did not file prison
grievance due to pending disciplinary charges against him
because he did not trust prison officers to file charges and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

because such grievance would be futile, did not excuse prisoner's failure to file prison grievance regarding disciplinary charges before bringing § 1983 action, for purposes of showing exhaustion of administrative remedies under Prison Litigation Reform Act (PLRA). 42 U.S.C.A. §§ 1983, 1997e(a); 7 N.Y.C.R.R. §701.

**[4] Civil Rights 78 ☞ 1308**

78 Civil Rights
    78III Federal Remedies in General
        78k1306 Availability, Adequacy, Exclusivity, and Exhaustion of Other Remedies
            78k1308 k. Administrative Remedies in General. Most Cited Cases
        (Formerly 78k194)
Exhaustion of administrative remedies after § 1983 complaint is filed will not save case from dismissal for failure to exhaust administrative remedies. 42 U.S.C.A. §§ 1983, 1997e(a).

**[5] Civil Rights 78 ☞ 1092**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1089 Prisons
            78k1092 k. Discipline and Classification; Grievances. Most Cited Cases
        (Formerly 78k135)
Prison disciplinary proceeding and penalties imposed on state prisoner, such as loss of good time credit, were not invalidated on appeal, and thus prisoner's claims that conduct of hearings was procedurally flawed and that inappropriate penalties were imposed did not state a claim under § 1983. 42 U.S.C.A. §1983.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, Magistrate Judge.

**\*1** Larry McNair, the *pro se* plaintiff, brings this action pursuant to 42 U.S.C. § 1983, alleging that correction officers used excessive force against him during a pat frisk that occurred on June 7, 1999 while McNair was imprisoned in the Fishkill Correctional Facility; that medical personnel were deliberately indifferent to his serious medical needs; that he was forced to live in unsanitary conditions while confined as part of a "drug watch"; that all of the defendants were involved in a conspiracy to cover up the officers' malicious conduct; and that certain procedural defects occurred during his disciplinary hearing. The defendants have moved to dismiss pursuant to Fed.R.Civ.P. 12(b) or in the alternative for summary judgment pursuant to Fed.R.Civ.P. 56. For the following reasons, the defendants' motions should be granted.

I. *STATEMENT OF FACTS*

The details of the incident underlying the complaint are not directly relevant to the grounds for dismissal that are the subject of this Report and Recommendation. Nonetheless, they are recounted here to provide some background for the dispute.

A. *Allegations of Excessive Force*

At approximately 5:50 p.m. on June 7, 1999, while McNair was proceeding to his evening program at the Fishkill prison, Sergeant Jones directed McNair into the prison yard for a random pat frisk. Complaint, dated March 1, 2001 ("Complaint"), at § IV; Memorandum from E. Shepherd, dated June 7, 1999 ("Shepherd Report") (reproduced as Ex. D to Exhibits "A to D" in Support of Plaintiff's Statement Pursuant to Local Civil Rule 56.1, dated April 15, 2002), at 1.[FN1] Officer Shepherd instructed McNair to remove everything from his pockets and to stand against the wall so that the search could be performed. Shepherd Report at 1. McNair cooperated, first handing the officers his books, cigarettes and wallet, and then turning to place his hands on the wall. Complaint at § IV; Shepherd Report at 1.

> FN1. A number of documents discussed herein, including the Rule 56.1 Statement cited above, were not filed with the Clerk at the time of their service or submission to Chambers. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

documents consist of: (1) the defendants' notice of motion and memorandum of law dated August 6, 2001; (2) the exhibits, identified as "A to U," that were submitted as part of McNair's opposition papers to this motion, dated September 5, 2001; and (3) McNair's papers submitted in opposition to the defendants' February 2002 motion to dismiss or for summary judgment, consisting of an affirmation, memorandum of law, statement under Rule 56.1, a declaration and two sets of exhibits, all of which are dated April 15, 2002. These documents are now being docketed along with this Report and Recommendation.

According to a misbehavior report filed by Officer Shepherd, during the frisk Shepherd discovered a rolled up piece of toilet paper containing a small white packet of paper in McNair's wallet. At this point, according to the report, McNair began pushing Shepherd's hands, knocking the white packet to the ground. McNair immediately bent down, picked up the white packet and put it in his mouth. A struggle ensued, during which Shepherd lost his balance and fell to the ground. Shepherd ordered McNair to spit out the packet but McNair refused. Shepherd then placed his hands under McNair's chin in an attempt to force McNair to spit out the item. McNair, however, responded "I swallowed it." Officers Shepherd and Zoufaly then placed restraints on McNair, with Shepherd controlling McNair's left arm and Zoufaly controlling his right. Shepherd Report at 1-2.

According to McNair's version of events, however, Shepherd never discovered a white packet of paper in McNair's wallet. Rather, after McNair placed his hands against the wall, Shepherd asked McNair about a bulge in his left shoe. McNair, who was injured in a basketball game the night before, reached down to his ankle, revealing an ace bandage protecting his Achilles tendon. Shepherd reacted to this gesture by attacking McNair-choking him and knocking him to the ground. Sergeant Jones then instructed Zoufaly to grab McNair's right arm and to break it if necessary. McNair claims that Shepherd held him on the ground in a choke hold as Zoufaly twisted his arm and wrist. When Sergeant Jones asked Shepherd what happened, Shepherd replied that he thought McNair had swallowed something. Complaint at § IV.

*2 Officer Jones and another unnamed officer then escorted McNair through the facility, toward the Special Housing Unit. McNair claims that the officers took a route that placed the men out of view of the general population. According to McNair, during this trip Sergeant Jones threatened to harm him if he reported any injuries to the medical staff. Complaint at § IV.

B. *Medical Examination and Drug Watch*

Upon arrival at the Special Housing Unit, Nurse Matthews examined McNair. Complaint at § IV. Matthews asserts that, although McNair told Matthews that he had a cut on his face, Matthews was not able to find any damage. Defendant Matthews' Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002 ("Matthews Decl.") (annexed to Notice of Motion to Dismiss And/Or for Summary Judgment, filed February 22, 2002 ("Feb.Mot.") (Docket # 22)), at ¶ 7. Nurse Matthews did notice that McNair's knuckle was swollen but states that McNair retained a full range of motion in his hand. *Id.* McNair denies this, claiming that he was unable to clench his hand into a fist. Complaint at § IV. During the examination, Matthews states that McNair also drew attention to his ankle, which had been injured the previous night. Matthews Decl. at ¶ 7. Matthews' observations, however, revealed that McNair did not have difficulty walking. *Id.*

McNair asserts that he also discussed his history of high blood pressure with Nurse Matthews but was not placed on a low cholesterol diet. Complaint at § IV. McNair alleges that Dr. Supple, a physician who had examined McNair on three prior occasions for problems unrelated to the June 7 incident, should have either placed Nurse Matthews on notice of his condition or prescribed a remedy himself. *See* Affirmation in Opposition, dated September 5, 2001, ("McNair Aff.") (filed December 4, 2001, Docket # 20), at ¶¶ 2-3. Dr. Supple states that upon review of McNair's medical records, McNair did have high cholesterol, but his failure to prescribe special dietary provisions did not affect McNair negatively. Defendant Dr. Supple's Declaration in Support of Defendants' Motion to Dismiss And/Or for Summary Judgment, dated February 21, 2002, at ¶ 7. After the exam, McNair was not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

given any medication nor was he deemed to require any further medical attention. Matthews Decl. at ¶ 10.

At the conclusion of his examination, Officer Koenig took pictures of McNair as required by Directive No. 4944. *See* Photographs Taken by Officer K. Koenig After Use of Force and Directive 4944 (reproduced as Ex. O to Exhibits "A to U" in Support of Affirmation in Opposition, dated September 5, 2001 ("9/5/2001 Exs.")). McNair, however, claims that Officer Koenig refused to take pictures of his ankle and right hand. Complaint at § IV. McNair was then placed on a drug watch in the Special Housing Unit. *Id.* The purpose of such a watch is to monitor the progress of contraband suspected to have been ingested by the inmate. Declaration of Robert Ercole in Support of Defendants' Motion to Dismiss And/Or Summary Judgment, dated February 21, 2002 ("Ercole Decl.") (annexed to Feb. Mot.), at ¶ 6. Consequently, McNair was placed in a "dry cell" in which the water supply was turned off to enable the officers to monitor his bowel movements. Ercole Decl. at ¶ 7. McNair's cell was also lacking soap, a towel, toothpaste and a toothbrush. Complaint at § IV. However, as required by DOCS Directive No. 4910, such items were to have been provided to McNair when he was allowed out of his cell to wash himself. Ercole Decl. at ¶¶ 6-8. Though inmates are permitted to have bed linens in their cells, Ercole Decl. at ¶ 7, McNair alleges that his mattress remained undressed. Complaint at § IV.

**\*3** On the morning of June 8, 1999, Nurse Daly walked through the Special Housing Unit. Though she refused to stop at his cell, as she walked by, McNair told her that his ankle was causing him pain. According to McNair, Daly agreed to send him something to relieve his discomfort. However, no medication was ever sent. Complaint at § IV; Amended Complaint, dated July 2001 ("Amended Complaint"), at ¶ 2.

McNair remained on the drug watch for a total of 48 hours. Complaint at § IV. During this time, no contraband was found. A urinalysis test designed to recognize the existence of drugs also came back negative. *Id.*

McNair received no further medical treatment during his stay at the Fishkill Facility. Plaintiff's Statement Pursuant

to Local Civil Rule 56.1, dated April 15, 2002 ("McNair 56.1"), at ¶ 24. McNair alleges that as a result of the incident, the tendon in his right hand was torn and his left ankle was injured. Complaint at § IV-A. He also alleges that he needed physical therapy on his right hand and surgery, resulting in diminished usage of his hand. *Id.*

On July 6, 1999, McNair was transferred to Southport Correctional Facility. McNair 56.1 at ¶ 24. At Southport, McNair was given a health screening, Ambulatory Health Record, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 1, after which he was placed on a low cholesterol, low fat diet. Therapeutic Diet Order Form, dated July 6, 1999 (reproduced as Ex. Q to 9/5/2001 Exs.), at 2. In July 2000, a medical report showed that the tendon in the long finger of McNair's right hand had been torn. Surgical Pathology Report, dated July 11, 2000 (reproduced as Ex. T to 9/5/2001 Exs.).

C. *The Disciplinary Charge and Appeal*

On June 7, 1999, the day of the pat frisk, Shepherd filed an Inmate Misbehavior Report in which he described his version of events. Inmate Misbehavior Report, dated June 7, 1999 (reproduced as Ex. E to Strack Declaration in Support of Defendants' Motion to Dismiss And/Or Summary Judgment, dated February 21, 2002 ("Strack Decl.") (annexed to Feb. Mot.)). As a result, a disciplinary hearing was held before officer Jose Pico on June 18, 1999 in which McNair was charged with refusing a direct order, assaulting staff, and refusing to be searched or frisked. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). In support of his version of events, McNair presented a witness. Excerpt of Transcript from Disciplinary Hearing ("Disc.Hg.Transcript") (reproduced as Ex. P to 9/5/2001 Exs.), at 2. Nevertheless, Officer Pico found McNair guilty of all charges and sentenced him to loss of twelve months "good time" credits and 365 days in the Special Housing Unit, with a loss of package, commissary and phone call privileges. Disc. Hg. Transcript at 1.

McNair immediately sought to appeal this finding. On July 2, 1999, McNair sent Superintendent Strack the first of two letters requesting discretionary review of his disciplinary hearing. Letter to Wayne Strack, dated July 2,

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

1999 (reproduced as Ex. I to Exhibits "A to M" in Support of Plaintiff's Affirmation in Opposition to Defendant's Motion to Dismiss And/Or Summary Judgment, dated April 15, 2002 ("4/15/2002 A to M Exs.")). In his first letter, McNair stated that Officer Pico denied him his right to call a witness during the hearing. *Id.* That same day, William Mazzuca, on Strack's behalf, wrote to McNair, refusing to alter the results of the disciplinary hearing. Letter to McNair, dated July 2, 1999 (reproduced as Ex. K to 4/15/2002 A to M Exs.). On July 3, 1999, McNair sent a second letter to Superintendent Strack, this time informing him that he may be held personally liable if he failed to remedy the alleged violation of McNair's right to call witnesses. Letter to Wayne Strack, dated July 3, 1999 (reproduced as Ex. J to 4/15/2002 A to M Exs.).

**\*4** McNair also claims that he sent a letter to Superintendent Strack on June 16, 1999 in which he complained about the lack of medical attention he was receiving. McNair 56.1 at ¶ 20. Superintendent William Mazzuca apparently received this letter, although he asserted in January 2001 that he no longer had a copy. *See* Mazzuca Sworn Affidavit, dated January 26, 2001 (reproduced as Ex. G to 9/5/2001 Exs.), at ¶¶ 215, 220. Confusingly, defendants have submitted a copy of a letter dated June 16, 1999, from McNair to Superintendent Strack, which does not mention McNair's medical status or his disciplinary hearing but relates only to a missing package of cigarettes. Letter dated June 16, 1999 (reproduced as Ex. B to Hartofilis Declaration in Support of Defendant's Motion for Summary Judgment, dated February 22, 2002).

On September 1, 1999, McNair formally appealed the ruling in the disciplinary hearing. Inmate Disciplinary History (reproduced as Ex. P to 9/5/2001 Exs.). His appeal was heard by Donald Selsky, the Director of the Special Housing and Inmate Disciplinary Programs, who affirmed Hearing Officer Pico's order. *Id.* McNair sent out another letter appealing the ruling on October 19, 1999. *See* Response from Donald Selsky, dated October 28, 1999 ("Selsky Response") (reproduced as Ex. C to Affirmation in Opposition Exhibits "A to P", Docket # 41, dated June 11, 2002 ("6/11/2002 Exs.")). Selsky and Lucien J. Leclaire, Jr., Deputy Commissioner of the Department of Correctional Services, each received copies of the letter. Both declined to reconsider Pico's ruling and refused to reduce McNair's confinement time. *See* Selsky

Response; Letter from Lucien J. Leclaire, Jr., dated November 8, 1999 (reproduced as Ex. D to 6/11/2002 Exs.).

McNair then filed a petition with the Supreme Court of the State of New York, Dutchess County, challenging his disciplinary hearing. *See* Order to Show Cause, dated November 29, 1999 (reproduced as Ex. A to 6/11/2002 Exs.). On August 11, 2000, that court entered a judgment against McNair. *Cf.* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.). McNair then filed a notice of appeal on August 23, 2000. *Id.* On May 30, 2001, the Appellate Division, Second Department, dismissed the appeal because it had not been perfected within the time limit specified in 22 N.Y.C.R.R. § 670.8(e). Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3.

D. *Complaint to Inspector General*

In December 1999, McNair made a complaint to the Inspector General's Office. *See* Inspector General's Office Investigative Report, dated May 25, 2000 ("Investigative Report") (annexed to Memorandum of Law in Opposition of Defendant's Motion to Dismiss And/Or Summary Judgment and Supplemental Brief, dated April 15, 2002 ("McNair 4/15/2002 Mem.")). On December 15, 1999, Officer Todd of the Inspector General's Office interviewed McNair about his complaints. Supplemental Brief and Memorandum of Law in Decision of Interest, dated June 11, 2002 (Docket # 40) ("McNair Supp. Mem."), at 2. In May 2000, a second officer, Investigator Holland took over the investigation. *Id.* This officer, Investigator Holland, found McNair's claims to be unsubstantiated and recommended that the case be closed. *See* Investigative Report.

E. *The Present Action*

**\*5** On April 19, 2001, McNair filed the complaint in this matter pursuant to 42 U.S.C. § 1983 against defendants Jones, Shepherd, Zoufaly, Matthews, Koenig, an unidentified "sick call nurse," Dr. Supple, Captain Lowry and Superintendent Strack. The complaint, brought under 42 U.S.C. § 1983, describes the alleged attack, the

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

resulting injuries, the denial of medical care and unsanitary conditions. McNair seeks monetary damages in the amount of $5 million. Complaint at § V. On July 25, 2001, McNair filed an Amended Complaint which did not repeat any of the allegations in the original complaint but instead stated that it was being filed to add three new defendants: Jose Pico, Nurse T. Daly and a "Watch Commander." Amended Complaint at ¶¶ 1-3. McNair alleges that Pico, as Hearing Officer of McNair's disciplinary hearing, imposed improper penalties, denied "witnesses" and "adequate assistance," and was arbitrary and capricious. *Id.* at ¶ 1. McNair alleges that Daly failed to provide adequate medical care. *Id.* at ¶ 2. The "Watch Commander" is alleged to have "approved the photographs[ ] that were taken on June 7, 1999, with knowledge that these photographs were not in accordance with the 'Use of Force' Directive." *Id.* at ¶ 3.

On August 6, 2001, the defendants submitted a motion to dismiss the complaint arguing that the complaint should be dismissed because of McNair's failure to exhaust his administrative remedies and because the complaint did not state a claim for the various constitutional violations alleged. McNair thereafter submitted an "Affirmation in Opposition" dated September 5, 2001, along with other papers, that provided additional detail about his allegations-particularly the allegations regarding his improper medical treatment. *See* McNair Aff.; Memorandum of Law dated September 5, 2001, filed December 4, 2001 (Docket # 21). Upon McNair's request, made by letter dated November 3, 2001, the Court construed this affirmation as supplementing his complaint. *See generally* Order, dated October 25, 2001 (Docket # 18).

On February 22, 2002, defendants Shepherd, Matthews, Supple and Strack moved to dismiss McNair's complaint, as amended, pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6) and/or 56(c). *See* Feb. Mot. They argued that the complaint should be dismissed for a number of reasons: McNair had not exhausted his administrative remedies; he had failed to state a "deliberate indifference" claim with respect to his medical needs; there was no personal involvement by certain of the defendants; the defendants were entitled to qualified immunity; McNair had failed to state a claim regarding the allegation that a false misbehavior report had been filed; and he had failed to state a claim for conspiracy. On March 28, 2002, these

same defendants filed a supplemental memorandum (Docket # 30) to argue the effect of the Supreme Court's decision the previous month in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). By memorandum endorsement dated, April 2, 2002 (Docket # 31), the defendants' motion was deemed to include defendants Pico, Daly, Jones, and the Watch Commander (who had since been identified as A. Caves). The plaintiff submitted opposition papers to this motion, which are all dated April 15, 2002, and included an affirmation, a statement under Local Civil Rule 56.1, a memorandum of law, and exhibits identified as "A to M." On May 9, 2002, the defendants filed a reply memorandum of law (Docket # 34).

**\*6** On the same date that the defendants filed the reply brief on the pending motion, defendants Pico and Strack again moved to dismiss McNair's complaint-this time citing Fed.R.Civ.P. 12(b)(1) and (6). *See* Notice of Motion, dated May 9, 2002 (Docket # 32). While Pico and Strack had previously made (or, in Pico's case, been deemed to have made) the motion filed February 22, 2002 to dismiss or in the alternative for summary judgment, Pico and Strack filed the 12(b)(1) and (6) motion in order to make specific arguments regarding McNair's claims that the disciplinary hearing had not been properly conducted. *See* Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33), at 1 n. 1. McNair opposed this new motion with an affirmation, exhibits and a brief, all of which are dated June 11, 2002 (Docket # 's 39, 40 and 41). The defendants filed a reply brief on July 26, 2002 (Docket # 42).

II. *Discussion*

A. *Summary Judgment Standard*

A district court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *New York Stock Exchange, Inc. v. New York,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

*New York Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). A material issue is a "dispute[ ] over facts that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Thus, " '[a] reasonably disputed, legally essential issue is both genuine and material' " and precludes a finding of summary judgment. *McPherson,* 174 F.3d at 280 (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)).

When determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all factual inferences in favor of the non-moving party. *McPherson,* 174 F.3d at 280. Moreover, the pleadings of a pro se plaintiff must be read liberally and interpreted "to raise the strongest arguments that they suggest." *Id.* (citation omitted). Nonetheless, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Incorporated Village of Mineola,* 273 F.3d 494, 499 (2d Cir.2001).

B. *Exhaustion of Administrative Remedies*

Under the Prison Litigation Reform Act, 110 Stat. 1321-73, as amended, 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This means the prisoner "must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing suit." *Flanagan v.. Maly,* 2002 WL 122921, at *2 (S.D.N.Y. Jan.29, 2002); *see also Porter v. Nussle,* 534 U.S. 516, ----, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy and effective.' ") (citations omitted). The Supreme Court has clarified that "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 122 S.Ct. at 992.[FN2]

FN2. Even though McNair filed this action before *Porter v. Nussle* was decided, "the broad exhaustion requirement announced in *Nussle* applies with full force" to litigants in such a situation. *Espinal v. Goord,* 2002 WL 1585549, at *2 n. 3 (S.D.N.Y. July 17, 2002). *See generally Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule.").

*7 7 N.Y.C.R.R. § 701 outlines the Inmate Grievance Program under which New York prison inmates may file grievances regarding prison life. First, the inmate must file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.7(a). Next, after receiving a response from the IGRC, the inmate may appeal to the Superintendent of the facility. *Id. at §* 701.7(b). Finally, after receiving a response from the Superintendent, the prisoner can seek review of the Superintendent's decision with the Central Office Review Committee ("CORC"). *Id. at § 701.7(c). See, e.g., Anderson v. Pinto,* 2002 WL 1585907, at *1 (S.D.N.Y. July 17, 2002). In New York, a "prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hemphill v. New York,* 198 F.Supp.2d 546, 548 (S.D.N.Y.2002). As was noted in *Flanagan,* "New York permits inmates to file internal grievances as to virtually any issue affecting their confinement." 2002 WL 122921, at *1. Exhaustion is not accomplished by an inmate's appeal of a disciplinary hearing decision brought against the inmate. *See, e.g ., Benjamin v. Goord,* 2002 WL 1586880, at *2 (S.D.N.Y. July 17, 2002) (citing *Cherry v. Selsky,* 2000 WL 943436, at *7 (S.D.N.Y. July 7, 2000)).

[1] McNair's claims regarding the assault and subsequent denial of medical care were grievable under the prison regulations. *See* 7 N.Y.C.R.R. § 701.2(a) (permitting grievances for any "complaint about the substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services or any of its program units, or the lack of a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

policy, regulation, procedure or rule"); 7 N.Y.C.R.R. § 701.11 (describing special expedited grievance process for "[e]mployee misconduct meant to ... harm an inmate"); *see also* Espinal v. Goord, 2002 WL 1585549, at *2 (S.D.N.Y. July 17, 2002) ("It is undisputed that '[a] claim of excessive force is a proper subject of a grievance inmates may file through [DOCS's] Inmate Grievance Program.' ") (citation omitted); Cruz v. Jordan, 80 F.Supp.2d 109, 111-12 (S.D.N.Y.1999) ("New York State provides administrative remedies that are available to prevent, stop and mitigate deliberate indifference to the medical needs of prisoners."); Thomas G. Eagen's Affidavit in Support of Defendant's Motion to Dismiss, dated August 2, 2001 ("Eagen Aff.) (annexed to Feb. Mot.), at ¶ 4.

[2] In the face of defendants' assertions that McNair's complaint must be dismissed for his failure to exhaust administrative remedies, McNair argues that he accomplished exhaustion through verbal complaints and by writing to the Legal Aid Society, the Superintendent's office, and the Inspector General's Office. McNair 4/15/2002 Mem. at 2.

Making a verbal complaint, however, does not satisfy the exhaustion requirement because the administrative grievance process permits only written grievances. *See* Flanagan, 2002 WL 122921, at *2. A complaint made to the Legal Aid Society is likewise not permitted by the administrative grievance process. McNair's letters to the Superintendent could not satisfy the exhaustion requirement for two reasons. First, the only letters in the record complain of procedural defects in the disciplinary hearing and do not assert any of his other claims. *See* Exhibits "A to M", dated April 15, 2002, Exs. I, J. Second, forgoing the step of filing a claim with the IGRC by submitting letters directly to the superintendent does not satisfy the exhaustion requirement. *See, e.g.,* Byas v. New York, 2002 WL 1586963, at *2 (S.D.N.Y. July 17, 2002) ("Permitting a plaintiff to bypass the codified grievance procedure by sending letters directly to the facility's superintendent would undermine the efficiency and the effectiveness that the prison grievance program is intended to achieve."); Nunez v. Goord, 2002 WL 1162905, at *1 (S.D.N.Y. June 3, 2002).[FN3]

FN3. Although the Inmate Grievance Program

does allow for an expedited procedure for allegations of inmate harassment by prison employees, which in some cases allows for review by the IGRC to be bypassed, the inmate must still file a grievance with the employee's supervisor before the superintendent can review the allegations to determine if the grievance presents a bona fide harassment issue. *See* 7 N.Y.C.R.R. § 701.11(b); Hemphill v. New York, 198 F.Supp.2d 546, 549 (S.D.N.Y.2002) (describing expedited grievance procedure). The regulations provide that if the superintendent fails to respond, the prisoner may appeal the grievance to the CORC. 7 N.Y.C.R.R. § 701.11(b)(6).

**\*8** Finally, although McNair eventually made a complaint to the Inspector General, that action does not satisfy the exhaustion requirement. Grey v. Sparhawk, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint [plaintiff] may have made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures. To allow plaintiff to bypass those procedures would obviate the purpose for which the procedures were enacted."); Houze v. Segarra, 2002 WL 1301555, at *2 (S.D.N.Y. July 16, 2002).

In any event, McNair at no time suggests that he went through the appeal process permitted by 7 N.Y.C.R.R. §§ 701.7(b), (c); 701.11(b)(6). This failure alone means that McNair has not exhausted his administrative remedies. Hemphill, 198 F.Supp.2d at 548.

[3] McNair offers several arguments why the lack of exhaustion should be excused. First, he seems to argue that he should be excused from the exhaustion requirement because he seeks "monetary damages." McNair 4/15/2002 Mem. at 2. In Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001), however, the Supreme Court held that the exhaustion requirement applies to a plaintiff seeking relief unavailable in the prison administrative proceeding such as monetary damages. Id. at 740-41. Second, McNair adverts generally to a conspiracy among the defendants to cover up their misconduct. *See, e.g.,* Complaint at § IV. He does not, however, claim that any of the defendants prevented him

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

from filing a grievance complaint.

Third, McNair contends that had he filed a complaint earlier it would have been disregarded because of the pending disciplinary charges against him. McNair 4/15/2002 Mem. at 1. Assuming for purposes of argument that use of the administrative process would have been futile, the Supreme Court has made clear that where a statute mandates exhaustion, even a futile administrative process must be observed. *Booth,* 532 U.S. at 741 n. 6. Fourth, McNair implies that the "Grievance supervisor" failed to conduct his rounds in the segregated housing unit he was in at the time. McNair 4/15/2002 Mem. at 1-2.[FN4] But the grievance process allowed McNair to have filed a grievance without interacting with the "Grievance supervisor"-either by requesting a grievance form from any accessible officer, 7 N.Y.C.R.R. 701.13(a)(1), or simply writing the complaint on a plain sheet of paper. 7 N.Y.C.R.R. 701.7(a)(1).

> FN4. McNair never directly states that the "Grievance supervisor" failed to conduct these rounds. Instead, his memorandum states that the defendants' motion papers did not verify that this occurred. McNair 4/15/2002 Mem. at 2.

In fact, McNair admits that the reason the grievance was not filed was not due to any inability to file such a grievance but rather that he "could not trust an officer to mail his grievance due to the assault on staff he was being charged with." McNair 4/15/2002 Mem. at 3. McNair's own distrust of the system, however, in the absence of any indication that he made an affirmative effort to file a grievance, does not permit avoidance of the exhaustion requirement. *See Reyes v. Punzal,* 206 F.Supp.2d 431, 434 (W.D.N.Y.2002) ("There is no suggestion in the record that plaintiff was somehow prevented from appealing his grievance, and even if plaintiff believed that further attempts to seek relief through administrative channels would prove fruitless, 'the alleged ineffectiveness of the administrative remedies that are available does not absolve a prisoner of his obligation to exhaust such remedies when Congress has specifically mandated that he do so.' ") (citing *Giano v. Goord,* 250 F.3d 146, 150-51 (2d Cir.2001)). The fact that McNair does not suggest that prison employees prevented him from filing a complaint distinguishes this case from those where the failure to

exhaust was excused because the prisoner made reasonable efforts to exhaust but was prevented from doing so by prison employees. *See, e.g., Rodriguez v. Hahn,* 2000 WL 1738410 (S.D.N.Y. Nov.22, 2000); *see also Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)").

**\*9** With respect to his medical needs claim, McNair states that he was threatened by Sergeant Jones and warned not to complain to the medical staff about his injuries. Complaint at § IV. Mere verbal threats from correctional officers, however, do not excuse the exhaustion requirement. *See Flanagan v. Maly,* 2002 WL 122921, at \*2 n. 3 (rejecting argument that prisoner could be excused from exhausting administrative remedies where correctional officers threatened him with violence if he filed a grievance because the prisoner "made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance").

Finally, McNair argues that he has not submitted "sufficient information" to establish whether he exhausted administrative remedies and that he should be allowed to take discovery concerning the Inspector General's investigations and to depose various prison officials. McNair Supp. Mem. at 4. In support of this argument he cites *Perez v. Blot,* 195 F.Supp.2d 539 (S.D.N.Y.2002). In *Perez,* the plaintiff was permitted to take discovery on his informal grievance efforts because the Court concluded that it was not clear if the plaintiff had complied with the "informal" provisions of § 701.11. *Id.* at 546. Here, McNair has explicitly stated what he in fact did with respect to submitting his complaints and nothing he states suggests that he complied with the § 701.11 procedures. Thus, discovery is not necessary. *See, e.g., Byas,* 2002 WL 1586963, at \*3 (plaintiff's attempt to invoke *Perez* to suggest that he satisfied exhaustion requirement unavailing because, among other reasons, he did not submit evidence that he notified the defendants' supervisor of the alleged assaults as required by § 701.11).

In sum, having determined that McNair has not exhausted his administrative remedies nor offered a justification for failing to do so, the claims of excessive force, unsanitary

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

conditions, conspiracy, and denial of medical needs must be dismissed without prejudice. *See Morales v. Mackalm,* 278 F.3d 126, 126 (2d Cir.2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion).

[4] In a recent filing with the Court, McNair states that on April 7, 2002, nearly a year after the complaint in this case was filed, he filed a grievance with the Inmate Grievance Resolution Committee. *See* Grievance, dated April 7, 2002 (annexed to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). He does not contend, however, that he has completed this process.[FN5] In any event, exhausting administrative remedies after a complaint is filed will not save a case from dismissal. *Neal v. Goord,* 267 F.3d 116, 121-23 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN5. In fact, McNair complains that the Department of Corrections has failed to respond to his grievance complaint. *See* Letter, dated June 11, 2002 (annexed as last page to Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39)). The Court notes that McNair filed this grievance nearly three years after the alleged incidents, and that inmate grievances must be filed within 14 days of the incident or be time-barred, unless the inmate demonstrates mitigating circumstances justifying the delay. 7 N.Y.C.R.R. § 701.7(a)(1). In any event, the Inmate Grievance Program regulations provide that "matters not decided within the time limits" for the initial step of review (14 days) "may be appealed to the next step." 7 N.Y.C.R.R. § 701.8.

C. *Claims of Procedural Defects*

[5] At the conclusion of his disciplinary hearing on June 18, 1999, McNair was found guilty of various rule violations. Disc. Transcript at 1. McNair challenges the conduct of this hearing on the grounds that it was procedurally flawed. He alleges that Pico "imposed inappropriate penalties of 365 days Special Housing Unit,

365 days loss of Telephones, Packages, and 365 days of recommended loss of good time" based on a prior weapons charge and a misbehavior report that is not in McNair's disciplinary record. Amended Complaint at ¶ 1; McNair Aff. at ¶ 3. McNair also claims that Pico denied McNair his right to call witnesses in his defense, denied him "adequate assistance," and that his ruling was "arbitrary and capricious." Amended Complaint at ¶ 1. In addition, McNair claims that because he gave Superintendent Strack notice of the alleged constitutional violations by way of his July 3, 1999 letter, Strack is also liable for damages. *See* Affirmation in Opposition Of Motion To Dismiss And/Or for Summary Judgment, dated April 15, 2002 ("McNair April Aff."). Defendants now move to dismiss these claims not on exhaustion grounds but rather pursuant to Fed.R.Civ.P. 12(b)(1) and (b)(6) on the ground that McNair's claims are not cognizable under 42 U.S.C. § 1983. *See* Notice of Motion, dated May 9, 2002 (Docket # 32); Memorandum of Law In Support of Jose Pico and Superintendent Strack's Motion to Dismiss the Amended Complaint, filed May 9, 2002 (Docket # 33).

1. *Standard for Motion to Dismiss*

**10** A court should dismiss a complaint pursuant to Rule 12(b)(6) if it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint that would entitle the plaintiff to relief. *See, e.g., Strougo v. Bassini,* 282 F.3d 162, 167 (2d Cir.2002); *King v. Simpson,* 189 F.3d 284, 286-87 (2d Cir.1999). The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). The issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support his or her claims. *See, e.g., Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). The Court must "confine its consideration 'to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' " *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir.1999).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

When considering motions to dismiss the claims of a plaintiff proceeding *pro se,* pleadings must be construed liberally. *See, e.g., Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' ") (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Lerman v. Board of Elections,* 232 F.3d 135, 139-40 (2d Cir.2000), *cert. denied,* 533 U.S. 915, 121 S.Ct. 2520, 150 L.Ed.2d 692 (2001); *Flaherty v. Lang,* 199 F.3d 607, 612 (2d Cir.1999).

2. *Merits of McNair's Claims*

In *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held that a state prisoner's claim for damages is not cognizable under 42 U.S.C. § 1983 if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence," unless the prisoner can demonstrate that the conviction or sentence had previously been invalidated. *Id.* at 486-87. Later in *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court made clear that a claim may not be brought under 42 U.S.C. § 1983 alleging a violation of procedural due process in a prison disciplinary proceeding where the nature of the challenge necessarily implies the invalidity of the judgment or punishment imposed, unless of course the disciplinary proceeding is first invalidated. *Id.* at 648.

Here, McNair seeks damages based on his allegations that the disciplinary proceedings were improperly conducted, *inter alia,* because McNair was not permitted to call witnesses, he did not have adequate assistance, and the hearing officer relied on improper evidence (the prior weapons charge). Amended Complaint at ¶ 1. McNair's own filings with this Court concede that his disciplinary sanction-the loss of good time credits and other privileges-has never been invalidated. *See, e.g.,* Notice of Appeal for Article 78, dated August 23, 2000 (reproduced as Ex. E to 6/11/2002 Exs.); Decision & Order on Motion, dated May 30, 2001 (reproduced as Ex. O to 6/11/2002 Exs.), at 2-3. Thus, *Heck* and *Edwards* bar consideration

of his claim in a § 1983 action.

**\*11** McNair asserts in reply that his appeal to the Appellate Division, Second Department, was dismissed for failure to perfect his appeal within 10 days and that he was unable to perfect the appeal because of the disruption of his legal mail. *See* Affirmation in Opposition to Defendant's Motion to Dismiss, filed July 29, 2002 (Docket # 39), at ¶ 19. But even assuming this to be true, any attempt to seek relief for the untimely filing would have been properly addressed only to the state court. Because McNair has not "fully exhausted available state remedies," he has "no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus." *Heck,* 512 U.S. at 489. In fact, nothing prevents McNair from returning to federal court on some later date if in fact he is able to obtain review from the state court and that review results in a reversal or expungement of the disciplinary action. *See id.* (statute of limitations for bringing § 1983 claim does not commence until state court proceedings have terminated in plaintiff's favor).

In addition, the Court notes that the case of *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999), is of no help to McNair because *Jenkins* held only that a § 1983 action would be available to a prisoner challenging the constitutionality of a disciplinary proceeding where the suit "does not affect the overall length of the prisoner's confinement." *Id.* at 27. Here, however, the sanction against McNair included the loss of "good time" credits, which is precisely the sort of sanction that affects the length of confinement. *See Edwards,* 520 U.S. at 646-48; *Hyman v. Holder,* 2001 WL 262665, at *3 (S.D.N.Y. Mar.15, 2001).

While McNair does not make the argument, it is also of no moment that McNair's disciplinary hearing resulted in additional sanctions that did not affect the length of McNair's sentence (for example, the placement in segregated housing and the loss of telephone privileges). This is because a judgment in favor of McNair in a § 1983 suit for damages would nonetheless imply the invalidity of his sentence through its reinstatement of good-time credits. McNair has not suggested that he seeks damages for the non-good-time sanctions by themselves and he would be unable in any event to so "split" his claim. *See*

Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)
(Cite as: 2002 WL 31082948 (S.D.N.Y.))

*Gomez v. Kaplan,* 2000 WL 1458804, at *7-11 (S.D.N.Y. Sept.29, 2000) (citing cases) (dictum).

Accordingly, McNair's claim challenging the process and validity of the disciplinary decision is not cognizable under § 1983 and must be dismissed with prejudice for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6).[FN6]

> FN6. The claim is not so patently without merit, however, that dismissal is appropriate for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). *See, e.g., Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 100 (2d Cir.1990). Accordingly, the defendants' motion must be denied on this ground.

> Additionally, the request to dismiss unserved defendants, made in a reply brief, *see* Defendants Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Amended Complaint And/Or For Summary Judgment, dated July 26, 2002, at 1 n. 1, is now moot as the complaint does not state a claim against any defendant.

III. *CONCLUSION*

Judgment should be entered in favor of the defendants on all claims. With respect to McNair's claims against Pico and Strack alleging due process violations, these claims should be dismissed with prejudice. All other claims should be dismissed without prejudice for failure to exhaust administrative remedies.

**Notice of Procedure for Filing of Objections to this Report and Recommendation**

**\*12** Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk

of the Court, with extra copies delivered to the chambers of the Honorable Richard C. Casey, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Casey. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

S.D.N.Y.,2002.
McNair v. Sgt. Jones
Not Reported in F.Supp.2d, 2002 WL 31082948 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert HAIRSTON, Plaintiff,
v.
New York State Department of Correction Officers Paul
L. LaMARCHE, Michael J. Walts, Reginald Wright,
Thomas J. Wurster, Gregory S. Kutus & Sergeant
Bernard A. Lonczak, Defendants.
**No. 05 civ. 6642(KMW)(AJP).**

Aug. 10, 2006.

Brett Harris Klein, Leventhal & Klein, LLP, Staten Island,
NY, for Plaintiff.

Christine Anne Ryan, Office of New York State Attorney
General, New York, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

ANDREW J. PECK, United States Magistrate Judge.

**\*1** To the Honorable Kimba M. Wood, United States
Chief District Judge:

Plaintiff Robert Hairston, an inmate in the custody of the
New York State Department of Correctional Services
("DOCS"), brings this action pursuant to 42 U.S.C. §
1983, represented by counsel, alleging violations of his
constitutional rights due to his alleged assault by various
DOCS employees. (Dkt. No. 31: Am. Compl.) After
completion of discovery limited to whether Hairston
exhausted his administrative remedies (*see* Dkt. No. 28:
4/12/06 Order), defendants moved for summary judgment
solely on the exhaustion issue (Dkt. No. 34: Notice of

Motion).[FN1]

> [FN1.] Defendants' summary judgment motion was
> made on behalf of Correction Officers Lamarche
> and Walts because they were the only defendants
> who had been served at that time. After the
> motion was submitted, Hairston served Officer
> Wright and Sgt. Lonczak but has yet to serve
> Officers Kutus and Wurster. (*See* Dkt. No. 40:
> Defs. Reply Br. at 1 n. 1.) Defendants have
> requested that, since their motion is not based on
> arguments particular to any individual defendant,
> their legal arguments be accepted on behalf of
> "the recently served Defendants as well [as]
> those individuals who have not yet been served."
> (*Id.*) The Court accepts defendants' arguments on
> exhaustion on behalf of all defendants, and
> decision of this motion will be the law of the
> case.

For the reasons set forth below, defendants' motion for
summary judgment should be DENIED.

### *FACTS*

Hairston's complaint alleges that on June 10, 2004 in
Green Haven Correctional Facility, Correction Officers
Lamarche and Walts physically attacked him, causing him
physical injury. (Dkt. Nos. 34 & 38: Defs. & Hairston
Rule 56.1 Stmts. ¶¶ 1, 7; Dkt. No. 31: Am. Compl. ¶¶
10-19.)[FN2]

> [FN2.] According to Hairston, the alleged assault
> occurred as follows: On June 10, 2004, Hairston
> was speaking to his wife on their weekly
> telephone conversation (Hairston Rule 56.1 Stmt.
> ¶ 24; Dkt. No. 37: Klein Aff. Ex. A: Hairston
> Aff. ¶¶ 6-7; Klein Aff. Ex. B: Willie Mae
> Hairston Aff. ¶¶ 3-4) when Correction Officer
> Lamarche banged on the door of the telephone
> room and yelled at Hairston to get off the phone
> and go to the second floor (Hairston Rule 56.1

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

Stmt. ¶¶ 25, 27; Hairston Aff. ¶ 7; Willie Mae Hairston Aff. Ex. 1: 6/10/04 Telecon. Tr. at 656-57). Hairston ended his phone call "within seconds" of the order and exited the telephone room, at which point Lamarche said, " 'I'll teach you not to turn your back,' " activated his personal alarm, told Hairston to go to the first floor and followed him there. (Hairston Rule 56.1 Stmt. ¶¶ 28, 30; Hairston Aff. ¶ 7; see Willie Mae Hairston Aff. ¶ 5; Willie Mae Hairston Aff. Ex. 1: 6/10/04 Telecon. Tr. at 656-57.)

Correction Officers Wright and Walts approached them on the first floor, and asked who the subject of the alarm was. (Hairston Rule 56.1 Stmt. ¶ 31; Hairston Aff. ¶ 8.) Officer Larmarche answered that Hairston was the alarm subject and "without provocation attacked [Hairston] from behind." (Hairston Rule 56.1 Stmt. ¶¶ 31-32; Hairston Aff. ¶ 8.) Officer Lamarche threw Hairston to the floor and repeatedly "smashed" Hairston's head into the floor and then repeatedly hit Hairston "in the face with a hard black object." (Hairston Rule 56.1 Stmt. ¶ 32; Hairston Aff. ¶ 8.) Officer Walts and other correction officers repeatedly kicked Hairston. (Hairston Rule 56.1 Stmt. ¶ 32; Hairston Aff. ¶ 8.) Hairston's hands were handcuffed behind his back, he was dragged to his feet, and an officer kicked him in the chest. (Hairston Rule 56.1 Stmt. ¶ 33; Hairston Aff. ¶ 8.) Hairston was unable to stand and defendants put him into a wheelchair and took him to the infirmary. (Hairston Rule 56.1 Stmt. ¶¶ 33-34; Hairston Aff. ¶ 8.)

Hairston suffered a broken nose, swollen and bloody face and eye, bruised ribs, back and legs and dislocated shoulder. (Hairston Rule 56.1 Stmt. ¶¶ 33, 36-37; Hairston Aff. ¶ 8.)

Due to his injuries, Hairston spent the night in the prison clinic and later was taken to the hospital. (Hairston Rule 56.1 Stmt. ¶¶ 35-37; Ex. A: [FN3] Hairston Aff. ¶¶ 10-11.) While in the prison clinic, Sergeant West interviewed

Hairston about the incident. (Hairston Rule 56.1 Stmt. ¶ 35; Hairston Aff. ¶ 9; Ex. N at 583: 6/10/04 Sgt. West "Inter-Departmental Communication.") According to Sgt. West's memo, Hairston told him only that he had been hit. (Ex. N at 583.) Hairston asserts that he told Sgt. West that he was "beaten for no reason by correction officers" at which point Sgt. West yelled at Hairston to "shut up," which intimidated Hairston such that he "felt that if [he] said anything else about the attack, [he] would be subject to further assault and abuse." (Hairston Rule 56.1 Stmt. ¶ 35; Hairston Aff. ¶¶ 9, 14.)

FN3. Unless otherwise indicated, references to Exhibits are to the Klein affidavit exhibits, Dkt. No. 37.

### Hairston's Time in the Special Housing Unit

When Hairston returned from the hospital he was issued a misbehavior report and placed in the Special Housing Unit ("SHU"), where he remained until August 8, 2004. (Hairston Rule 56.1 Stmt. ¶ 38; Dkt. No. 41: Defs. Reply Rule 56.1 Stmt. ¶ 20; Ex. A: Hairston Aff. ¶ 12.)

According to Hairston, he "never spoke with, observed, nor became aware of any IGRC staff member making rounds in SHU." (Hairston Rule 56.1 Stmt. ¶ 40; Hairston Aff. ¶ 13.)

On June 15, 2004, when Hairston was granted visitation with his wife, Willie Mae Hairston, he related the details of the June 10th assault to her. (Hairston Rule 56.1 Stmt. ¶ 41; Defs. Reply Rule 56.1 Stmt. ¶ 23; Ex. B: Willie Mae Hairston Aff. ¶ 8.)

### Willie Mae Hairston's Letter to Superintendent Phillips and the Inspector General's Office Investigation

On June 18, 2004, Willie Mae Hairston wrote a letter to Superintendent Phillips describing in detail her husband's beating and requesting a thorough investigation. (Hairston Rule 56.1 Stmt. ¶ 42; Ex. B: Willie Mae Hairston Aff. ¶¶ 9-10; Willie Mae Hairston Aff. Ex. 2: 6/18/04 Letter to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

Supt. Phillips.) On June 25, 2004, Superintendent Phillips responded that "the incident involving your husband has been referred to the Department's Inspector General's Office for investigation." (Willie Mae Hairston Aff. Ex. 3: 6/25/04 Letter from Supt. Phillips; Hairston Rule 56.1 Stmt. ¶ 43; Defs. Reply Rule 56.1 Stmt. ¶ 25; Willie Mae Hairston Aff. ¶ 11.) [FN4] On June 29, 2004, Superintendent Phillips signed the "Use of Force Report" with a note that "circumstances" had "led the facility to refer case to the Inspector General for investigation." (Ex. G at 87: "Use of Force Report.")

> FN4. Additionally, the Inspector General's Office received a complaint from Hairston's brother on July 2, 2004 complaining about Correction Officer Lamarche's assault on Hairston (Dkt. No. 42: Ryan Reply Aff. Ex. A at 523: "Office of the Inspector General, Receipt of Complaint.") Superintendent Phillips also wrote to Barry M. Fallik, Esq., Hairston's attorney, in apparent response to Fallick's letters to him. (Defs. Reply Rule 56.1 Stmt. ¶ 25; Ryan Reply Aff. Ex. A at 718, 719.)

**\*2** The Inspector General's Office conducted a thorough investigation of the incident. (Hairston Rule 56.1 Stmt. ¶ 44; Defs. Reply Rule 56.1 Stmt. ¶ 26; Ex. N: "Inspector General's Office Investigative Report" & Case File.) The case was assigned to Inspector Hudson on July 6, 2004 (Ex. N at 518: "Investigative Report.") His investigation included interviews with involved correction officers, Hairston and nine inmate witnesses. (Ex. N.) The case file also contained written statements from the involved correction officers; receipts of complaints by the Inspector General's Office; general letters of complaint; and the Inspector's report. (Ex. N.) On July 16, 2004, Investigator Hudson interviewed Hairston, who described the assault. (Hairston Rule 56.1 Stmt. ¶ 48; Defs. Reply Rule 56.1 Stmt. ¶ 30; Ex. N at 629-30: I.G. "Report of Interview" of Hairston; Hairston Aff. ¶ 21.) According to Hairston, Investigator Hudson "indicated that the Inspector General's office would thoroughly and fairly investigate and bring charges against all officers involved in any unjustified use of force." (Hairston Aff. ¶ 21.)

The Inspector General's Report, dated October 5, 2004,

concluded that "the use of force involving Inmate Hairston ... was reasonably necessary and in accordance with Department policy and procedure. No evidence was found to support Inmate Hairston's allegation of assault by staff. [The Inspector General] therefore recommend[ed] that this case be closed as unsubstantiated." (Ex. N at 519: "Inspector General's Office Investigative Report" at 2.)

### Hairston's Tier III Disciplinary Hearing and Appeal

On June 16, 2004, Hairston's Tier III Disciplinary Hearing commenced. (Ex. I at 662: Tier III Disciplinary Hrg. Tr. ["Tr."] 2.) At the disciplinary hearing, Hairston described the events of June 10, 2004, including the fact that Officer Lamarche beat him up. (Ex. I at 670-71, 711-14: Tr. 10-11, 51-54.) Hairston wanted to ask the correction officers more details about the assault on him but the hearing officer limited the inquiry, explaining that "it's not [his] job to investigate staff misconduct" but rather to "try to figure out this incident." (Ex. I at 697-98: Tr. 37-38.) [FN5] The hearing was adjourned until July 2, 2004 and adjourned again to July 11 (Ex. I at 706-07: Tr. 46-47), when Hairston reiterated his testimony, describing his beating in detail. (Ex. I at 712-14: Tr. 52-54.)

> FN5. Hairston asked Officer Walts if he had punched him in the face, which prompted the hearing officer to limit the scope of Hairston's questions. (Ex. I at 697-98: Tr. 37-38.) When Hairston persisted with the question, Officer Walts testified that he had to use force and the hearing officer again said that he was "not gonna get into it" and that "staff members are allowed to use justifiable force in an incident." (Ex. I at 698-99: Tr. 38-39.)

On June 17, 2004, Superintendent Phillips wrote Hairston in response to a letter Hairston apparently sent to the Superintendent on June 16, requesting an investigation into Hairston's Tier III hearing. (Dkt. No. 42: Ryan Reply Aff. Ex. A at 720: 6/17/04 "Inter-Departmental Communication.") Superintendent Phillips informed Hairston that he could make the facts of his case known to the hearing officer and could appeal the disposition of the hearing if

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

he was unsatisfied with the result. (*Id.*)

At the conclusion of the hearing, the hearing officer found Hairston guilty of the charges (including violence, assault on staff and refusing a direct order), based on the correction officers' testimony. (Ex. I at 714-15: Tr. 54-55; Ex. H: Tier III Disposition; Hairston Aff. ¶ 19.) The hearing officer imposed 60 days in SHU and related penalties. (Ex. I at 715-16; Tr. 55-56; Ex. H: Tier III Disposition.) Hairston was informed of his right to file a Tier III appeal of the decision. (Ex. I at 716: Tr. 56.)

**\*3** On July 12, 2004, Hairston filed a Tier III appeal in which he also reiterated the facts of the assault on him. (Ex. J: Tier III Appeal; Hairston Rule 56.1 Stmt. ¶ 50; Hairston Aff. ¶ 19.) [FN6] On September 15, 2004, Hairston's appeal was denied by Ronald Selsky, Director of Special Housing/Inmate Disciplinary Program. (Ex. K: Review of Superintendent's Hearing.)

> FN6. Although defendants deny that Hairston reiterated the facts of the assault (Defs. Reply Rule 56.1 Stmt. ¶ 32), Hairston's appeal letter does go through the incident and states that Officer Larmarche "started the attack, with a push and punching knock me down to the floor, knocking my head to the floor several times and CO Walts was kicking me all on the left side and back, legs and ribs" (Ex. J: Tier III Appeal).

### Hairston's Release From SHU and Subsequent Filing of Grievance

Hairston asserts that within eight days of his August 8, 2004 release from SHU, he learned from another inmate that he should have filed a grievance to address his assault claim. (Ex. A: Hairston Aff. ¶¶ 22, 24.) Consequently, on August 16, 2004, Hairston filed a grievance alleging assault by Officers Lamarche and Walts. (Ex. L: 8/16/04 Inmate Grievance Complaint No. GH54482-04; Defs. & Hairston Rule 56.1 Stmts. ¶ 14; Hairston Rule 56.1 Stmt. ¶ 51; Hairston Aff. ¶ 24.)

On August 21, 2004 Hairston was again interviewed by

Sgt. West about the incident. (Ryan Aff. Ex. B at 18: "Inter-Departmental Communication"; see Hairston Rule 56.1 Stmt. ¶ 54; Hairston Aff. ¶ 25.)

On September 10, 2004, Superintendent Phillips denied Hairston's grievance:

All written To/Froms, U.I. reports, misbehavior report and Tier hearing were utilized in the investigation.

The evidence presented does not substantiate the allegations. This grievance is filed over 2 months after the incident and is grossly untimely.

Grievance is denied.

(Ex. M: 9/10/04 Superintendent Phillips Decision on Grievance GH54482-04; see Defs. & Hairston Rule 56.1 Stmts. ¶ 15.) It is undisputed that Hairston did not appeal the denial of his grievance. (Defs. & Hairston Rule 56.1 Stmts. ¶ 17; Ryan Aff. Ex. D: Eagen Aff. ¶¶ 8-10.) Hairston asserts that he "believed that [he] could not make any other administrative complaints or appeals and that [he] had to file a lawsuit to seek justice." (Hairston Aff. ¶ 26.)

### Hairston's Federal Complaint

Hairston's initial § 1983 complaint asserted claims against New York State, DOCS and Correction Officers Lamarche, Wright and Walts. (Dkt. No. 2: Compl.) On May 19, 2006, represented by counsel, Hairston filed an Amended Complaint adding Correction Officers Wurster and Kutus and Sgt. Lonczak as additional defendants, and dropping New York State and DOCS. (Dkt. No. 31: Am. Compl.; see Dkt. No. 28: 4/12/06 Order.) Hill's amended complaint alleges that his Fourth and Eighth Amendment rights were violated due to the excessive use of force against him, summary punishment imposed on him by defendants, and deliberate indifference to his serious medical needs. (Am.Compl.¶ 26.)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

*ANALYSIS*

**I.   SUMMARY   JUDGMENT   STANDARDS   IN SECTION 1983 CASES** [FN7]

FN7. For additional decisions by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Hill v. Melvin, 05 Civ. 6645, 2006 WL 1749520 at *3-5 (S.D.N.Y. June 27, 2006)* (Peck, M.J.); *Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *9-11 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006)* (Kaplan, D.J.); *Ramashwar v. Espinoza,* 05 Civ.2021, 2006 WL 23481 at *5-6 (S.D.N.Y. Jan. 5, 2006)* (Peck, M.J.); *Doe v. Goord,* 04 Civ. 0570, 2005 WL 3116413 at *8-10 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.); *Dawkins v. Jones,* No. 03 Civ. 0068, 2005 WL 196537 at *9-10 (S.D.N.Y. Jan. 31, 2005)* (Peck, M.J.); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *3 (S.D.N.Y. May 13, 2004)* (Peck, M.J.); *Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *4-6 (S .D.N.Y. Dec. 10, 2003)* (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *10-11 (S.D.N.Y. Aug. 5, 2003)* (Peck, M.J.) (citing prior decisions).

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

*4 The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See,*

*e.g., Adickes v.. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994).* The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513; see also, *e.g., Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987); *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

*cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

## II. DEFENDANTS' SUMMARY JUDGMENT MOTION FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES SHOULD BE DENIED

### A. *Exhaustion of Administrative Remedies: Background*

*5 Under 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act ("PLRA"), a prisoner must exhaust administrative remedies before bringing suit in federal court under federal law:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). This provision requires complete and proper exhaustion in accordance with the prison's administrative procedures. *See, e.g., Woodford v. Ngo,* 126 S.Ct. 2378, 2382, 2387-88 (2006). Exhaustion is required even when a prisoner seeks a remedy that cannot be awarded by the administrative procedures. *E.g., Woodford v. Ngo,* 126 S.Ct. at 2382-83; *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 988 (2002); *Booth v. Churner,* 532 U.S. 731, 741, 121 S.Ct. 1819, 1825 (2001).[FN8] The Supreme Court has made clear that the PLRA's exhaustion requirement applies to all prisoner claims:

FN8. *See also, e.g., Beharry v. Ashcroft,* 329

F.3d 51, 58 (2d Cir.2003); *Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *7 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *Rivera v. Pataki,* 01 Civ. 5179, 2003 WL 21511939 at *4, 8 (S.D.N.Y. July 1, 2003); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *7 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Nelson v. Rodas,* 01 Civ. 7887, 2002 WL 31075804 at *2 (S.D.N.Y. Sept. 17, 2002) (Peck, M.J.).

[W]e hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

*Porter v. Nussle,* 534 U.S. at 532, 122 S.Ct. at 992; *see also, e.g., Woodford v. Ngo,* 126 S.Ct. at 2383 ("exhaustion of available administrative remedies is required for any suit challenging prison conditions"); *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006); *Doe v. Goord,* 2004 WL 2829876 at *7-8.

The purpose of the PLRA is " 'to reduce the quantity and improve the quality of prisoner suits ... [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004) (quoting *Porter v. Nussle,* 534 U.S. at 524-25, 122 S.Ct. at 988); *see also, e.g., Woodford v. Ngo,* 126 S.Ct. at 2387; *Brownell v. Krom,* 446 F.3d at 310.

The Second Circuit has held, in furtherance of the PLRA's objectives, that "inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004); *accord, e.g., Brownell v. Krom,* 446 F.3d at 310. "In determining whether exhaustion has been achieved, [the Second Circuit has] drawn an analogy between the contents of an administrative grievance and notice pleading, explaining that ' "[a]s in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." ' " *Brownell v. Krom,* 446 F.3d at 310 (quoting *Johnson v. Testman,* 380 F.3d at 697). Thus, to determine whether an inmate has exhausted his

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

administrative remedies, the Court must determine whether the inmate's grievance was sufficient on its face to alert the prison of his complaint. *Brownell v. Krom,* 446 F.3d at 310-11.

**\*6** Where an inmate has not exhausted administrative remedies according to the letter of the prescribed prison procedures, the Court must determine whether circumstances existed to excuse the inmate's failure to exhaust his administrative remedies. *Brownell v. Krom,* 446 F.3d at 311 (concluding that the inmate's grievance was not exhausted where it had not sufficiently put the defendants on notice of the allegations in his complaint but that special circumstances justified his failure to exhaust).

The Second Circuit has set forth a three-part inquiry to determine whether an inmate has exhausted administrative remedies:

Depending on the inmate's explanation for the alleged failure to exhaust, the court must [1] ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F .3d 663, 2004 WL 1842647.[2] The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 2004 WL 1842669, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba [v. Wezner],* 366 F.3d [161,] 163 [ (2d Cir.2004) ]. [3] If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 2004 WL 1842652 [ (2d Cir.2004) ].

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *accord, e.g., Brownell v. Krom,* 446 F.3d at 311-12;

*Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).[FN9]

FN9. The Second Circuit has yet to address the effect, if any, of the recent Supreme Court's *Woodford* decision on the three-step *Hemphill* inquiry. In *Woodford,* where the inmate had filed an untimely grievance, the Supreme Court held that a prisoner must "properly" exhaust administrative remedies before suing in federal court. *Woodford v. Ngo,* 126 S.Ct. at 2382. Judge Mukasey issued the only opinion within this Circuit discussing *Woodford,* and in it he recognized that "it is open to doubt whether *Woodford* is compatible with the results reached in some of the cases in this Circuit applying *Hemphill,* and parts of the *Hemphill* inquiry may be in tension with *Woodford.*" *Collins v. Goord,* 05 Civ. 7484, --- F.Supp.2d ----, 2006 WL 1928646 at \*7 n. 13 (S.D.N.Y. July 11, 2006); *see Hernandez v. Coffey,* 99 Civ. 11615, 2006 WL 2109465 at \*3 (S.D.N.Y. July 26, 2006) (noting that *Collins* applied the *Hemphill* three-part inquiry after *Woodford* ).

"The test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available ." *Hemphill v. New York,* 380 F.3d at 688.

Similarly, justification for a failure to exhaust otherwise available administrative remedies is determined by "looking at the circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d at 678 (prisoner's belief that direct appeal of his disciplinary conviction was his only available remedy was a reasonable interpretation of DOCS' directives and therefore his failure to exhaust was justified).

Dismissal of an action for failure to exhaust administrative remedies ordinarily is without prejudice. *E.g., Giano v. Goord,* 380 F.3d at 675 ("[A]dministrative exhaustion is not a jurisdictional predicate."); *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004) ("As we have noted, ' [f]ailure to

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

exhaust administrative remedies is often a temporary, curable procedural flaw. If the time permitted for pursuing administrative remedies has not expired, a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit....' In such circumstances, we have recognized that dismissal without prejudice is appropriate.") (citations omitted).[FN10]

> FN10. *See also, e.g., Townsend v. Armstrong,* 67 Fed. Appx. 47, 49 (2d Cir.2003); *De La Motte v. Menifee,* 40 Fed. Appx. 639, 639 (2d Cir.2002); *Doe v. Goord,* 2004 WL 2829876 at *8; *Muhammad v.. Pico,* 2003 WL 21792158 at *8; *Stevens v. Goord,* 99 Civ. 11669, 2003 WL 21396665 at *4 (S.D.N.Y. June 16, 2003); *Nelson v. Rodas,* 2002 WL 31075804 at *2.

**1. *DOCS' Grievance Procedures***

*\*7* It is useful to summarize DOCS' "well-established" normal three tier internal grievance procedure ("IGP"):

It consists of three levels. The first is the filing of a complaint with the facility's Inmate Grievance Review Committee. The second is an appeal to the facility superintendent. The final level is an appeal to the DOCS Central Office Review Committee in Albany.... A prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure.

*Doe v. Goord,* 04 Civ. 0570, 2004 WL 2829876 at *8-9 (S.D.N.Y. Dec. 10, 2004) (Peck, M.J.); *accord, e.g., Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *8 & n. 21 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.) (citing cases); see N.Y. Correct. Law §§ 138-39; 7 N.Y.C.R.R. § 701.1, et seq.; *see also, e.g., Brownell v. Krom,* 446 F.3d 305, 309 (2d Cir.2006); *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004); *Collins v. Goord,* 05 Civ. 7484, --- F.Supp.2d ----, 2006 WL 1928646 at *7 (S.D.N.Y. July 11, 2006) ("As a general matter, only after pursuing all three steps has an inmate 'exhausted' his claim.").

DOCS also provides for an "expedited procedure for the review of grievances alleging harassment" by DOCS employees,[FN11] as follows:

> FN11. Harassment includes "employee misconduct meant to ... harm an inmate." 7 N.Y.C.R.R. § 701.11(a); *see also, e.g., Hemphill v. New York,* 380 F.3d 680, 687 (2d Cir.2004) (7 N.Y.C.R.R. § 701.11 "provided grievance procedures that inmates claiming excessive force could utilize."); *Dukes v. S.H.U. C.O. John Doe,* 03 Civ. 4639, 2006 WL 1628487 at *4 (S.D.N.Y. June 12, 2006) (expedited grievance procedure under 7 N.Y.C.R.R. § 701.11 applied to inmate's claim of excessive force by DOCS officers); *Larry v. Byno,* No. 9:01-CV1574, 2006 WL 1313344 at *3 (N.D.N.Y. May 11, 2006) ("There is also an expedited grievance procedure for prisoners who, as in the present case, allege that they have been harassed or assaulted by correctional officers. 7 N.Y.C.R.R. § 701.11.").

(b) Procedure.

(1) An inmate who wishes to file a grievance complaint that alleges employee harassment shall follow the procedures set forth in section 701.7(a)(1) of this Part.

Note: An inmate who feels that s(he) has been the victim of employee misconduct or harassment should report such occurrences to the immediate supervisor of that employee. However, this is not a prerequisite for filing a grievance with the IGP.

(2) All grievances alleging employee misconduct shall be given a grievance calendar number and recorded in sequence. All documents submitted with the allegation must be forwarded to the superintendent by close of business that day.

(3) The superintendent or his designee shall promptly determine whether the grievance, if true, would represent a bona fide case of harassment as defined in subdivision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

(a) of this section. If not, then it shall be returned to the IGRC for normal processing.

(4) If it is determined that the grievance is a bona fide harassment issue, the superintendent shall either:

(i) initiate an in-house investigation by higher ranking supervisory personnel into the allegations contained in the grievance; or

(ii) request an investigation by the inspector general's office or, if the superintendent determines that criminal activity is involved, by the New York State Police Bureau of Criminal Investigation.

(5) Within 12 working days of receipt of the grievance, the superintendent will render a decision on the grievance and transmit said decision, with reasons stated to the grievant, the IGP clerk, and any direct party of interest. Time limit extensions may be requested, but such extensions may be granted only with the consent of the grievant.

*8 (6) If the superintendent fails to respond within the required time limit, the grievant may appeal his grievance to the CORC. This is done by filing a notice of decision to appeal with the IGP clerk.

(7) If the grievant wishes to appeal the superintendent's response to the CORC, he must file a notice of decision to appeal with the inmate IGP clerk within four working days of receipt of that response.

(8) Unless otherwise stipulated in this section, all procedures, rights, and duties required in the processing of any other grievance as set forth in section 701.7 of this Part shall be followed.

7 N.Y.C.R.R. § 701.11. (*See* Ex. O: DOCS Directive 4040, § VIII.)

The Inmate Grievance Procedure for prisoners in SHU provides that "an IGRC staff member ... will make rounds of all SHU areas at a reasonable time at least once a week." 7 N.Y.C.R.R. § 701.13(c).

(1) These rounds will allow for direct access to a member of the IGP. This procedure will allow inmates with writing or other communication problems the opportunity to request assistance.

(2) Inmates who wish to file a grievance and who have difficulty in doing so will be provided the necessary assistance upon request. Any problems of this nature will be reported to the IGP supervisor. The IGP supervisor will work with the deputy superintendents of programs and/or security to obtain the necessary assistance for inmates with such problems.

7 N.Y.C.R.R. § 701.13(c)(1)-(2). (*See* Ex. O: DOCS Directive 4040 § VII.E). [FN12]

> [FN12.] Additionally, 7 N.Y.C.R.R. § 304.14 provides that "a staff representative of the inmate grievance resolution committee will visit the SHU a minimum of once per week, or more often if necessary or requested to do so by the supervisor in charge of the SHU, to interview the inmate and investigate the grievance."

**B. *Hairston's Administrative Remedies Should Be Deemed Exhausted***

Hairston contends that he exhausted administrative remedies by notifying DOCS of his complaint through his disciplinary appeal and through letters to the Superintendent which resulted in an investigation by the Inspector General's Office. (Dkt. No. 39: Hairston Br. at 2-7.)

This is not a case, like *Woodford,* where the inmate tried to bring his federal lawsuit while bypassing prison grievance procedures. Rather, Hairston tried to exhaust prison grievance procedures; although each of his efforts,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance as to satisfy the purpose of the PLRA or to constitute "special circumstances" justify any failure to fully comply with DOCS' exhaustion requirements.

Hairston did not initially file a grievance to initiate the expedited grievance procedure of 7 N.Y.C.R.R. § 701.11(b). However, he had been placed in SHU immediately after the incident and he alleges that, contrary to DOCS policy, he was never aware of any IGRC staff making rounds in SHU. (*See* pages 3-4 above.) Hairston's testimony thus would create an issue of fact as to whether administrative procedures were "available" to him while he was in SHU, or whether, if Hairston were believed, DOCS' action inhibiting Hairston's exhaustion of remedies while in SHU would estop defendants from raising Hairston's failure to exhaust as a defense.

**\*9** There is more, however, that allows the Court to decide the exhaustion issue in Hairston's favor on this record.

Hairston's wife timely (within eight days of the incident) wrote to the Superintendent, describing the guards' assault on her husband and requesting a thorough investigation. (*See* page 4 above.) As defendants point out (Dkt. No. 40: Defs. Reply Br. at 6), pre-*Hemphill* cases generally held that merely writing a complaint letter to the Superintendent (or Commissioner or other high-level prison official, or the Inspector General or similar official) does not suffice to exhaust administrative remedies; such officials receive too many such letters. *See, e.g., Muhammed v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at \*8 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements.") (citing cases).[FN13] After the Second Circuit's August 18, 2004 *Hemphill* line of cases, whether or not a complaint letter to the Superintendent or Inspector General alone suffices to exhaust administrative remedies (and this Court believes it should not), a letter to the Superintendent who then commences an Inspector General investigation can constitute "special circumstances" that satisfy the PLRA requirement that

prison officials be afforded time and opportunity to address prisoner complaints internally. The Second Circuit has held that an inmate's letter of complaint which results in a formal investigation could "suffice[ ] to put the defendants on notice and provide[ ] defendants the time and an opportunity to address" an inmate's complaints. *Edwards v. Tarascio,* 119 Fed. Appx. 327, 330 (2d Cir.2005); *see Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005) ( "Although we agree with the District Court's conclusion that remedies were available, our decision in *Johnson* nonetheless requires that we remand for consideration of whether [plaintiff's] filing of three inmate request forms, his complaint about the prison officials' unresponsiveness to these forms during his disciplinary appeal, or some combination of the two, provided sufficient notice to the prison officials 'to allow [them] to take appropriate responsive measures,' thereby satisfying the exhaustion of administrative remedies requirement."); *Riccio v. Wezner,* 124 Fed. Appx. 33, 36 (2d Cir.2005).[FN14]

FN13. *See also, e.g., Thomas v. Cassleberry,* 315 F.Supp.2d 301, 304 (W.D.N.Y.2004) (plaintiff's letter to the Inspector General's Office did not result in a finding favorable to him and therefore did not suffice to exhaust his claim); *McNair v. Jones,* 01 Civ. 3253, 2002 WL 31082948 at \*7-8 (S.D.N.Y. Sept. 18, 2002) (letters to the Superintendent and to the Inspector General did not satisfy exhaustion requirement); *report & rec. adopted,* 2003 WL 22097730 (S.D.N.Y. Sept. 10, 2003); *Houze v. Segarra,* 217 F.Supp.2d 394, 395-96 (S.D.N.Y.2002); *Grey v. Sparhawk,* 99 Civ. 9871, 2000 WL 815916 at \*2 (S.D.N.Y. June 23, 2000).

FN14. The Court notes that a pre-*Hemphill* district court decision which held an inmate had failed to exhaust administrative remedies despite letters to the Superintendent and the Inspector General's Office, was vacated and remanded by the Second Circuit to consider whether "special circumstances" justified the inmate's failure to exhaust. *See Stephenson v. Dunford,* 320 F.Supp.2d 44 (W.D.N.Y.2004), *vacated,* 139 Fed. Appx. 311 (2d Cir.2005). *But see Tapp v. Kitchen,* No. 02-CV-6658, 2004 WL 2403827 at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

*7 (W.D.N.Y. Oct. 26, 2004) (Plaintiff's letters to the Superintendent and the Inspector General were not sufficient to exhaust administrative remedies where Inspector General's investigation found plaintiff's complaint unsubstantiated.).

That is what happened here. Superintendent Phillips took action on Ms. Hairston's letter-he referred the complaint to the Inspector General's Office for investigation, and so notified Ms. Hairston. (*See* page 4 above.) Thus, Ms. Hairston's letter caused the same result as an expedited grievance-the Superintendent "request[ing] an investigation by the inspector general's office." 7 N.Y.C.R.R. § 701.11(b)(4)(ii).

DOCS procedures as to an administrative appeal are unclear to this Court where, as here, the Superintendent has directed that the complaint be investigated by the Inspector General's Office. 7 N.Y.C.R.R. § 701.11(b)(4)(ii). At that stage, the inmate has obtained at least partial favorable relief, and as the Second Circuit has held, where the inmate receives favorable relief there is no basis for administrative appeal. *See, e.g., Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) ("The defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA.... A prisoner who has not received promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion."). Moreover, the requirement in § 701.11(b)(5) that the Superintendent render a decision within 12 working days of receipt of the grievance (or else the inmate "may" file an appeal, § 701.11(b)(6)), does not seem consistent with the time necessary for an Inspector General investigation (which in Hairston's case took almost four months after the incident). (*See* page 5 above.)

*10 If, following the procedures of 7 N.Y.C.R.R. § 701.11(b), the Superintendent (regardless of the 12 day rule) is to render a decision *after* the Inspector General concludes its investigation, and that triggers the inmate's obligation to appeal, the Superintendent here did not render any decision after the October 5, 2004 Inspector General's report. Indeed, it appears that Hairston did not receive the Inspector General's report until discovery in this litigation.

It is the practice in this Circuit to dismiss without prejudice unexhausted claims to provide inmates the opportunity to exhaust within the administrative system and then return to federal court if need be. (*See* cases cited on page 15 above.) Here, since Hairston never received notice of a decision by the Superintendent regarding his complaint, the four days he would have had to file an appeal of that decision under 7 N.Y.C.R.R. § 701.11(b)(7) never began to run. Thus, Hairston could still file an appeal to CORC. However, from the Superintendent's denial of Hairston's August grievance and Deputy Commissioner Selsky's denial of Hairston's appeal of his disciplinary hearing, it is apparent that any administrative appeal by Hairston now would be denied. Thus, on the particular circumstances of this case, in the interest of judicial efficiency, Hairston's federal complaint should not be dismissed without prejudice but instead should be allowed to proceed on the merits, especially since Hairston also tried to exhaust administrative remedies in two additional ways, justifying a finding of special circumstances.

In the midst of the Inspector General Office's investigation, Hairston's disciplinary hearing was held. (*See* pages 5-6 above.) Hairston raised the issue of the guards' assault at the disciplinary hearing, but the hearing officer did not allow the issue to be explored and did not inform Hairston of the proper avenue to raise that complaint.[FN15] Hairston again raised the assault issue in his appeal of the disciplinary hearing, which was denied by Deputy Commissioner Selsky on September 15, 2004. (*See* page 7 above.)

FN15. *Compare Revnoso v. Swezey,* 423 F.Supp.2d 73, 75-76 (W.D.N.Y.2006) (plaintiff who had filed grievance but failed to appeal to CORC and raised his allegations of assault in his disciplinary proceeding failed to exhaust where plaintiff had been informed during his disciplinary hearing that he had "other avenues available" to claim staff misconduct thereby eliminating the ambiguities that existed in *Johnson* and *Giano.*).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

The Court agrees with defendants (Defs. Reply Br. at 8, citing *Eleby v. Simmons,* 02 Civ. 636, 2005 U.S. Dist. LEXIS 40346 at *27 (W.D.N.Y. Apr. 11, 2005), *report & rec. adopted,* 2005 U.S. Dist. LEXIS 40350 (W.D.N.Y. June 24, 2005)) that prison disciplinary proceedings focus on the inmate's conduct, and thus ordinarily do not serve to exhaust the inmate's claim against correction officers. *See also, e.g,* Scott v. Gardner, 02 Civ. 8963, 2005 WL 984117 at *2-4 (S.D.N.Y. Apr. 28, 2005) (Even though *Giano* held that disciplinary appeals could excuse the filing of a grievance, plaintiff was not excused where he did not allege retaliation in his disciplinary hearing and appeal); Colon v. Farrell, No. 01-CV-6480, 2004 WL 2126659 at *5 (W.D.N.Y. Sept. 23, 2004) (" 'The general rule is that an appeal from a disciplinary hearing does not satisfy the grievance exhaustion requirement for an Eighth Amendment excessive force claim, even if the hearing is based on the same set of facts underlying the grievance.' ") (quoting pre-*Hemphill* cases). In this case, however, it is further evidence that Hairston tried to alert DOCS officials, including those in Albany, to his claims against correction officers for assault.

**\*11** Finally, once Hairston was released from the SHU and was advised by another inmate that he should file a grievance, he promptly did so. (*See* page 7 above.) Superintendent Phillips denied the grievance (although the Inspector General's investigation had not concluded), stating: "The evidence presented does not substantiate the allegations. This grievance is filed over two months after the incident and is grossly untimely." (Ex. M, quoted at pages 7-8 above.) It is unclear if the Superintendent's decision was on the merits, or based on the grievance being untimely, or some combination. Hairston asserts that he believed he could not appeal because the Superintendent found his grievance untimely. (*See* page 8 above.) Under Woodford v. Ngo, 126 S.Ct. 2378, 2387-88 (2006), an untimely grievance (whether or not Hairston had appealed) would not properly exhaust administrative procedures. However, the Court reads the Superintendent's denial of the grievance as resting on the merits ("The evidence presented does not substantiate the allegations.") with the untimely nature of the grievance an additional factor. The Superintendent's decision is anything but clear, and a reasonable inmate in Hairston's position could have forgone an appeal by focusing on the part of the decision finding the grievance untimely.

One thing is clear, however. Hairston was not attempting to circumvent the exhaustion requirements. *Compare, e.g.,* Woodford v. Ngo, 126 S.Ct. at 2388, & Giano v. Goord, 380 F.3d 670, 677 (2d Cir.2004). His wife's complaint on his behalf to the Superintendent led to an investigation by the Inspector General. Hairston also filed his own grievance once out of SHU, and also tried to raise issues about the guards' assault on him in the Tier III disciplinary hearing and his appeal to Albany from that decision. While he never exactly and completely complied with DOCS' grievance procedures, he did try to appropriately exhaust, and "special circumstances" exist justifying his failure to fully comply with the administrative procedural requirements. Allowing Hairston's case to proceed on the merits would not "subvert Congress's desire to 'afford[ ] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " Giano v. Goord, 380 F.3d at 677-78. On the contrary, a complete investigation was conducted. Therefore, under *Giano* and *Johnson,* "special circumstances" justify any technical failure by Hairston to completely exhaust his administrative remedies; Hairston put defendants on notice sufficient to now pursue his claims in federal court. *See* Benjamin v. Comm'r, New York State Dep't of Corr. Servs., 02 Civ. 1702, 2006 WL 783380 at *3 (S.D.N.Y. Mar. 28, 2006) (Plaintiff's letter to the Superintendent explaining the incident and detailed allegations about the incident in his disciplinary appeal statements satisfy the "lenient standard" set forth in *Johnson, i.e.,* providing prison officials enough information to take appropriate responsive measures, although noting the "potential for abuse inherent in the exceptions outlined in *Johnson, Giano,* and *Hemphill.*").

### CONCLUSION

**\*12** For the reasons set forth above, defendants motion for summary judgment for alleged failure to exhaust administrative remedies should be *DENIED.* This Court is issuing a separate scheduling order.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2309592 (S.D.N.Y.)
(Cite as: 2006 WL 2309592 (S.D.N.Y.))

(10) days from service of this Report to file written
objections. *See also* Fed.R.Civ.P. 6. Such objections (and
any responses to objections) shall be filed with the Clerk
of the Court, with courtesy copies delivered to the
chambers of the Honorable Kimba M. Wood, 500 Pearl
Street, Room 1610, and to my chambers, 500 Pearl Street,
Room 1370. Any requests for an extension of time for
filing objections must be directed to Judge Wood (with a
courtesy copy to my chambers). Failure to file objections
will result in a waiver of those objections for purposes of
appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466
(1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d
1049, 1054 (2d Cir.1993), cert. denied, 513 U.S. 822, 115
S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d
Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.),
*cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small
v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16
(2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55,
57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234,
237-38 (2d Cir.1983); 28 U.S.C. 636(b)(1); Fed.R.Civ.P.
72, 6(a), 6(e).

S.D.N.Y.,2006.
Hairston v. LaMarche
Not Reported in F.Supp.2d, 2006 WL 2309592
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
James MURRAY, Plaintiff,
v.
R. PALMER; S. Griffin; M. Terry; F. Englese; Sergeant
Edwards; K. Bump; and K.H. Smith, Defendants.
**No. 9:03-CV-1010 (GTS/GHL).**

March 31, 2010.

James Murray, Malone, NY, pro se.

Bosman Law Office, AJ Bosman, Esq., of Counsel, Rome,
NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, Timothy Mulvey, Esq., James Seaman,
Esq., Assistant Attorneys General, of Counsel, Albany,
NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

**\*1** The trial in this prisoner civil rights action, filed *pro se*
by James Murray ("Plaintiff") pursuant to 42 U.S.C. §
1983, began with an evidentiary hearing before the
undersigned on March 1, 2010, regarding the affirmative
defense of seven employees of the New York State
Department of Correctional Services-R. Palmer, S. Griffin,
M. Terry, F. Englese, Sergeant Edwards, K. Bump, and

K.H. Smith ("Defendants")-that Plaintiff failed to exhaust
his available administrative remedies, as required by the
Prison Litigation Reform Act, before filing this action on
August 14, 2003. At the hearing, documentary evidence
was admitted, and testimony was taken of Plaintiff as well
as Defendants' witnesses (Darin Williams, Sally Reams,
and Jeffery Hale), whom Plaintiff was able to
cross-examine through *pro bono* trial counsel. At the
conclusion of the hearing, the undersigned indicated that
a written decision would follow. This is that written
decision. For the reasons stated below, Plaintiff's Second
Amended Complaint is dismissed because of his failure to
exhaust his available administrative remedies.

**I. RELEVANT LEGAL STANDARD**

The Prison Litigation Reform Act of 1995 ("PLRA")
requires that prisoners who bring suit in federal court must
first exhaust their available administrative remedies: "No
action shall be brought with respect to prison conditions
under § 1983 ... by a prisoner confined in any jail, prison,
or other correctional facility until such administrative
remedies as are available are exhausted." 42 U .S.C. §
1997e. The PLRA was enacted "to reduce the quantity and
improve the quality of prisoner suits" by "afford[ing]
corrections officials time and opportunity to address
complaints internally before allowing the initiation of a
federal case." *Porter v. Nussle,* 534 U.S. 516, 524-25, 122
S.Ct. 983, 152 L.Ed.2d 12 (2002). In this regard,
exhaustion serves two major purposes. First, it protects
"administrative agency authority" by giving the agency
"an opportunity to correct its own mistakes with respect to
the programs it administers before it is haled into federal
court, and it discourages disregard of the agency's
procedures." *Woodford v. Ngo,* 548 U.S. 81, 89, 126 S.Ct.
2378, 165 L.Ed.2d 368 (2006). Second, exhaustion
promotes efficiency because (a) "[c]laims generally can be
resolved much more quickly and economically in
proceedings before an agency than in litigation in federal
court," and (b) "even where a controversy survives
administrative review, exhaustion of the administrative
procedure may produce a useful record for subsequent
judicial consideration." *Woodford,* 548 U .S. at 89. "[T]he
PLRA's exhaustion requirement applies to all inmate suits
about prison life, whether they involve general

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[FN1] *First,* an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[FN2] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. *Second,* a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. *Third,* a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

FN1. *See also White v. The State of New York,* 00-CV-3434, 2002 U . S. Dist. LEXIS 18791, at *6 (S.D.N.Y. Oct 3, 2002).

FN2. The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

*2 Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

It is important to note that these procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application was denied, the inmate could file a complaint complaining that the application was wrongfully denied.[FN3] Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can-and must-be appealed to the next level, including CORC, to complete the grievance process.[FN4] There appears to be a conflict in case law regarding whether the IGRC's nonresponse must be appealed to the superintendent where the plaintiff's grievance was never assigned a grievance number.[FN5] After carefully reviewing this case law, the Court finds that the weight of authority appears to answer this question in the affirmative.[FN6] The Court notes that, if the plaintiff adequately describes, in his appeal to the superintendent, the substance of his grievance (or if the plaintiff attaches, to his appeal, a copy of his grievance), it would appear that there is something for the superintendent to review.

FN3. *Groves v. Knight,* 05-CV-0183, Decision and Order at 3 (N.D.N.Y. filed Aug. 4, 2009)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

(Suddaby, J.).

FN4. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York,* 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), *vacated and remanded on other grounds,* 380 F.3d 680 (2d Cir.2004); *see, e.g .,* DOCS Directive 4040 dated 8/22/03, ¶ VI.G. ("Absent [a time limit extension granted by the grievant], matters not decided within the time limits may be appealed to the next step.); *Pacheco v. Drown,* 06-CV-0020, 2010 WL 144400, at *19 & n. 21 (N.D.N.Y. Jan.11, 2010) (Suddaby, J.) ("It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process."), *accord, Torres v. Caron,* 08-CV-0416, 2009 WL 5216956, at *5 & n. 28 (N.D.N.Y. Dec.30, 2009) (Mordue, C.J.), *Benitez v. Hamm,* 04-CV-1159, 2009 WL 3486379, at *13 & n. 34 (N.D.N.Y. Oct.21, 2009) (Mordue, C.J.), *Ross v. Wood,* 05-CV-1112, 2009 WL 3199539, at *11 & n. 34 (N.D.N.Y. Sept.30, 2009) (Scullin, J.), *Sheils v. Brannen,* 05-CV-0135, 2008 WL 4371776, at *6 & n. 24 (N.D.N.Y. Sept.18, 2008) (Kahn, J.), *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *15 & n. 46 (N.D.N.Y. June 20, 2008) (Hurd, J.), *McCloud v. Tureglio,* 07-CV-0650, 2008 WL 17772305, at *10 & n. 25 (N.D.N.Y. Apr. 15, 2008) (Mordue, C.J.), *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *14 & n. 114 (N.D.N.Y. Nov.6, 2007) (McAvoy, J.); *Nimmons v. Silver,* 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *11 & n. 66 (N.D.N.Y. June 22, 2006) (McAvoy, J.) ("[A]n inmate's

mere attempt to file a grievance (which is subsequently lost or destroyed by a prison official) is not, in and of itself, a reasonable effort to exhaust his administrative remedies since the inmate may still appeal the loss or destruction of that grievance."); *Walters v. Carpenter,* 02-CV-0664, 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) ("[M]atters not decided within the prescribed time limits must be appealed to the next level of review."); *Croswell v. McCoy,* 01-CV-0547, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him.").

FN5. *Compare Johnson v. Tedford,* 04-CV-0632, 616 F.Supp.2d 321, 326 (N.D.N.Y.2007) (Sharpe, J.) ("[W]hen a prisoner asserts a grievance to which there is no response, *and it is not recorded or assigned a grievance number,* administrative remedies may be completely exhausted, as there is nothing on record for the next administrative level to review.") [emphasis in original, and citations omitted] *with Waters v. Schneider,* 01-CV-5217, 2002 WL 727025, at *2 (S.D.N.Y. Apr.23, 2002) (finding that, in order to exhaust his available administrative remedies, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to his grievance, of which no record existed).

FN6. *See, e.g., Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *16, 18 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (finding that, in order to exhaust his available administrative remedies with regard to his grievance of August 30, 2000, plaintiff had to file an appeal with the superintendent from the IGRC's non-response to that grievance, which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

included a failure to acknowledge the receipt of the grievance and assign it a number); *Midalgo v. Bass,* 03-CV-1128, 2006 WL 2795332, at \*7 (N.D.N.Y. Sept.26, 2006) (Mordue, C.J., adopting Report-Recommendation of Treece, M.J.) (observing that plaintiff was "requir[ed]" to seek an appeal to the superintendent, even though he never received a response to his grievance of April 26, 2003, which was never assigned a grievance number); *Collins v. Cunningham,* 06-CV-0420, 2009 WL 2163214, at \*3, 6 (W.D.N.Y. July 20, 2009) (rejecting plaintiff's argument that his administrative remedies were not available to him where his grievance of March 20, 2004, was not assigned a grievance number); *Veloz v. New York,* 339 F.Supp.2d 505, 515-16 (S.D.N.Y.2004) (rejecting inmate's argument that the prison's grievance procedure had been rendered unavailable to him by the practice of prison officials' losing or destroying his grievances, because, *inter alia,* "there was no evidence whatsoever that any of [plaintiff's] grievances were filed with a grievance clerk," and he should have "appeal[ed] these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming"); *cf. Hernandez v. Coffey,* 582 F.3d 303, 305, 309, n. 3 (2d Cir.2009) ("Our ruling in no way suggests that we agree with Hernandez's arguments regarding exhaustion or justification for failure to exhaust [which included an argument that the Inmate Grievance Program was not available to him because, when he filed a grievance at the first stage of the Program, he received no response and his grievance was not assigned a grievance number].").

It is also important to note that DOCS has a *separate and distinct* administrative appeal process for inmate misbehavior hearings:

A. For Tier III superintendent hearings, the appeal is to the Commissioner's designee, Donald Selsky, D.O.C.S. Director of Special Housing/Inmate Disciplinary Program, pursuant to 8 N.Y.C.R.R. § 254.8;

B. For Tier II disciplinary hearings, the appeal is to the facility superintendent pursuant to 7 N.Y.C.R.R. § 253.8; and

C. For Tier I violation hearings, the appeal is to the facility superintendent or a designee pursuant to 7 N.Y.C.R.R. § 252.6.

**\*3** "An individual decision or disposition of any current or subsequent program or procedure having a written appeal mechanism which extends review to outside the facility shall be considered nongrievable." 7 N.Y.C.R.R. § 701.3(e)(1). Similarly, "an individual decision or disposition resulting from a disciplinary proceeding ... is not grievable." 7 N.Y.C.R.R. § 701.3(e)(2). However, "[t]he policies, rules, and procedures of any program or procedure, including those above, are grievable." 7 N.Y.C.R.R. § 701.3(e)(3); *see also* N.Y. Dep't Corr. Serv. Directive No. 4040 at III.E.

Generally, if a prisoner has failed to follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (citing *Porter,* 534 U.S. at 524). However, the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004), *accord, Ruggiero,* 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* [citations and internal quotations omitted].

With regard to this third inquiry, the Court notes that, *under certain circumstances,* an inmate may exhaust his administrative remedies by raising his claim during a related *disciplinary proceeding. Giano v. Goord,* 380 F.3d 670, 678-79 (2d Cir.2004); *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004).[FN7] However, in essence, the circumstances in question include instances in which (1) the inmate reasonably believed that his "only available remedy" was to raise his claim as part of a tier disciplinary hearing,[FN8] *and* (2) the inmate articulated and pursued his claim in the disciplinary proceeding in a manner that afforded prison officials the time and opportunity to thoroughly investigate that claim.[FN9] Some district courts have found the first requirement not present where (a) there was nothing objectively confusing about the DOCS regulations governing the grievability of his claim,[FN10] (b) the inmate was specifically informed that the claim in question was grievable,[FN11] (c) the inmate separately pursued the proper grievance process by filing a grievance with the IGRC,[FN12] (d) by initially alleging that he did appeal his claim to CORC (albeit without proof), the inmate has indicated that, during the time in question, he understood the correct procedure for exhaustion,[FN13] and/or (e) before and after the incident in question, the inmate pursued similar claims through filing a grievance with the IGRC.[FN14] Other district courts have found the second requirement not present where (a) the inmate's mention of his claim during the disciplinary hearing was so insubstantial that prison officials did not subsequently investigate that claim,[FN15] and/or (b) the inmate did not appeal his disciplinary hearing conviction.[FN16]

FN7. The Court recognizes that the Supreme Court's decision in *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), may have changed the law regarding possible exceptions to the exhaustion requirement (and thus the possibility that exhaustion might occur through the disciplinary process). Specifically, in *Woodford,* the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Woodford,* 548 U.S. at 93.

"Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* as a prerequisite to bringing suit in federal court. *Id. at 88-103* (emphasis added). It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. Out of special solicitude to Plaintiff, the Court will assume that *Woodford* has not overruled the Second Circuit's *Giano-Testman* line of cases.

FN8. *Giano,* 380 F.3d at 678 ("[W]hile Giano was required to exhaust available administrative remedies before filing suit, his failure to do so was justified by his reasonable belief that DOCS regulations foreclosed such recourse."); *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia,* whether prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing).

FN9. *Testman,* 380 F.3d at 696-98 (remanding case so that district court could consider, *inter alia.* whether prisoner's submissions in the disciplinary appeals process exhausted his remedies "in a substantive sense" by "afford[ing] corrections officials time and opportunity to address complaints internally"); *Chavis v. Goord,* 00-CV-1418, 2007 WL 2903950, at *9 (N.D.N.Y. Oct.1, 2007) (Kahn, J.) ("[T]o be considered proper, exhaustion must occur in both a substantive sense, meaning that prison officials are somehow placed on notice of an inmate's complaint, and procedurally, in that it must be presented within the framework of some established procedure that would permit both investigation and, if appropriate, remediation.") [citation omitted]. The Court joins the above-described two requirements in the conjunctive because the Second Circuit has recognized that mere notice to prison officials through informal channels, without more, does not suffice to satisfy the PLRA procedural

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

exhaustion requirement. *See Macias v. Zenk,* No. 04-6131, 495 F.3d 37, at *43-44 (2d Cir.2007) (recognizing that *Woodford v. Ngo,* 548 U.S. 81 [2006], overruled *Braham v. Casey,* 425 F.3d 177 [2d Cir.2005], to the extent that *Braham* held that "informal complaints" would suffice to exhaust a claim).

FN10. *See, e.g., Reynoso v. Swezey,* 423 F.Supp.2d 73, 75 (W.D.N.Y.2006), *aff'd,* 238 F. App'x 660 (2d Cir.2007) (unpublished order), *cert. denied,* 552 U.S. 1207, 128 S.Ct. 1278, 170 L.Ed.2d 109 (2008); *Holland v. James,* 05-CV-5346, 2009 WL 691946, at *3 (S.D.N.Y. March 6, 2009); *Winston v. Woodward,* 05-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008); *cf. Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *5 & n. 23 (N.D.N.Y. July 11, 2007) (McAvoy, J.) (reciting this point of law in context of failure to appeal grievance determination to CORC).

FN11. *See, e.g., Johnson v. Barney,* 04-CV-10204, 2007 WL 2597666, at *2 (S.D.N.Y. Aug.30, 2007); *Reynoso,* 423 F.Supp.2d at 75-76.

FN12. *See, e.g., Reynoso,* 423 F.Supp.2d at 75 ("There is no evidence that plaintiff was confused or misled about the proper method for raising his claims. In fact, the record shows exactly the opposite: plaintiff did file a grievance about the incident. He simply failed to appeal the denial of that grievance to CORC."); *Tapp v. Kitchen,* 02-CV-6658, 2004 WL 2403827, at *9 (W.D.N.Y. Oct.26, 2004) ("In the instant case, however, plaintiff does not and cannot claim to have believed that his only available remedy was to raise his complaint as part of his disciplinary hearing, since he also filed a grievance with the Inspector General, and also claims to have filed both an inmate grievance and a separate complaint with the facility superintendent."); *cf. Muniz,* 2007 WL 2027912, at *5 & n. 23 ("Plaintiff's Complaint alleges facts indicating that he believed it necessary to file a grievance

with the Gouverneur C.F. IGRC and to appeal the denial of that grievance to the Gouverneur C.F. Superintendent. Why would he not also believe it necessary to take the next step in the exhaustion process and appeal the Superintendent's decision to CORC?").

FN13. *See, e.g., Petrusch v. Oliloushi,* 03-CV-6369, 2005 WL 2420352, at *5 (W.D.N.Y. Sept.30, 2005) ("[A]s to his grievance, which is the subject of this lawsuit, plaintiff does not appear to be contending that he believed the Superintendent's denial constituted exhaustion, since by initially claiming that he did appeal to CORC, albeit without proof, he has demonstrated his knowledge of the correct procedure for exhaustion.").

FN14. *See, e.g., Benjamin v. Comm'r N.Y. State DOCS,* 02-CV-1703, 2007 WL 2319126, at *14 (S.D.N.Y. Aug.10, 2007) ("Benjamin cannot claim that he believed that appealing his disciplinary proceeding was the only available remedy at his disposal in light of the numerous grievances he has filed during his incarceration at Green Haven [both before and after the incident in question]."), *vacated in part on other grounds,* No. 07-3845, 293 F. App'x 69 (2d Cir.2008).

FN15. *See, e.g., Chavis,* 2007 WL 2903950, at *9 ("The focus of a disciplinary hearing is upon the conduct of the inmate, and not that of prison officials.... While the mention of a constitutional claim during plaintiff's disciplinary hearing could potentially have satisfied his substantive exhaustion requirement by virtue of his having notified prison officials of the nature of his claims, he did not fulfill his procedural exhaustion requirement [under the circumstances due to his] ... mere utterance of his claims during the course of a disciplinary hearing .... [T]here is nothing in the record to suggest that when the issues of interference with plaintiff's religious free exercise rights or alleged retaliation for having voiced his concerns were in any way

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

investigated by prison officials.") [citations omitted].

FN16. *See, e.g., Colon v. Furlani,* 07-CV-6022, 2008 WL 5000521, at *2 (W.D.N.Y. Nov.19, 2008) ("Colon was found guilty of harassment based on a letter that he wrote to defendant Bordinaro, concerning some of the events giving rise to his failure-to-protect claim, but it does not appear that he appealed that disposition.... While under some circumstances an inmate may be able to satisfy the exhaustion requirement by appealing from a disciplinary hearing decision ..., plaintiff did not do so here, and this claim is therefore barred under the PLRA.") [citations omitted]; *Cassano v. Powers,* 02-CV-6639, 2005 WL 1926013, at *5 (W.D.N.Y. Aug.10, 2005) ("[E]ven assuming plaintiff believed that his proper recourse was to raise [his] complaint at his disciplinary hearing, rather than using the Inmate Grievance Program, he did not exhaust that process. That is, plaintiff has not provided any evidence that he appealed his Tier III hearing conviction. Since plaintiff did not pursue even the disciplinary appeal process, he can not have made submissions in the disciplinary process that were sufficient, in a substantive sense, to exhaust his remedies under § 1997e(a).") [internal quotation marks and citation omitted].

*4 Finally, two points bear mentioning regarding exhaustion. First, given that non-exhaustion is an affirmative defense, the defendant bears the burden of showing that a prisoner has failed to exhaust his available administrative remedies. *See, e.g., Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *4 (S.D.N.Y. July 25, 2008). However, once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then "counter" Defendants' assertion by showing exhaustion, unavailability, estoppel, or "special circumstances." [FN17]

FN17. *See Hemphill,* 380 F.3d at 686 (describing the three-part inquiry appropriate in cases where

a prisoner plaintiff plausibly seeks to "counter" defendants' contention that the prisoner failed to exhaust his available administrative remedies under the PLRA); *Verley v. Wright,* 02-CV-1182, 2007 WL 2822199, at *8 (S.D.N.Y. Sept.27, 2007) ("[P]laintiff has failed to demonstrate that the administrative remedies were not, in fact, 'actually available to him.' "); *Winston v. Woodward,* 05-CV-3385, 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (finding that the plaintiff "failed to meet his burden under *Hemphill* of demonstrating 'special circumstances' "); *see also Ramirez v. Martinez,* 04-CV-1034, 2009 WL 2496647, at *4 (M.D.Pa. Aug.14, 2009) ("In order to effectively oppose defendants' exhaustion argument, the plaintiff has to make a showing in regard to each of his claims."); *Washington v. Proffit,* 04-CV-0671, 2005 WL 1176587, at *1 (W.D.Va. May 17, 2005) ("[I]t is plaintiff's duty, at an evidentiary hearing, "to establish by a preponderance of the evidence that he had exhausted his administrative remedies or that any defendant had hindered or prevented him from doing so within the period fixed by the Jail's procedures for filing a grievance.").

Second, the Court recognizes that there is case law from within the Second Circuit supporting the view that the exhaustion issue is one of fact, which should be determined by a jury, rather than by the Court.[FN18] However, there is also case law from within the Second Circuit supporting the view that the exhaustion issue is one of law, which should be determined by the Court, rather than by a jury.[FN19] After carefully reviewing the case law, the Court finds that the latter case law-which includes cases from the Second Circuit and this District-outweighs the former case law.[FN20] (The Court notes that the latter case law includes cases from the Second Circuit and this District.) [FN21] More importantly, the Court finds that the latter cases are better reasoned than are the former cases. In particular, the Court relies on the reasons articulated by the Second Circuit in 1999: "Where administrative remedies are created by statute or regulation affecting the governance of prisons, ... the answer depends on the meaning of the relevant statute or regulation." *Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999). The Court relies also on the several reasons articulated by Judge

Case 9:10-cv-00141-FJS-DEP   Document 33   Filed 12/17/10   Page 113 of 157


Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

Richard A. Posner in a recent Seventh Circuit decision: most notably, the fact that the exhaustion-of-administrative-remedies inquiry does not address the merits of, or deadlines governing, the plaintiff's claim but an issue of "judicial traffic control" (i.e., what forum a dispute is to be resolved in), which is never an issue for a jury but always an issue for a judge. *See Pavey v. Conley,* 544 F.3d 739, 740-42 (7th Cir.2008) (en banc), *cert. denied,* --- U.S. ----, 129 S.Ct. 1620, 173 L.Ed.2d 995 (2009). The Court notes that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth and Eleventh Circuits appear to agree with the ultimate conclusion of the Second and Seventh Circuits that the exhaustion issue is properly decided by a judge, not a jury.[FN22]

FN18. *See, e.g., Lunney v. Brureton,* 04-CV-2438, 2007 WL 1544629, at *10 n. 4 (S.D.N.Y. May 29, 2007) ("There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. As the Supreme Court has recently affirmed, however, exhaustion is an 'affirmative defense,' much like a statute of limitations defense. Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that 'issues of fact as to the application of that defense must be submitted to a jury.' Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court."); *Finch v. Servello,* 06-CV-1448, 2008 WL 4527758, at *8 n. 5 (N.D.N.Y. Sept.29, 2008) (McAvoy, J.) (citing *Lunney* and noting that "it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court").

FN19. *See, e.g., Harrison v. Goord,* 07-CV-1806, 2009 WL 1605770, at *7 n. 7 (S.D.N.Y. June 9, 2009) (recognizing that "[t]here is authority ... for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide ...."); *Amador v. Superintend. of Dept. of Corr. Servs.,* 03-CV-0650, 2007 WL 4326747, at *5 n. 7 (S.D.N.Y. Dec.4, 2007) ("It is unclear

whether factual disputes regarding the exhaustion defense should ultimately be decided by the court or by a jury.... [T]here is ... case law ... supporting the view that exhaustion should be determined by the court and not a jury."), *appeal pending,* No. 08-2079-pr (2d Cir. argued July 15, 2009).

FN20. *See, e.g., Mastroianni v. Reilly,* 602 F.Supp.2d 425, 438 (E.D.N.Y.2009) (noting that the magistrate judge held an evidentiary hearing "on the issue of exhaustion"); *Sease v. Phillips,* 06-CV-3663, 2008 WL 2901966, *3 n. 2 (S.D.N.Y. July 25, 2008) (finding that "the better approach is for the judge, and not the jury, to decide any contested issues of fact relating to the defense of failure to exhaust administrative remedies."); *Amador,* 2007 WL 4326747, at *5 n. 7 ("[T]here is ... case law, which in my view is more persuasive and on point, supporting the view that exhaustion should be determined by the court and not a jury. I find it proper that this issue be decided by the court."); *Enigwe v. Zenk,* 03-CV-0854, 2006 WL 2654985, at *4 (E.D.N.Y. Sept.15, 2006) (finding that, at the summary judgment "stage of the proceedings, a genuine question of fact exists with respect to whether [plaintiff] should be excused from exhausting his administrative remedies with regard to claims relating to his confinement at MDC Brooklyn," and therefore "direct[ing] that a hearing be held" before a judge, to resolve this issue; *Dukes v. S.H.U. C.O. John Doe # 1,* 03-CV-4639, 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering an "evidentiary hearing [before a judge] on the issue of whether prison officials failed to assign grievance numbers to [plaintiff]'s grievances and, if so, whether that rendered further administrative remedies unavailable, estopped the Defendants from asserting non-exhaustion, or justified [plaintiff]'s failure to appeal to the CORC"); *Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) ("The Court could have *sua sponte* dismiss[ed] this action as the record is unmistakeably clear that an appropriate administrative procedure was available to him, that he was required to exhaust

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

his administrative remedies, and that he failed to do so as required by the PLRA.... In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear."); *Roland v. Murphy,* 289 F.Supp.2d 321, 323 (E.D.N.Y.2003) "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.") [internal quotation marks and citation omitted]; *Evans v. Jonathan,* 253 F.Supp.2d 505, 509 (W.D.N.Y.2003) ( "[W]hether the plaintiff has exhausted his administrative remedies is a question for the Court to decide as a matter of law.").

FN21. *See, e.g., Snider v. Melindez,* 199 F.3d 108, 113-14 (2d Cir.1999) ("Whether an administrative remedy was available to a prisoner in a particular prison or prison system, and whether such remedy was applicable to the grievance underlying the prisoner's suit, are not questions of fact. They either are, or inevitably contain, questions of law. Where administrative remedies are created by statute or regulation affecting the governance of prisons, the existence of the administrative remedy is purely a question of law. The answer depends on the meaning of the relevant statute or regulation."), *accord, Mojias v. Johnson,* 351 F.3d 606, 608-11 (2d Cir.2003) (citing relevant language from *Snider v. Melindez,* and later stating that a district court could *sua sponte* dismiss a prisoner's civil rights complaint for failure to exhaust his available administrative remedies if it gave him notice and an opportunity to be heard); *DeBlasio v. Moriarty,* 05-CV-1143, Minute Entry (N.D.N.Y. filed Dec. 9, 2008) (McCurn, J.) (indicating that judge held pre-trial evidentiary hearing on whether plaintiff had exhausted administrative remedies before filing action); *Pierre v. County of Broome,* 05-CV-0332, 2007 WL 625978, at *1 n. 1 (N.D.N.Y. Feb.23, 2007) (McAvoy, J.) (noting that "[t]he court held an evidentiary hearing on October 25, 2006 concerning the issue of whether Plaintiff had exhausted administrative remedies"); *Hill v. Chanalor,* 419 F.Supp.2d 255, 257-59 (N.D.N.Y. March 8,

2006) (Kahn, J.) (*sua sponte* dismissing a prisoner's civil rights complaint, pretrial, for failure to exhaust his available administrative remedies after it gave him notice and an opportunity to be heard); *Raines v. Pickman,* 103 F.Supp.2d 552, 555 (N.D.N.Y.2000) (Mordue, J.) ("[I]n order for the Court to dismiss for failing to exhaust administrative remedies, the Court must be shown that such a remedy exists for an inmate beating in the grievance context. This is an issue of law for the Court to determine.").

FN22. *See Casanova v. Dubois,* 289 F.3d 142, 147 (1st Cir.2002); *Hill v. Smith,* 186 F. App'x 271, 273-74 (3d Cir.2006); *Mitchell v. Horn,* 318 F.3d 523, 529 (3d Cir.2003); *Anderson v. XYZ Corr. Health Servs., Inc.,* 407 F.3d 674, 682-83 (4th Cir.2005); *Dillon v. Rogers,* No. 08-30419, 2010 WL 378306, at *7 (5th Cir. Feb.4, 2010); *Taylor v. U.S.,* 161 F. App'x 483, 486 (6th Cir.2005); *Larkins v. Wilkinson,* 172 F.3d 48, at *1 (6th Cir.1998); *Husley v. Belken,* 57 F. App'x 281, 281 (8th Cir.2003); *Ponder v. Wackenhut Corr. Corp.,* 23 F. App'x 631, 631-32 (8th Cir.2002); *Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.2003), *cert. denied,* 540 U.S. 810 (2003); *Freeman v. Watkins,* 479 F.3d 1257, 1260 (10th Cir.2007); *Alloway v. Ward,* 188 F. App'x 663, 666 (6th Cir.2006); *Bryant v. Rich,* 530 F.3d 1368, 1373-76 (11th Cir.), *cert. denied,* --- U.S. ----, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008).

## II. ANALYSIS

As an initial matter, Plaintiff argues that he exhausted his administrative remedies regarding the claims at issue in this action, by filing a grievance regarding those claims, and then appealing the non-response to that grievance all the way to CORC. Because the Court rejects this argument based on the evidence adduced at the hearing, the Court proceeds to an analysis of the three-step exhaustion inquiry established by the Second Circuit.

### A. Availability of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

**\*5** New York prison inmates are subject to an Inmate
Grievance Program established by DOCS and recognized
as an "available" remedy for purposes of the PLRA. *See*
*Mingues v. Nelson,* 96-CV-5396, 2004 WL 324898, at \*4
(S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351
F.3d 606 (2d Cir.2003), and *Snider v. Melindez,* 199 F.3d
108, 112-13 [2d Cir.1999] ). There are different
circumstances under which the grievance procedure is
deemed not to have been available to an inmate plaintiff.
*Hemphill,* 380 F.3d at 687-88. For example, courts have
found unavailability "where plaintiff is unaware of the
grievance procedures or did not understand it or where
defendants' behavior prevents plaintiff from seeking
administrative remedies." *Hargrove v. Riley,* 04-CV-4587,
2007 WL 389003, at \*8 (E.D.N.Y. Jan.31, 2007) (internal
citations omitted). When testing the availability of
administrative remedies in the face of claims that undue
influence from prison workers has caused a plaintiff
inmate to forego the formal grievance process, courts
employ an objective test, examining whether "a similarly
situated individual of ordinary firmness [would] have
deemed them available." *Hemphill,* 380F.3d at 688
(quotations and citations omitted); *see also Hargrove,* 2007
WL 389003, at \*8.

Here, after carefully considering the evidence submitted at
the hearing in this action on March 1, 2010, the Court
finds that administrative remedies were "available" to
Plaintiff during the time in question. The Court makes this
finding for the following four reasons.

First, in his sworn Complaint (which has the force and
effect of an affidavit), Plaintiff stated, "Yes," in response
to the question, "Is there a prisoner grievance procedure at
this facility ." (Dkt. No. 1, ¶ 4.a.) [FN23] Second, both Darin
Williams (the corrections officer in charge of the special
housing unit during the relevant time period) and Sally
Reams (the Inmate grievance program supervisor during
the relevant time period) testified credibly, at the
exhaustion hearing, that there was a working grievance
program at Great Meadow Correctional Facility during the
time in question. (Hearing Tr. at 10, 12, 14-21, 40-54.)
Third, Plaintiff testified, at the exhaustion hearing that,
during this approximate time period (the August to
November of 2000), he filed at least three other grievances

Great Meadow Correctional Facility, to which he received
responses from the inmate grievance clerk, the
Superintendent, and CORC. (*Id.* at 154, 157-58, 169-70;
*see also* Hearing Exs. D-4, D-5, P-8, P-13, P-14.) [FN24]
Fourth, the Court finds the relevant portions of Plaintiff's
hearing testimony regarding the grievance at issue in this
action to be incredible due to various omissions and
inconsistencies in that testimony, and his demeanor during
the hearing. (*Id.* at 127-34.) [FN25]

FN23. The Court notes that, in his Complaint,
Plaintiff also swore that his "grievance was
denied." (Dkt. No. 1, ¶ 4.b.ii.) However, during
the exhaustion hearing, Plaintiff testified that he
never received a response to his grievance from
any member of DOCS.

FN24. In addition, the documentary evidence
adduced at the hearing establishes that, in
actuality, Plaintiff filed ten other grievances
during this time period (and several appeals from
the denials of those grievances). The first of
these grievances (Grievance Number
GM-30651-00), filed on August 25, 2000,
regarded Plaintiff's request for medications.
(Hearing Exs. D-4, D-5.) The second of these
grievances (Grievance Number GM-30691-00),
filed on September 1, 2000, regarded Plaintiff's
request for copies. (Hearing Ex. D-4.) The third
of these grievances (Grievance Number
GM-30729-00), filed on September 11, 2000,
regarded the use of full restrains against Plaintiff.
(*Id.; see also* Hearing Ex. P-14.) The fourth of
these grievances, filed on October 19, 2000
(Grievance Number GM-30901-00), regarded
Plaintiff's request for the repair of his cell sink.
(Hearing Exs. D-4, D-5.) The fifth of these
grievances (Grievance Number GM-30901-00),
also filed on October 19, 2000, regarded
Plaintiff's request for the clean up of his cell.
(Hearing Ex. D-4.) The sixth of these grievances
(Grievance Number GM-31040-00), filed on
November 17, 2000, regarded the review of
records. (*Id.*) The seventh of these grievances
(Grievance Number GM-31041-00), also filed on
November 17, 2000, regarded Plaintiff's request
for medical attention. (*Id.;* see also Hearing Ex.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

P-13) The eighth of these grievances (Grievance Number GM-31048-00), filed on November 20, 2000, regarded the rotation of books. (Hearing Ex. D-14) The ninth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded the review of records (and was consolidated with his earlier grievance on the same subject. (*Id.*) The tenth of these grievances (Grievance Number GM-31040-00), filed on November 27, 2000, regarded Plaintiff's eyeglasses. (*Id.*)

FN25. For example, Plaintiff was unable to identify the corrections officers to whom he handed his grievance and appeals for mailing. (*Id.* at 127-34.) Moreover, Plaintiff did not convincingly explain why the grievance and appeals at issue in this action did not make it through the mailing process, while his numerous other grievances and appeals did make it through the mailing process. (*Id.* at 154-171.) In addition, Plaintiff acknowledged that it was his belief, during this time period, that an inmate was not required to exhaust his administrative remedies in matters involving the use of excessive force; yet, according to Plaintiff, he decided to exhaust his administrative remedies on his excessive force claim anyway. (*Id.* at 148-49.)

**B. Estoppel**

After carefully considering the evidence submitted at the hearing in this action on March 1, 2010, the Court finds that Defendants did not forfeit the affirmative defense of non-exhaustion by failing to raise or preserve it, or by taking actions that inhibited Plaintiff's exhaustion of remedies. For example, Defendants' Answer timely asserted this affirmative defense. (Dkt. No. 35, ¶ 17.) Moreover, Plaintiff failed to offer any credible evidence at the hearing that *Defendant* s in any way interfered with Plaintiff's ability to file grievances during the time in question. (Hearing Tr. at 127-34, 157-58, 169-70.) Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.[FN26]

FN26. *See Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (holding that defendants were not estopped from asserting the affirmative defense of non-exhaustion where the conduct plaintiff alleged kept him from filing a grievance-that he was not given the manual on how to grieve-was not attributable to the defendants and plaintiff "point[ed] to no affirmative act by prison officials that would have prevented him from pursuing administrative remedies"); *Murray v. Palmer,* 03-CV-1010, 2008 WL 2522324, at *19 (N.D.N.Y. June 20, 2008) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) ("I have found no evidence sufficient to create a genuine issue of triable fact on the issue of whether Defendants, *through their own actions,* have inhibited Plaintiff's exhaustion of remedies so as to estop one or more Defendants from raising Plaintiff's failure to exhaust as a defense.") [emphasis in original]; *Shaheen v. McIntyre,* 05-CV-0173, 2007 WL 3274835, at *16 (N.D.N.Y. Nov.5, 2007) (McAvoy, J. adopting Report-Recommendation of Lowe, M.J.) (finding defendants not estopped from raising Plaintiff's non-exhaustion as a defense based on plaintiff's allegation "that [he] was inhibited (through non-responsiveness) by [ ] unnamed officials at Coxsackie C.F.'s Inmate Grievance Program (or perhaps the Grievance Review Committee), and Coxsackie C.F. Deputy Superintendent of Security Graham" because plaintiff's complaint and "opposition papers ... fail to contain any evidence placing blame on Defendants for the (alleged) failure to address his grievances and complaint letters"); *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *16 (N.D.N.Y. Apr.24, 2006) (Hurd, J. adopting Report-Recommendation of Lowe, M.J.) (finding that defendants are not estopped from relying on the defense of non-exhaustion because "no evidence (or even an argument) exists that any Defendant ... inhibit[ed] Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter."); *cf. Warren v. Purcell,* 03-CV-8736, 2004 WL 1970642, at *6 (S.D.N.Y. Sept.3, 2004) (finding that conflicting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

statements [offered by a non-party]-that the prisoner needed to refile [his grievance] and that the prisoner should await the results of DOCS's investigation-estopped the defendants from relying on the defense on non-exhaustion, or "[a]lternatively, ... provided ... a 'special circumstance' under which the plaintiff's failure to pursue the appellate procedures specified in the IGP was amply justified."); *Brown v. Koenigsmann,* 01-CV-10013, 2005 WL 1925649, at *1-2 (S.D.N.Y. Aug.10, 2005) ("Plaintiff does not assert that Dr. Koeingsmann personally was responsible for [the failure of anyone from the Inmate Grievance Program to address plaintiff's appeal]. [However,] *Ziemba [v. Wezner,* 366 F.3d 161 (2d Cir.2004) ] does not require a showing that Dr. Koenigsmann is personally responsible for plaintiff's failure to complete exhaustion [in order for Dr. Koeinsgmann to be estopped from asserting the affirmative defense of failure to exhaust administrative remedies], as long as someone employed by DOCS is. If that reading of Ziemba is incorrect, however, ... then the circumstances here must be regarded as special, and as justifying the incompleteness of exhaustion, since a decision by CORC is hardly something plaintiff could have accomplished on his own.").

**C. Special Circumstances**

**\*6** There are a variety of special circumstances that may excuse a prisoner's failure to exhaust his available administrative remedies, including (but not limited to) the following:

(1) The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance appeal process unavailable to him." *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendants are estopped from relying on the exhaustion defense, as well as "special circumstances" excusing plaintiff's failure to exhaust");

(2) Other individuals' "threats [to the plaintiff] of physical retaliation and reasonable misinterpretation of the statutory requirements of the appeals process." *Clarke v. Thornton,* 515 F.Supp.2d 435, 439 (S.D.N.Y.2007) (noting also that "[a] correctional facility's failure to make forms or administrative opinions "available" to the prisoner does not relieve the inmate from this burden."); and

(3) When plaintiff tries "to exhaust prison grievance procedures[, and] although each of his efforts, alone, may not have fully complied, together his efforts sufficiently informed prison officials of his grievance and led to a thorough investigation of the grievance." *Hairston v. LaMarche,* 05-CV-6642, 2006 WL 2309592, at *8 (S.D.N.Y. Aug.10, 2006).

After carefully considering the issue, the Court finds that there exists, in this action, no "special circumstances" justifying Plaintiff's failure to comply with the administrative procedural requirements. Construed with the utmost of special leniency, Plaintiff's hearing testimony, and his counsel's cross-examination of Defendants' witnesses, raise the specter of two excuses for not having exhausted his available administrative remedies before he (allegedly) mailed his Complaint in this action on August 14, 2003:(1) that exhaustion was not possible because of the administrative procedures that DOCS has implemented regarding inmate grievances; and/or (2) that an unspecified number of unidentified corrections officers (who are not Defendants in this action) somehow interfered with the delivery of his grievance and appeals. For example, Plaintiff testified at the exhaustion hearing that he handed his grievance and appeals to various corrections officers making rounds where he was being housed, and that, if his grievance and/or appeals were never received, it must have been because his letters were not properly delivered. (Hearing Tr. at 126-36.)

With regard to these excuses, the Court finds that, while these excuses could constitute special circumstances justifying an inmate's failure to exhaust his available administrative remedies in certain situations,[FN27] these excuses are not available to Plaintiff in the current action because, as stated in Part II.A. of this Decision and Order, the credible testimony before the Court indicates that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)
(Cite as: 2010 WL 1235591 (N.D.N.Y.))

Plaintiff did not hand his grievance and appeals to various corrections officers with regard to the claims in question. *See, supra,* Part II.A. of this Decision and Order.[FN28]

      FN27. *See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (noting that "refusal to accept or forward plaintiff's appeals ... effectively render[s] the grievance appeal process unavailable to him").

      FN28. The Court notes that, even if Plaintiff did (as he testified) hand to a corrections officer for mailing a letter to the Superintendent on September 13, 2000, appealing from the IGRC's failure to decide his grievance of August 22, 2000, within nine working days (i.e., by September 5, 2000), it appears that such an appeal would have been filed two days too late under DOCS Directive 4040, which requires that appeal to be filed within four working days of the IGRC's failure to decide his grievance (i.e., by September 11, 2000). (*See* Hearing Tr. 127-34; Hearing Ex. P-1, at 5-7 [attaching ¶¶ V.A, V.B. of DOCS Directive 4040, dated 6/8/98].)

**\*7** For all these reasons, the Court finds that Plaintiff's proffered excuse does not constitute a special circumstance justifying his failure to exhaust his available administrative remedies before filing this action.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 10) is ***DISMISSED* in its entirety without prejudice** for failure to exhaust his available administrative remedies before filing this action, pursuant to the PLRA; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment for Defendants and close the file in this action.

N.D.N.Y.,2010.

Murray v. Palmer
Not Reported in F.Supp.2d, 2010 WL 1235591 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Anthony FOX, Plaintiff,
v.
Thomas POOLE, et al., Defendants.
**No. 06CV148.**

April 24, 2008.

Anthony Fox, Gouvenor, NY, pro se.

Delia Dianna Cadle, NYS Attorney General's Office,
Buffalo, NY, for Defendants.

**Order**

HUGH B. SCOTT, United States Magistrate Judge.

*1 Before the Court are (a) defendants' motion for
summary judgment (Docket No. 114 FN1) and (b) plaintiff's
cross motion for partial summary judgment (Docket No.
121, dated Mar. 31, 2008, filed Apr. 2, 2008, entered Apr.
8, 2008). Response to defendants' motion was due by
April 4, 2008, any reply by April 18, 2008, and the motion
was deemed submitted (without oral argument) on April
18, 2008 (Docket No. 120), as was plaintiff's cross
motion. On August 25, 2006, the parties consented to
proceed before the undersigned as Magistrate Judge
(Docket No. 17).

> FN1. In support of this motion, defendants
> submitted their statement of facts, Docket No.
> 115; their memorandum of law, Docket No. 116;
> and the declarations of defendants Thomas
> Eagen (as spelled in declaration, compare with

caption) (with exhibits), Docket No. 117; J.P.
Gregoire (with exhibits), Docket No. 118; and
Thomas Poole (with exhibits), Docket No. 119.

In opposition to this motion (and in support of
his own motion), plaintiff filed his motion for
partial summary judgment, Docket No. 121;
his affidavit (with statement of undisputed and
disputed facts and exhibits), Docket No. 122;
and his memorandum of law, Docket No. 123.

**BACKGROUND**

Familiarity with the prior Orders in this case (Docket Nos.
25, 33, 65, 83) is presumed.

On March 13, 2006, plaintiff (proceeding *pro se* as an
inmate) sued the superintendent of his former facility, Five
Points Correctional Facility ("Five Points"), the director
of Health Services for the New York State Department of
Correctional Services ("DOCS"), the Five Points health
services director, treating medical personnel at Five
Points, the DOCS grievance director, and the State of New
York for allegedly violating his constitutional rights by
placing plaintiff in medical isolation for tuberculosis (or
"TB") in September 2005 (Docket No. 1, Compl.). This
Court granted plaintiff's motion (Docket No. 2) to proceed
*in forma pauperis* without dismissing any claims or parties
(Docket No. 3).

In 2006, defendants separately answered the original
Complaint (Docket Nos. 5-7, 11-13, 20). Plaintiff moved
to dismiss affirmative defenses on June 12, 2006 (Docket
No. 8, at 2), which this Court denied (Docket No. 18,
Order at 3).

*Amended Complaint*

Plaintiff moved for leave to amend the Complaint to allege
a second ailment (Docket No. 67), which was granted on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

November 1, 2007 (Docket No. 83). In the Amended
Complaint (Docket No. 92), plaintiff alleges six causes of
action. First, he claims that he was deprived of his rights
under the First, Eighth, and Fourteenth Amendments by
"Illegally Confining" (*id.* at 6) plaintiff in medical
isolation from September 22, 2005, to October 18, 2005,
depriving him of access to a dermatologist for treatment of
a severe skin rash that had been otherwise untreated while
he was at Five Points (*id.* at 6-7). While in isolation,
plaintiff was deprived of other medical treatment and was
denied access to facility programs and activities because
of an alleged disability, an alleged positive tuberculosis
test in 1990 or 1992 combined with plaintiff's HIV
positive status (*id.* at 7 FN2), which was not mentioned at
the time of the September 2005 assignment (*id.*).
Defendants also violated Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section
504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a),
by depriving him of medical and dental treatment and
access to facility programs based solely on his disabilities
(*id.*).

> FN2. Previously, the Court carefully avoided
> mentioning plaintiff's second ailment, *see* Docket
> No. 56, Order; Docket No. 83, Order at 7; *see
> also* Docket No. 55 (defense motion to file
> medical documents under seal), with plaintiff
> having the option of disclosing that ailment (if he
> chose) in amending the Complaint or the manner
> in which he filed that pleading (whether or not
> under seal), *see* Docket No. 83, Order at 7
> (outlining plaintiff's options). Since plaintiff
> openly declares his condition in his Amended
> Complaint and made no attempt to file it under
> seal, the Court will discuss his relevant medical
> conditions in this Order.

The second cause of action alleges that defendants used
plaintiff's disabilities to retaliate against him for filing
grievances and lawsuits against DOCS employees at Sing
Sing and Eastern Correctional Facilities (*id.*). He claims
that his medical isolation was due solely to retaliatory
motives and not based upon plaintiff's medical record
(*id.*).

**\*2** Plaintiff alleges in his third cause of action cruel and

unusual punishment, in violation of the Eighth
Amendment, in denying him access to adequate and
appropriate treatment for his severe skin rash. Plaintiff
applied for a dermatologist appointment on or about
August 29, 2005, but that request was denied because of
plaintiff's medical isolation. (*Id.* at 8.)

The fourth cause of action alleges that plaintiff was
deprived of due process and equal protection of the laws,
under the Fourteenth Amendment, in several ways. First,
plaintiff was confined in medical isolation in violation of
his due process rights. (*Id.* at 9-10.) Second, DOCS Health
Services Policy Manual § 1.18 (*see* Docket No. 118,
Gregoire Decl., Ex. B), that served as the procedures for
his isolation, violated the Equal Protection Clause by
treating HIV positive inmates differently than non-HIV
positive inmates in regards to alleged or suspected
tuberculosis test results (Docket No. 92, Am. Compl. at
10). Plaintiff thus was discriminated against due to his
HIV positive status and his alleged positive tuberculosis
test diagnosis (*id.*). Plaintiff also claims that defendants
failed to follow their own procedure under § 1.18 in
dealing with a suspected tuberculosis patient and that there
was not a factual record for a positive tuberculosis test in
1990 or 1992 to warrant his eventual medical isolation
(*id.*).

Plaintiff alleges in his fifth cause of action a violation of
the ADA when defendants discriminated against him
based upon his alleged positive tuberculosis test and his
HIV positive status in denying him access to medical and
dental treatment (*id.* at 10-11), essentially realleging what
he claims (in part) in his first cause of action.

Finally, in his sixth cause of action, plaintiff asserts that
defendants violated the Rehabilitation Act, alleging that
Five Points is a "public entity" that receives "federal
grants and/or assistance" from "federal programs" to be
subject to that provision (*id.* at 11), again realleging the
deprivations claimed in part in his first cause of action.
Plaintiff points to the period of his medical isolation as
when he was deprived of access to all facility programs
and activities, in particular deprived of dental treatment
until November 29, 2005 (*id.* at 11-12).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

Plaintiff then details the actions of the named defendants (*id.* at 12-18). Defendant then-Superintendent (*cf.* Docket No. 119, Poole Decl. ¶ 1) Thomas Poole became aware of plaintiff's claims through the grievance process and Poole allegedly failed to investigate these complaints (Docket No. 92, Am. Compl. at 12). Defendant Dr. Lester Wright, the director of DOCS Health Services, promulgated the Health Services Policy Manual § 1.18, the policy plaintiff claims is unconstitutional (*id.* at 12-13). Defendant Dr. J.P. Gregoire, the Five Points Facility Health Services Director, allegedly conspired with defendant physician assistant Robert Macomber to place plaintiff in medical isolation, falsifying medical records from Macomber and defendant Wendy Goines and depriving plaintiff of access to medical treatment and programs (*id.* at 13-14). Dr. Gregoire allegedly did this in retaliation against plaintiff for filing other grievances and legal actions (*id.* at 14-15). Goines, the nurse administrator at Five Points, was in charge of the paper work to admit inmates to medical isolation and allegedly conspired to place plaintiff into isolation (*id.* at 15). Macomber interviewed plaintiff on September 21, 2005, after which plaintiff was x-rayed. Macomber then conspired with other medical defendants to have plaintiff placed in isolation. (*id.* at 16.) Defendant Thomas Eagen, the then-director of grievances at DOCS (*cf.* Docket No. 117, Eagen Decl. ¶ 1), became aware of plaintiff's complaints though plaintiff's grievance appeals and Eagen failed to investigate plaintiff's complaints (Docket No. 92, Am. Compl. at 17).

**\*3** Plaintiff seeks compensatory and punitive damages (*id.* at 20).

*Subsequent Proceedings*

Defendants then separately answered the Amended Complaint (Docket Nos. 102-08; *see also* Docket Nos. 96-101) and plaintiff filed a response to those Answers (Docket No. 109). After some extensions of the dispositive motion deadline (*see* Docket Nos. 110, 111, 112; *see also* Docket No. 113, leave granted to file an oversized memorandum), defendants filed the present motion for summary judgment (Docket No. 114).

*Defendants' Motion for Summary Judgment*

Defendants contend that plaintiff's claims should be dismissed (Docket No. 114). According to their motion, when plaintiff was transferred from Eastern Correctional Facility to Five Points, his medical problem list indicated that he tested positive for tuberculosis and HIV (Docket No. 115, Defs. Statement of Facts ¶ 2; Docket No. 118, Gregoire Decl. ¶ 5). On or about September 20, 2005, plaintiff missed two follow up appointments, so defendant Macomber requested that plaintiff be sent to the medical department (Docket No. 115, Defs. Statement of Fact ¶ 3; Docket No. 118, Gregoire Decl. ¶ 10). Upon examination on September 21, 2005, plaintiff was asymptomatic for tuberculosis except for weight loss, he had bilateral abscesses in the axillae [FN3], not draining, which were symptomatic of extra pulmonary tuberculosis. Because of plaintiff's HIV history, certain tests were conducted indicating that he had a severely compromised immune system or anergic state. Although a chest x-ray did not reveal active disease, because of plaintiff's history, he was admitted to respiratory isolation to rule out extra pulmonary tuberculosis pursuant to Health Services Policy Manual § 1.18. (Docket No. 115, Defs. Statement ¶ 4; Docket No. 118, Gregoire Decl. ¶ 11). Because of plaintiff's Purified Protein Derivative ("PPD") positive history, plaintiff going without treatment, and his HIV status, plaintiff was admitted to respiratory isolation (Docket No. 118, Gregoire Decl. ¶ 11; *see id.* ¶¶ 5 (explaining PPD test), 8, 7 (plaintiff denying he had HIV or TB and refusing treatment for either)).

FN3. Axillary abscesses are localized collections of pus in the axilla, the armpit, that results in disintegration or displacement of tissue, *Taber's Cyclopedic Medical Dictionary* 8-9, 173 (16th ed.1989).

Defendants claim that plaintiff's refusal of treatments for the tuberculosis prolonged his isolation (Docket No. 115, Defs. Statement ¶ 5). Plaintiff remained in isolation until he had given three Acid Fast Bacillus ("AFB") sputum that were negative. He had refused to give sputum and had refused all medical treatment (Docket No. 116, Defs. Memo. at 21; Docket No. 118, Gregoire Decl. ¶¶ 12, 18, 19). While isolated, plaintiff did not have recreation outside of the isolation room (Docket No. 118, Gregoire

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

Decl. ¶ 20, Ex. B, § 1. 18, at 11).

Eventually, plaintiff provided sputum on October 3, 2005, which was tested and plaintiff was found to be asymptomatic and was released from medical isolation on October 18, 2005. Plaintiff returned to isolation on November 3, 2005, when his cultures revealed that his third sputum was growing AFB (Docket No. 118, Gregoire Decl. ¶¶ 12-15). Plaintiff was tested again and was found to be asymptomatic and was released without further medical restrictions on December 5, 2008 (Docket No. 115, Defs. Statement ¶¶ 6-8). While in isolation, plaintiff filed grievances to be allowed to participate in yard exercises, which were refused due to his medical isolation (id. ¶¶ 9-10).

*Plaintiff's Response*

**4** Plaintiff contends that defendants Dr. Gregoire and Macomber admitted that they did not test plaintiff's "Axillary Abcesses" [sic] for extra pulmonary TB and that his September 21, 2005, x-ray was negative for pulmonary TB (Docket No. 122, Pl. Undisputed Facts ¶ 1). Defendants based their " 'suspicions of plaintiff's alleged active T.B. status' solely on a recent loss of weight and the plaintiff (H.I.V.) Status," with plaintiff arguing that the weight loss could have been from his HIV (id. Undisputed Facts ¶ 2). During his isolation, plaintiff lost 10-17 pounds and suffered from "severe itching, pain and stomach problems" which were (and remain) ineffectively treated (id. ¶ 4).

Plaintiff argues that there are material issues of fact regarding his 1992 and 1998 TB tests, the basis for the subsequent 2005 medical isolation. As for the 1992 tests, he contends that his medical record indicates that he was tested at two different facilities on the same date, an impossibility (Docket No. 122, Pl. Disputed Facts ¶ 5, Ex. B (Bates No. 0002)). As for the 1998 test, plaintiff disputes the test result and the information relied upon by defendants and the accuracy of plaintiff's medical record (id. Pl. Disputed Facts ¶ 5), without presenting evidence to support his contention.

He contends that there is a fact issue regarding the level of care he was afforded for his skin condition while in medical isolation (id. ¶ Pl. Disputed Facts ¶ 6, Ex. A (plaintiff's medical records, Sept.21-Oct. 18, 2005)). He argues that his transfer from Eastern Correctional Facility to Five Points (and from a single cell at Eastern to double cell for a time while at Five Points) was retaliatory, or at least raised an issue of fact (id. Pl. Disputed Facts ¶ 7, Ex. C (transfer order from Eastern to Five Points)). In addition, since plaintiff was placed in medical isolation less than one month after transferring to Five Points without any evidence (in plaintiff's view) of medical necessity, he concludes that this placement was retaliatory (id. Pl. Disputed Facts ¶ 7).

*Plaintiff's Motion for Partial Summary Judgment*

Plaintiff cross moves for partial summary judgment on the admissions of defendants, namely that the facility received federal funds (Docket No. 123, Pl. Memo. at 25; Docket No. 73, Defs. Supp'al Responses to Pl.2d Request for Admission, at 4, response to Request # 11) and that plaintiff had a negative chest x-ray for tuberculosis and that they did not test his " 'Axillary Abcesses' [sic] for extra-pulmonary T.B." (Docket No. 123, Pl. Memo. at 25).

### DISCUSSION

I. Summary Judgment Standards

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003); Fed.R.Civ.P. 56(c). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. *Ford, supra,* 316 F.3d at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

verdict for the nonmoving party.' " *Lazard Freres & Co. v. Protective Life Ins. Co.,* 108 F.3d 1531, 1535 (2d Cir.) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), *cert. denied,* 522 U.S. 864 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis in original removed); *McCarthy v. American Intern. Group, Inc.,* 283 F.3d 121, 124 (2d Cir.2002); *Marvel Characters v. Simon,* 310 F.3d 280, 285-86 (2d Cir.2002).

**\*5** Rule 56(d) allows the Court to "determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts-including items of damages or other relief-are not genuinely at issue. The facts so specified must be treated as established in the action." Fed.R.Civ.P. 56(d)(1) (effective Dec. 1, 2007). When the Court cannot grant summary judgment on the entire case, "it is empowered, when it would be practicable to save time and expense and to simplify the trial, to issue an order that specifies the facts that appear without substantial controversy," 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2737, at 311-12 (Civil 3d ed.1998) (footnote omitted). Under Rule 56(d)(1), the Court does not enter judgment on part of a claim or grant partial relief; this rule merely allows the Court to specify issues that are not controverted, *id.* at 316, 318, and is better referred to as a "partial summary adjudication" to avoid the confusion with a judgment, *id.* at 324, 322-24. If the Court determines that entering partial summary judgment does not materially expedite the adjudication, the Court may decline to do so, *id.* at 319.

II. Defense Motion for Summary Judgment

Plaintiff complains about being placed in medical isolation for over three months (thus deprived access to prison programs and other medical treatment) due to two purported ailments. Defendants raise several defenses and immunities to reject these claims.

A. Tuberculosis Protocol and § 1.18

Plaintiff's claims arise from defendants' imposition of DOCS protocols for suspicion that he was positive for tuberculosis, pursuant to Health Services Policy Manual § 1.18 (*see* Docket No. 118, Gregoire Decl. Ex. B), and the deprivations inherent in medical isolation. The Court first looks at that protocol.

"Tuberculosis is a highly infectious contagious disease. It is spread through the air." *Selah v. Goord,* 255 F.Supp.2d 42, 45 (N.D.N.Y.2003) (citation to record omitted). The Northern District of New York, in *Selah,* noted that there were three types of tuberculosis infection-latent, active, and active contagious. Latent tuberculosis is from mere exposure to tuberculosis and without the exposed person experiencing effects from the disease, *id.* Active tuberculosis "occurs when the body is not able to contain the tuberculosis bacillus and the individual becomes ill," *id.* When infected "the individual will exhibit signs and symptoms of the disease such as coughing, night sweats, chills and weight loss," *id.* (record citation omitted). Active contagious tuberculosis "is the form of active tuberculosis where the infection exists in an individual's lungs" and when so infected, "the individual is capable of spreading the disease to others through the shared air space," *id.* (footnote omitted). Five to ten percent of persons with latent TB will develop active TB in their lifetimes, while those who are HIV positive have a higher percentage, *id.*

**\*6** Section 1.18 of the Health Services Policy Manual is DOCS's TB control program, which is "composed of overlapping statewide systems for prevention, detection, containment, and treatment of tuberculosis infection and tuberculosis disease" (*id.* Ex. B, § 1. 18, at 3). An inmate under this policy is considered infected with TB if they are PPD positive (*id.*), *see also* Selah, *supra,* 255 F.Supp.2d at 46. Symptoms of TB stated in the policy include

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

persistent cough, hemoptysis (expectoration of blood arising from the oral cavity, larynx, trachea, bronchi, or lungs, *Taber's Cyclopedic Medical Dictionary, supra,* at 810), fever, chills, night sweats, weight loss, with "inmates with active, contagious disease may have only one (or rarely none) of these symptoms" (*id* .). Inmates are screened for TB upon entry into DOCS custody and at least one annually (*id.* at 5). Conditions known to increase an infected inmate's risk of developing active TB include HIV infection and immunosuppressive therapy (*id.*). Inmates with documented positive PPD tests do not need annual chest x-rays or repeat PPD tests (*id.* at 7). Under that protocol, if an inmate is suspected of having an infectious disease (such as tuberculosis), that inmate is placed in medical isolation until that suspicion is confirmed (*id.* at 9-13). While in medical isolation, the inmate can leave only for medical treatments unavailable within isolation (*id.* at 10), the inmate cannot leave the room for recreation (*id.* at 11).

According to Dr. Gregoire, possible TB infection is measured by swelling under the skin called induration, with a five millimeter or more induration being considered significant (or positive) for the highest risk groups, "including: immunosuppressed people such as people with HIV," (Docket No. 118, Gregoire Decl. ¶ 6). Ten or more millimeter induration is considered significant (or positive) for others (*id.*). Inmates with HIV receive PPD testing and, if that test is negative, they will have a CD4 count done; if the count is less than 300, the inmate will have his blood tested for TB 60 or more days after the PPD test (*id.* ¶ 9). Any inmate suspected of having TB, with or without a positive skin test, is placed in medical isolation pending evaluation, pursuant to Health Services Policy Manual § 1. 18, at 3, 5, 8 (*id.*).

Plaintiff was placed in medical isolation to rule out extra pulmonary tuberculosis (*id.* ¶ 11). Plaintiff refused AFT and highly active antiretroviral therapy (or "HAART") prolonging the duration of his isolation (*id.* ¶ 12; *see* Docket No. 122, Pl. Aff. Ex. B, Bates No. 0005) and Dr. Gregoire stated that plaintiff "remained upset and argumentative throughout the isolation" (Docket No. 118, Gregoire Decl. ¶ 18).

B. Eleventh Amendment Immunity

Defendants first argue that claims against them in their official capacity should be dismissed pursuant to the immunity granted to states by the Eleventh Amendment to the Constitution (Docket No. 116, Defs. Memo. at 3-4; *see also id.* at 8 (official capacity claims against individual defendants are barred by Eleventh Amendment immunity as if the state were named). Plaintiff contends that Dr. Wright can be held liable in his official capacity as the chief policy maker that enacted Health Services Policy Manual § 1.18, or the Citizens of Subjects of any Foreign State (Docket No. 123, Pl. Memo. at 3-4, citing *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

**\*7** The **Eleventh Amendment** provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State," U.S. Const. amend. XI. **Monell** involved **municipal** liability under **§ 1983** and whether the municipality is the " "person" under that statute, and is not applicable in this case.

Thus, the defendant State of New York and those individuals sued in their official capacities **are immune** and the claims against them (save the Title II ADA and Rehabilitation Act claims, discussed below) are **dismissed.** What remains, then, are (a) claims against the individual defendants in their individual capacities and (b) the possible Title II ADA and Rehabilitation Act claims.

C. Personal Involvement of Some Defendants

Next, defendants contend that plaintiff fails to allege personal involvement of defendants Poole, Eagen, and Wright to make them liable (Docket No. 116, Defs. Memo. at 4-7).

1. Superintendent Poole

Poole was the superintendent of Five Points and his only

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

role here was in the grievance process when plaintiff complained about the substantive violations by other parties, while Eagen was the director of grievances at DOCS. Dr. Wright promulgated Health Services Policy Manual § 1.18 which plaintiff claims is unconstitutional. Although plaintiff sought Eagen to have him investigate plaintiff's allegations, Eagen was never involved in the investigation of his grievance (Docket No. 115, Defs. Statement ¶ 13; Docket No. 117, Eagen Decl. ¶ 5).

Plaintiff argues that Poole and Eagen may be held personally responsible for being placed on notice during the grievance process of the violations and failing to act and by exhibiting deliberate indifference by failing to act on information that unconstitutional acts were occurring (Docket No. 123, Pl. Memo. at 6). Plaintiff, however, fails to show the involvement of Poole or Eagen aside from conducting grievances, see *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Mere receipt of a grievance and recipient's subsequent inaction is insufficient to establish a claim of personal involvement by a correctional supervisor, *Harris v. Westchester County Dep't of Corrections,* No. 06 Civ.2011, 2008 U.S. Dist. LEXIS 28372, at *28 (S.D.N.Y. Apr. 2, 2008); *Rivera v. Goord,* 119 F.Supp.2d 327, 344 (S.D.N.Y.2000). Personal involvement would be found where a supervisory official receives and acts upon an inmate's grievance or otherwise reviews and responds to his complaint, *Johnson v. Wright,* 234 F.Supp.2d 352, 363-64 (S.D.N.Y.2002). Plaintiff here alleges that Poole was aware of his claims from the grievances he filed (Docket No. 92, Am. Compl. at 5-6; Docket No. 1, Compl. at 5-6, Exs. A, B, B-1, B-2), where Poole responded to one grievance to reject it on the basis of the protocol in Health Services Policy Manual § 1.18 (Docket No. 1, Compl. Ex. B-2), **hence stating Poole's personal involvement.**

2. Eagen

**\*8** Plaintiff also alleges similar correspondence to Eagen, with Eagen responding that plaintiff had to follow grievance procedures rather than separate missives (*id.* Ex. D-1; *see also* Docket No. 117, Eagen Decl.). He does not show, however, how Eagen could have remedied the alleged constitutional violations in his role as director of grievances. Eagen's role as Director of the Inmate

Grievance Program was to administer that program and inform grievant inmates, like plaintiff, of the status of their grievances (Docket No. 117, Eagen Decl. ¶¶ 5-8). Thus, the claims against Eagen are **dismissed.**

3. Dr. Wright

One of the ways to find personal involvement is institution of a policy which permits an infraction to occur, *Colon, supra,* 58 F.3d at 873; *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986); *Turpin v. Mailet,* 619 F.2d 196, 201 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Defendants argue that Dr. Wright was not involved in the decision to isolate plaintiff and did not receive plaintiff's grievances (Docket No. 116, Defs. Memo. at 7). But as author of the Health Services Policy Manual at issue, Dr. Wright has personal involvement in enacting the policy that lead to plaintiff's medical isolation (*see* Docket No. 123, Pl. Memo. at 3-4). Therefore, plaintiff **has stated the personal involvement by policy maker Dr. Wright;** the issue becomes whether that policy creates a constitutional infraction.

D. Title II of the Americans with Disabilities Act and the Rehabilitation Act

Plaintiff's claims that defendants violated Title II of the ADA and the Rehabilitation Act. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," 42 U.S.C. § 12132, while the Rehabilitation Act prohibits discrimination against a qualified individual with a disability "solely by reason of her or his disability," in excluding them "from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...," 29 U.S.C. § 794(a).

1. Eleventh Amendment Immunity

Defendants respond that the individual defendants (either

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

in their official or individual capacities) cannot be sued under either act, *Garcia v. State Univ. of N.Y. Health Sciences Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (Title II and Rehabilitation Act do not provide for suits against persons in their individual capacity); *Coles v. Goord,* No. 9:01CV 1819, 2002 U.S. Dist. LEXIS 22519, at *6-7 (N.D.N.Y. Nov. 22, 2002) (dismissed ADA claim against individual defendants both individual and official capacities because DOCS is appropriate defendant); *Warren v. Goord,* No. 99CV296, 2006 U.S. Dist. LEXIS 41096, at *9 (W.D.N.Y. May 26, 2006) (Foschio, Mag. J.) (discussing affirmance of earlier dismissal of ADA claims against defendants in their official and individual capacities, 81 Fed. Appx. 400 (2d Cir.2003)); *Parkinson v. Goord,* 116 F.Supp.2d 390, 399 (W.D.N.Y.2000) (Larimer, J.) (Docket No. 116, Defs. Memo. at 7-8). A suit against defendants in their official capacity is, in effect, a suit against the state and, as such, is governed by the Eleventh Amendment, *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (*id.* at 8). Defendants also contend that plaintiff fails to show a constitutional violation or animus required for an ADA claim, *Garcia, supra,* 280 F.3d at 112 (need proof of discriminatory animus or ill will due to disability) (*id.* at 8-12).

**\*9** Plaintiff counters that he did not assert claims against he individual defendants in their personal capacities but, if he did, courts have recognized personal capacity actions under the ADA or the Rehabilitation Act, *see K.M. ex rel. D.G. v. Hyde Park Cent. Sch. Dist.,* 381 F.Supp.2d 343, 362-63 (S.D.N.Y.2005) (Docket No. 123, Pl. Memo. at 7). But *K.M.* held that § 1983 claims "can be maintained against individual defendants on the basis of Title II [of the ADA] or Section 504 [Rehabilitation Act] violations," *id.* at 362, citing *Weixel v. Board of Educ. of City of N.Y.,* 287 F.3d 138, 146, 151 (2d Cir.2002). The court went on to discuss the qualified immunity of the school district official defendants in that case, 381 F.Supp.2d at 362-63.

The ADA declares that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this chapter," 42 U.S.C. § 12202; *see United States v. Georgia,* 546 U.S. 151, 154, 126 S.Ct. 877, 163 L.Ed.2d 650 (2006) (accepting this provision as an "unequivocal expression of

Congress's intent to abrogate state sovereign immunity"); *Board of Trustees of Univ. of Ala. v. Garrett,* 531 U.S. 356, 363-64, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Although states have been held to be immune from suit under Title I of the ADA under the Eleventh Amendment, *Garrett, supra,* 531 U.S. at 360, n. 1, the Supreme Court has allowed a suit against a state under Title II of the ADA where the suit sought to vindicate a fundamental right (such as access to courts), *Tennessee v. Lane,* 541 U.S. 509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004), or where a constitutional violation occurs, *United States v. Georgia, supra,* 546 U.S. at 154 (conditions of confinement in state prison) (Docket No. 116, Defs. Memo. at 8-9; *cf.* Docket No. 123, Pl. Memo. at 4); *cf. Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) (Title II applies to state prisons as "public entities" under act, nowhere raising Eleventh Amendment immunity). Defendants argue that *Lane* and *United States v. Georgia* did not state the full extent of Title II's reach and whether all Eleventh Amendment immunity was abrogated, concluding that sovereign immunity was abrogated only when plaintiffs establish the violation was motivated by discriminatory malice or ill will (*id.* at 9-10), quoting *Castells v. Fisher,* No. 05CV4866, 2007 U.S. Dist. LEXIS 30188, at *13 (E.D.N.Y. Mar.23, 2007)).

Plaintiff argues that the Second Circuit has held that a **§ 1983** claim against individual defendants may be maintained for violations of Title II of the ADA or the Rehabilitation Act, *Weixel, supra,* 287 F.3d at 146, 151 (Docket No. 123, Pl. Memo. at 5). The issue in *Weixel,* however, was whether the *pro se* plaintiffs alleged that the infant plaintiff was disabled under the ADA or Rehabilitation Act to resist a motion to dismiss, 287 F.3d at 146-47, and did not reach the issue whether defendants could be sued in their individual capacities. The Second Circuit's discussion of **§ 1983** claims rested upon plaintiffs' ability to allege violations of their rights under the Fourteenth Amendment as well as the ADA and Rehabilitation Act and, since the Second Circuit reinstated the statutory claims, plaintiffs' **§ 1983** claims were restored as well, *id.* at 151, again without discussion of defendants' liability in their individual capacities or any Eleventh Amendment analysis.

**\*10** Given plaintiff's position that he did not sue the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

individual defendants in their personal capacities and the rejection of such suits by other courts had plaintiff so sued them, the Court will consider plaintiff's claims against them only in their official capacities. The next issue then is whether Eleventh Amendment immunity was abrogated by Title II of the ADA or the Rehabilitation Act.

2. Constitutional Violations

In *United States v. Georgia,* the Court held that Congress had power under § 5 of the Fourteenth Amendment to create private remedies against states for "actual violations" of provisions of the Fourteenth Amendment, 546 U.S. at 158. "Thus, insofar as Title II[of the ADA] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity," *id.* at 159 (emphasis in original).

Plaintiff alleges Eighth and Fourteenth Amendment violations and this Court need not decide the scope of Congress' abrogation of Eleventh Amendment immunity under Title II beyond a constitutional violation, *cf. United States v. Georgia, supra,* 546 U.S. at 160, 163 (Stevens, J., with Ginsburg, J., concurring).

To abrogate sovereign immunity, *Garcia* requires proof of discriminatory animus or ill will due to plaintiff's disability, 280 F.3d at 112; *see id.* at 105 (on summary judgment), while *United States v. Georgia* requires an "actual" Fourteenth Amendment violation, 546 U.S. at 159; *see Castello, supra,* 2007 U.S. Dist. LEXIS 30188, at *13.

Plaintiff argues that he alleged a constitutional violation of deliberate indifference in inadequately treating his severe rash or at least raised a material issue of fact (Docket No. 123, Pl. Memo. at 9-10) and that his placement in medical isolation was retaliatory (*id.* at 11-12), raising possible First Amendment violation and potential proof of animus or ill will. He also argues that his medical records show due process and equal protection violations (*id.* at 10-11) by not testing him for TB or confirming defendants' diagnosis of TB.

As for the constitutional violation, *United States v. Georgia* implies that the mere allegation of an actual violation may suffice, since that case arose under a motion to dismiss, *see* 546 U.S. at 155. This case, however, is on a motion for summary judgment, where both parties have raised (or had opportunity to raise) evidence to support the existence of an actual constitutional violation. As discussed below, plaintiff **fails to assert an actual constitutional violation to abrogate defendants' Eleventh Amendment immunity.** For example, plaintiff now points to violations of his constitutional rights that *precede* his isolation, by arguing that his skin condition was not treated prior transfer from Eastern Correctional Facility to Five Points and that the transfer itself was retaliatory (*cf. id.* at 9 (six months prior to September 2005 isolation plaintiff complained of " 'continuous [sic] ineffective treatment for severe, persistent skin rash condition' "), 11). His allegations now are not restricted to his medical isolation. As discussed below, plaintiff fails to establish a deliberate indifference claim as well as a retaliation or due process violation claims to abrogate Eleventh Amendment immunity.

**\*11** As for the discriminatory animus or ill will, plaintiff does not allege or establish any animus or ill will on the part of the defendants. The closest allegation is his retaliation claim, but (as discussed elsewhere in this Order) plaintiff fails to show how defendants at Five Points retaliated for his grievances and other activities in other facilities.

Plaintiff here fails to allege a constitutional violation or sufficient animus to state a claim under Title II of the ADA. Since Eleventh Amendment immunity is not abrogated by these statutes, plaintiff's first, fifth, and sixth causes of action (as against all defendants), involving the ADA and the Rehabilitation Act, are **dismissed.**

E. Retaliation

Next, defendants contend that plaintiff failed to establish retaliation or retaliatory animus to substantiate his claims (Docket No. 116, Defs. Memo. at 12-13). Plaintiff alleges

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

in his second cause of action that defendants used his disabilities to retaliate against him for his prior grievances in other facilities (Docket No. 92, Am. Compl. at 7). To establish a claim for retaliation for the exercise of a constitutional right (presumably here vindicating his rights through the grievance process), "Plaintiff must first show he was engaged in constitutionally protected conduct, and the conduct was a substantial motivating factor for adverse action taken against him by the defendant," *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (Docket No. 116, Defs. Memo. at 12). Plaintiff has a heavy burden, *Lowrance v. Achtyl,* 20 F.3d 529, 534-35 (2d Cir.1994), to show that whatever permissible basis defendants cite for their actions to render it unlikely that defendants acted absent a retaliatory purpose, *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995) (*id.*). Given the ease an inmate can claim any prison official's action is retaliatory, courts "examine prisoners' claims of retaliation with skepticism and particular care," *Colon, supra,* 58 F.3d at 872.

Plaintiff alleges retaliation from his transfer from Eastern Correctional Facility (with removal from his single inmate cell and from which he had pending grievances) to Five Points and a double cell. He was transferred on August 26, 2005, and then was placed in medical isolation (without any medical basis, according to plaintiff) on September 21, 2005. (*See* Docket No. 123, Pl. Memo. at 11-12, 13.) He argues that this one month period shows the retaliatory causation (*id.* at 12, citing *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)), and that "plaintiff stated a claim for 'causation' by alleging that after filing a grievance, plaintiff was placed in a psychiatric unit, due to the short length between the placement, and subsequent transfer, allegations support a 'retaliatory motive' " (*id.* at 12). *Graham* involved an inmate alleging that a false misbehavior report was filed against him in retaliation for leading the filing of a grievance to protest the removal of inmate showers, 89 F.3d at 79, and not for placement in a psychiatric unit as plaintiff argues.

**\*12** Here, while pursuing inmate grievances is a constitutionally protected activity under the First and Fourteenth Amendments, *see, e.g., Graham, supra,* 89 F.3d at 80; *Varela v. Demmon,* 491 F.Supp.2d 442, 450 (S.D.N.Y.2007), plaintiff only alleges that defendants in Five Points retaliated against him for prior grievances he filed while in Sing Sing and Eastern Correctional Facilities

(*see* Docket No. 92, Am. Compl. at 7; *see also id.* at 4-5, listing other litigation [FN4]), without alleging which grievances those were, when they were commenced, or (more importantly) how these defendants at Five Points were aware of those grievances to retaliate against plaintiff for commencing them. In opposition, plaintiff now argues that retaliation was shown by his transfer from Eastern Correctional Facility (and placement in a single cell) to Five Points and placement in a double cell and then, one month after his transfer, into medical isolation (Docket No. 122, Pl. Disputed Facts ¶ 7, Ex. C). From other parts of the Amended Complaint, it appears that these grievances later became federal actions in 2004 and 2005 (*see* note 2, *supra* ), possibly pending while plaintiff was placed in medical isolation in September to December 2005. Plaintiff alleges that defendants used two disabilities as a " 'covert' means" to retaliate against him (Docket No. 92, Am. Compl. at 7) by isolating him. The only defendant possibly capable of knowing about plaintiff's Sing Sing or Eastern Correctional Facilities grievances was Poole. Plaintiff has not made the connection between the non-Five Points grievances and his medical isolation that would make his placement in medical isolation retaliatory. Plaintiff could have been tested for TB (pursuant to DOCS protocols, *see* Docket No. 118, Gregoire Decl. Ex. B, § 1.18 at 5) upon his transfer to Five Points unrelated to his prior or pending grievances from other facilities. Defendants have come forward with medical justification for plaintiff's isolation that is not pretextual (*see* Docket No. 116, Defs. Memo. at 13-15). As a result, plaintiff's retaliation claims are **denied.**

FN4. The Amended Complaint notes a 2004 federal action against Sing Sing Correctional Facility officers in the Southern District of New York and a 2005 action against Eastern Correctional Facility staff in the Northern District of New York.

F. Conspiracy

Defendants contend that plaintiff failed to show that a conspiracy existed among the defendants (Docket No. 116, Defs. Memo. at 15-17). The conspiracy allegations stem from the medical personnel at Five Points (including Dr. Gregoire) agreeing to medically isolate plaintiff on

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

what he believes to be the absence of proof of active pulmonary tuberculosis (Docket No. 92, Am. Compl. at 13-14, 15-17, *see also id.* (general conspiracy alleged among defendants)). Defendants argue that plaintiff has not alleged an understanding was reached among the conspiring defendants to violate plaintiff's rights, *see Duff v. Coughlin,* 794 F.Supp. 521, 525 (S.D.N.Y.1992); *Katz v. Morgenthau,* 709 F.Supp. 1219, 1231 (S.D.N.Y.), *aff'd in relevant part,* 892 F.2d 20, 23 (2d Cir.1989) (per curiam) (Docket No. 116, Defs. Memo. at 16). Defendants dispute any role in the alleged conspiracy by Poole or Eagen (*id.* at 16-17).

**\*13** Plaintiff contends that defendants conspired in writing and orally in discussing his grievances, that defendants agreed to deny them even though the medical record to support his isolation was lacking or contradictory (Docket No. 123, Pl. Memo. at 14). While arguing the pleading standard (*id.* at 14-15), plaintiff only makes conclusory allegations and recital of their roles, *see Katz, supra,* 709 F.Supp. at 1231, in diagnosing him, assigning him to medical isolation, and (in the case of Poole and Eagen) in handling his grievances that resulted. At this summary judgment stage, plaintiff must not rely only upon his earlier pleadings but, by affidavits or other means, needs to set out facts showing a genuine issue for trial, Fed.R.Civ.P. 56(e)(2) (effective Dec. 1, 2007). Absent such a response, "summary judgment should, if appropriate, be entered against that party," *id.* This claim is **dismissed.**

G. Fourteenth Amendment Rights

1. Procedural Due Process

Defendants next argue that plaintiff was afforded all procedural process due to someone in his situation (Docket No. 116, Defs. Memo. at 24-26). To succeed on this **§ 1983** claim, plaintiff needs to establish that he possessed a liberty or cognizable property interest that was interfered with when he was placed in medical isolation and that he was deprived of those interests without due process, *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996)

(*id.* at 24). As a prisoner, he must allege that the State has granted inmates a protected liberty interest with respect to the terms and conditions of confinement and defendants' actions created "atypical and significant hardship," *Shariff v. Artuz,* No. 99 Civ. 321, 2000 U.S. Dist. LEXIS 12248, at \*18 (S.D.N.Y. Aug. 28, 2000) (*id.* at 25). Defendants contend that plaintiff was placed in medical isolation pursuant to Health Services Policy Manual § 1.18 (*id.* at 25).

Again, the chief factual issue underlying this case is whether defendants could reasonably have suspected that plaintiff was positive for tuberculosis in September 2005 to justify his medical isolation pending confirmation or treatment of TB. Plaintiff alleges that he was not positive for tuberculosis, relying upon the negative chest x-ray results. In response, plaintiff disputes the accuracy of his medical records, in particular, the TB tests in 1992 and 1998, as well as the TB diagnosis that lead to his 2005 isolation (*see* Docket No. 122, Pl. Disputed Facts ¶ 5, Ex. B), but plaintiff fails to offer evidence showing the inaccuracies in his record or expert review of defendant's version of his medical record to show the deficiencies.

The only evidence plaintiff has produced are the entries in September 3, 1992, for positive TB results at both Sing Sing and Ulster Correctional Facilities (*id.* Ex. B). In fact, plaintiff has two other federal actions pending that contest the validity of those tests (*see* Docket No. 92, Am. Compl. at 4-5). While the 1992 entry presents an issue of fact, it is not material to preclude summary judgment here.

**\*14** The symptoms in September 2005 indicating the presence of TB here were plaintiff's weight loss, bilateral abscesses at the axillae, combined with plaintiff's HIV status, his prior history of TB, and his refusal of treatment. Plaintiff also disputes the 1998 and 2005 diagnoses but raises no evidence to support his contentions. All he has presented is his conclusory assertions that disputes his diagnoses or (at a minimum) suggest the existence of a factual issue surrounding them. Plaintiff's medical record produced in this case has shown that he has denied that he had TB as well as HIV at various times. He has not presented evidence (such as contrary medical evidence or his own medical expert construing the medical record presented to the Court) to support his contention that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

believes that he was misdiagnosed. Further, he could have shortened this period of isolation by participating earlier in the testing and treatment.

Plaintiff thus fails to counter defendants' medical proof and his fourth cause of action is **denied.**

2. Equal Protection

Defendants do not address plaintiff's fourth cause of action contention that Health Services Policy Manual § 1.18 discriminates against HIV positive inmates by treating them differently than non-HIV positive inmates (*see* Docket No. 92, Am. Compl. at 10; Docket No. 123, Pl. Memo. at 21).

Plaintiff cites *Brown v. City of Oneonta,* 221 F.3d 329, 337 (2d Cir.2000), for setting forth three ways to plead an Equal Protection Clause claim, concluding that he plead all three (Docket No. 123, Pl. Memo. at 22). The first way is for a plaintiff pointing to a law or policy that " 'expressly classifies persons on the basis of race,' " *Brown, supra,* 221 F.3d at 337 (quoting *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 213, 227-29, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)), or, as argued by plaintiff, on the basis of a protected category (such as being HIV positive) (*id.*). Plaintiff does not allege race but argues that HIV status is a protected classification. Plaintiff has not established that persons with HIV are in a protected category under the Equal Protection Clause. The Equal Protection Clause "directs that all persons similarly situated should be treated alike.... However, 'the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same,' " *Spence v. Miles Labs.,* 810 F.Supp. 952, 961 (E.D.Tenn.1992) (quoting *Plyer v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), and citing *Clerburne v. Clerburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). In *Spence,* the district court held that HIV positive status was not a suspect classification and that the Tennessee Legislature had a rational basis for distinguishing AIDS from asbestos exposure in enacting the statute of repose that had different treatment for either situation, 810 F.Supp. at 962-63; *see also David v. Local 801, Danbury Fire*

*Fighters Ass'n,* 899 F.Supp. 78, 80 (D.Conn.1995) (rejecting as a protected class those persons sexually affiliated with AIDS patients as not a suspect or quasi-suspect classification). This Court, in *Nolley v. County of Erie,* 776 F.Supp. 715, 739 (W.D.N.Y.1991) (Curtin, J.), held that an HIV positive inmate carrying a contagious disease had not shown that she was similarly situated with other inmates to state an Equal Protection Clause claim, *see also Nolley v. County of Erie,* 802 F.Supp. 898, 901 (W.D.N.Y.1992) (summarizing earlier holding that defendants' segregation policy did not violate plaintiff's equal protection rights).

**\*15** Second, *Brown* held that a plaintiff "could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner," 221 F.3d at 337 (citing *Yick Wo v. Hopkins,* 118 U.S. 356, 373-74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Plaintiff here, however, has not alleged any intent to discriminate on the part of defendants here in applying § 1.18 to HIV positive inmates different from non-HIV positive inmates.

Third, *Brown* stated that a plaintiff "could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus," 221 F.3d at 337 (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). Plaintiff only argues the first part of this, that DOCS's policy had an "adverse and discriminatory effect on inmates classified as (H.I.V.positive)" (*id.,* internal quotations omitted). He does not allege the second part that such effects were motivated by discriminatory animus. Further, he produces no proof of such animus. Therefore, on this pleading basis, plaintiff fails to plead an Equal Protection Clause claim and this aspect of his claim is **denied.**

H. Deliberate Indifference

Plaintiff's third cause of action alleges cruel and unusual punishment in being deliberately indifferent to his severe skin rash by failing to treat it while he was in medical isolation for about three months (*see* Docket No. 92, Am. Compl. at 7). He does not complain about the treatment of the ailments that were the reason for his medical isolation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

The Eighth Amendment prohibits infliction of "cruel and unusual punishment," U.S. Const. art. VIII. In order to state a claim for inadequate medical treatment under that amendment, plaintiff must allege that defendants acted with "deliberate indifference to [a] serious medical need," *LaGrange v. Ryan,* 142 F.Supp.2d 287, 293 (N.D.N.Y.2001); *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *see also Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (the Eighth Amendment prohibits infliction of "cruel and unusual punishments" which includes punishments that "involve the unnecessary and wanton infliction of pain.") (citations omitted); *see Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "To establish an unconstitutional denial of medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Hathaway, supra,* 37 F.3d at 66 (quoting *Estelle, supra,* 429 U.S. at 104). Mere negligent treatment or malpractice upon a suspect, however, does not create an Eighth Amendment violation, *see Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972). This deliberate indifference claim has two elements, an objective component, that the deprivation must be sufficiently serious; and a subjective component, that the defendant official must act with sufficiently culpable state of mind. *Hathaway, supra,* 37 F.3d at 66. "Sufficiently serious" for the objective component contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (quoted in *Hathaway, supra,* 37 F.3d at 66). Plaintiff needs to prove that defendants wantonly intended to cause him to suffer. *Wilson v. Seiter,* 501 U.S. at 294, 302 (1991).

**\*16** Defendants argue that plaintiff cannot establish either the objective or subjective elements (Docket No. 116, Defs. Memo. at 18-20, 20-24). As for the objective element, defendants assert plaintiff's medical condition, his skin rash, was not "sufficiently serious," *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998), to have failure to treat it rise to the level of deliberate indifference, *see, e.g., Marshall v. Strack,* No. 98 Civ. 6789, 1998 U.S. Dist. LEXIS 3136, at \*1, \*7-9 (S.D.N.Y. Mar. 11, 1998), *aff'd without opinion,* 173 F.3d 845 (2d Cir.1999)

(rejecting deliberate indifference claim for skin rash as serious medical condition) (*id.* at 18-19). Defendants argue that plaintiff received medication for his stomach ache, gastrointestinal pain, heartburn and skin condition (*id.* at 21-22; Docket No. 118, Gregoire Decl. ¶ 19). As for the subjective element, defendants contend that plaintiff received extensive medical care while in isolation and that plaintiff fails to show the culpable state of mind of defendants to violate his rights (Docket No. 116, Defs. Memo. at 20, 21-22).

Plaintiff alleges ineffective treatment of his rash since March 2005 (Docket No. 123, Pl. Memo. at 16), *before* his transfer to Five Points and subsequent placement in medical isolation. This prior ineffective treatment was not alleged in his Complaint. Plaintiff's prior treatment and transfer to Five Points is unrelated to the decision at that facility to place plaintiff in medical isolation, the issue in this case.

Dr. Gregoire states that plaintiff was prescribed Hydrocortisone cream and Benadryl for his rash and Alamag, Zantac, and Simethicome for his gastrointestinal pain and heartburn while in isolation (Docket No. 118, Gregoire Decl. ¶ 19; Docket No. 122, Pl. Aff. Ex. A, Bates Nos. 0171-74). Thus, plaintiff received treatment for his skin and internal conditions while in isolation, negating the objective element for his deliberate indifference claim.

The Southern District of New York's case in *Marshall v. Strack* is instructive; there, plaintiff sought to sue the prison's dermatologist and prison official for failing to treat his skin rash, 1998 U.S. Dist. LEXIS 3136, at \*1-3. The court dismissed his deliberate indifference claim holding that plaintiff failed to meet the objective element because he merely claimed negligent or inadequate treatment rather than a sufficiently serious and urgent condition, *id.* at \*8-9, and failed to establish the subjective element, *id.* at \*9-10.

In the case at bar, plaintiff only alleges that he sought an appointment with a dermatologist on August 29, 2005 (before his medical isolation), which was not granted and he was deprived treatment of a severe skin rash (Docket No. 92, Am. Compl. at 8-9). He also alleged that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

suffered "severe gastro-intestinal pain" while in isolation and lost 17 pounds during two weeks of the isolation (*id.* at 9). In opposition, plaintiff argues that there is a material issue of fact as to the level of treatment for his skin condition he received while in isolation (Docket No. 122, Pl. Disputed Facts ¶ 6) and since March 2005 (months before his isolation at Five Points) (Docket No. 123, Pl. Memo. at 16). These allegations fail to show a sufficiently serious condition or conditions (such as leading to death or indicating severe pain) to meet the objective element for a deliberate indifference claim. Defendants have established that plaintiff in fact was treated for his skin and intestinal conditions *while in medical isolation* (Docket No. 118, Gregoire Decl. ¶ 19; Docket No. 122, Pl. Aff. Ex. A, Bates Nos. 0171-74). Plaintiff may not have been satisfied with the treatment he received, but that does not rise to the level of a constitutional violation (or raise a material issue of fact) to establish the objective element for deliberate indifference.

**\*17** Plaintiff also fails to allege a sufficiently culpable state of mind of the individual defendants treating (or failing to treat) him. Plaintiff's argument (*id.* at 17-19) does not address this subjective element for the deliberate indifference claim.

Therefore, plaintiff's third cause of action is **dismissed.**

\* \* \*

In sum, plaintiff's case rests upon his dispute with defendants' diagnoses of tuberculosis (and HIV) in the 1990s leading to his medical isolation in 2005 without showing evidence to refute his medical record and the conclusion defendants reached in September 2005. As a result, plaintiff's claims are **dismissed.**

I. Plaintiff's Motion for Partial Summary Judgment

Plaintiff cross moved to seek partial adjudication of certain facts he deemed were not in dispute (Docket No. 121). One fact plaintiff sought adjudicated is whether Five Points receives federal funds (Docket No. 123, Pl. Memo.

at 25), for purposes of having the ADA and the Rehabilitation Act apply, concluding that his claims under the ADA and the Rehabilitation Act should be granted (*id.* at 8). The Court **declines** to enter a judgment as to this fact since resolution of that issue will not expedite the adjudication. Even if Five Points received federal funds, that fact alone does not establish a violation of the ADA or Rehabilitation Act.

Next, plaintiff seeks adjudication that he had negative x-ray results and no test for his axillary abscesses for TB, based upon defendants' admissions in discovery (*id.*). But defendant Dr. Gregoire states in his declaration that plaintiff had "bilateral abscesses in the axillae, not draining, which are symptomatic of extra pulmonary TB" (Docket No. 118, Gregoire Decl. ¶ 11; *see* Docket No. 115, Defs. Statement ¶ 4). In their Supplemental Responses to Plaintiff's Second Request for Admission (Docket No. 73), defendants responded to the request regarding Macomber admitting that "he did any diagnostic testing to verify that the plaintiff's 'Axillary Abscesses' were caused by 'extra pulmonary T.B .'" that "because the Axillary Abscesses resolved quickly with antibiotics, no cultures were obtained" (*id.* at 3-4 (Request # 9); *see also id.* at 3 (Request # 8 to Dr. Gregoire, asking for same admission)). Plaintiff cites to other defense discovery responses (Docket Nos. 72, 74) as providing admissions, but these discovery responses do not support plaintiff's contention. Therefore, plaintiff's motion for partial summary judgment is **denied** as to this point.

J. Qualified Immunity

Alternatively, if a constitutional violation is found, defendants as prison officials and employees claim qualified immunity for their actions (Docket No. 116, Defs. Memo. at 28-30).

When confronted by a claim of qualified immunity, one of the first questions for the Court to resolve is do the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. *See Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). As required by the *Saucier* Court, the Court first considered (above) the constitutional

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)
(Cite as: 2008 WL 1867939 (W.D.N.Y.))

questions, then considered the qualified immunity question, *id.* The discussion above indicates whether a constitutional violation occurred. Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, *see Frank v. Reilin,* 1 F.3d 1317, 1327 (2d Cir.1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568-69 (2d Cir.1996). Particularly in the prison context, prison official defendants enjoy qualified immunity from damage actions, *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978).

**\*18** As held above, here the Court found that there was no constitutional violation. Hence, it need not apply qualified immunity.

III. Punitive Damages

Assuming a finding of liability, defendants next argue that plaintiff is not entitled to punitive damages because such damages are not available under Title II of the ADA or the Rehabilitation Act, *Barnes v. Gorman,* 536 U.S. 181, 189-90, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002); *see Bayon v. State Univ. of N.Y. at Buffalo,* No. 98CV578, 2001 U.S. Dist. LEXIS 1511, at \*13-14 (W.D.N.Y. Feb. 15, 2001) (Elfvin, J.) (punitive damages not available under Title II of the ADA against defendants in their individual capacity); *see also City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (Docket No. 116, Defs. Memo. at 26-28). Further, plaintiff did not allege maliciousness or wantonness to warrant punitive damages (*id.* at 27). They do not address whether punitive damages are allowed for plaintiff's constitutional claims.

Even if the constitutional claims allow for punitive

damages, plaintiff here fails to allege malice or wantonness on defendants' part to justify such damages. Plaintiff's claim for punitive damages is **denied.**

**CONCLUSION**

For the reasons stated above, defendants' motion for summary judgment (Docket No. 114) is **granted.** In particular, claims against defendants State of New York, Thomas Poole and Thomas Eagen are **dismissed** on Eleventh Amendment or failure to allege personal involvement grounds. Claims against the remaining individual defendants in their official capacities are also **dismissed** on Eleventh Amendment grounds. Plaintiff's claims are **denied** on substantive grounds discussed above. Plaintiff's claims for punitive damages against all defendants is **denied.** Plaintiff's motion for partial summary judgment (Docket No. 121) also is **denied.** The Clerk of Court is instructed to enter judgment dismissing this case and closing it.

So Ordered.

W.D.N.Y.,2008.
Fox v. Poole
Not Reported in F.Supp.2d, 2008 WL 1867939 (W.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
William BLAKE, Jr., Plaintiff,
v.
Terry BASE; Jeff Domachowski; Earl Smith; and Other
Unknown Police Officers, Defendants.
**No. 90-CV-0008.**

Sept. 14, 1998.

William Blake, Jr., Sullivan Correctional Facility,
Fallsburg, for Plaintiff, Pro Se.

Salvatore A. Pavone, Esq., Syracuse, Pro Bono Standby
Trial Counsel for Plaintiff Pro Se.

Jon A. Gerber, Esq., County Attorney, Attorney for
Defendants, Syracuse, John W. Sharon, Esq., Asst. County
Attorney, of Counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, S.J.

**\*1** On August 11, 1998, the court conducted a non-jury
trial FN1 in this civil rights action. In accordance with
Fed.R.Civ.P. 52(a), after a careful review of the witnesses'
testimony, and an appraisal of their credibility, and a
careful review of the exhibits, the court makes the
following findings of fact and conclusions of law.

> FN1. In his complaint plaintiff did demand a jury
> trial. Just prior to trial, however, both the
> plaintiff and the defendants agreed to waive a
> jury.

*Findings of Fact*

Plaintiff William Blake Jr. testified on his own behalf; he
also called defendant Terry Base as a witness. Not only
did the defendants elect not to testify in this action, but
they also did not submit any independent evidence. FN2 The
parties did stipulate, though, to the admission of ten
exhibits into evidence, including an audio cassette and
selected portions of a videotape. From the testimony of
Blake and Base and from those exhibits, the following
facts emerge.

> FN2. The court is extremely reluctant to second
> guess any party's trial strategy. The court's task
> herein was made needlessly difficult by
> defendants' failure to testify, however. This is
> especially so as to defendant Domachowski
> given that, as will be seen, plaintiff Blake was
> adamant that it was Domachowski who struck
> plaintiff in the face, "split [ting]" his eye.
> Transcript (Aug. 11, 1998) ("Tr.") at 13. In the
> court's opinion, the defendants' failure to testify,
> to offer any independent evidence, and to
> adequately elicit testimony from defendant Base,
> the one witness who potentially could have
> significantly bolstered the defense case, is
> troublesome, to say the least.

Unfortunately, this is not the first time this
court has witnessed such a lapse on the part of
defense counsel in these prisoner civil rights
lawsuits. For the past several years this court
has conducted numerous trials in cases such as
this. In so doing, one theme emerges: the
defense bar has a rather cavalier attitude
towards these cases, believing that all they
need do is appear for trial. Defense lawyers do
not take discovery demands seriously,
particularly, as is often the case, if those
demands come from *pro se* inmate litigants.
Motions are not timely made, if at all. And,
lawyers are often ill-prepared for trial, with the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

end result being the waste of scarce judicial resources.

By its silence, the court can no longer condone this behavior. The time has long since passed for defense lawyers in prisoner civil rights cases to take seriously their duty to represent clients vigorously and zealously. *See* N.Y. CODE OF PROF. RESP. EC 7-1 (McKinney Supp.1998).

In this action, brought pursuant to 42 U.S.C. § 1983, plaintiff Blake alleges, albeit not in precisely these terms, that his civil rights were violated when defendants used excessive force upon him following his arrest, and thereafter when he was taken to the Onondaga County Sheriff Department ("Sheriff" or "Sheriff Department") headquarters. In particular, plaintiff alleges that handcuffs, and what is referred to as a "Welch-It" device, [FN3] were placed upon him "in a vicious fashion not to merely restrain him ....but to cause him extreme pain and suffering." Complaint, "Statement of Claim." Plaintiff further alleges that defendants Jeff Domachowski and Earl Smith [FN4] both "attack[ed] and beat[ ]" him, "without cause or provocation" at Sheriff Department headquarters. *Id.* Although plaintiff does not assert that defendant Base actually engaged in any of the foregoing, he alleges that nonetheless Base is liable because he failed to intervene and protect Blake.

FN3. As plaintiff describes it, the "Welch-It" device is "a nylon rope that loops around the ankles and is fastened to the chain of the handcuffs [,] ... draw[ing] the feet up behind the back towards the cuffed hands [.]" Complaint, "Statement of Claim."

FN4. Also named as defendants were "other unknown police officers." Complaint, Civil Cover Sheet. As part of their pre-trial submissions, the named defendants moved pursuant to Fed.R.Civ.P. 41(b) for dismissal of the complaint against those unnamed and unidentified defendants. Plaintiff did not object and the court granted that motion just prior to

trial.

Then, at the close of all of the proof, the court granted defendant Smith's Rule 52 motion to dismiss the complaint as against him because there was absolutely no evidence implicating him in the events complained of by plaintiff Blake. Thus, there are only two defendants remaining in this action, Base and Domachowski.

As will be more fully discussed herein, because the central inquiry in this case is whether the amount of force employed was that which a reasonable officer would have employed under similar circumstances,[FN5] the court cannot look at the defendants' conduct on February 10, 1987, in isolation. Rather, the court must examine those actions in light of *all* of the circumstances which confronted the defendants at that time.

FN5. *See supra* at 24-27.

In so doing, the court will separately examine three different time frames. First the court will focus on what transpired in the Dewitt Town Court ("Town Court") parking lot, when defendant Base arrived there at approximately 9:00 p.m. on February 10, 1987. Next, the court will examine the proof adduced with respect to the transport of plaintiff Blake from that parking lot to Sheriff headquarters in downtown Syracuse. Third, the court will consider the evidence as to how plaintiff was treated by defendants as he was being taken to a holding cell at Sheriff headquarters.

*I. Dewitt Town Court Parking Lot*

Throughout this litigation, plaintiff Blake has consistently maintained that he is not making any claims in connection with his arrest. His claims are limited to how he was treated *after* his arrest. Nevertheless, it is necessary for the court to examine what happened at the Town Court parking lot when plaintiff was rehandcuffed because, as will be seen, it is defendants' position that in all likelihood

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

plaintiff's injury to his left eye area occurred in that
parking lot, and not later at Sheriff headquarters.

**\*2** Defendant Base testified that he first saw plaintiff
Blake when Base arrived at the Town Court parking lot.
Consistent with his affidavit sworn to the next day, on
February 11, 1987,[FN6] and the Chairs Incident Report
prepared by him,[FN7] Base testified that when he arrived at
that parking lot he observed plaintiff and two others
handcuffed together, leaning against a car. Two uniformed
deputies were holding those three individuals at gunpoint.
When Base exited his vehicle, he was advised by one of
the deputies that Blake had just shot two other deputies
inside the Town Court, *see* pl. exh. 2; and pl. exh. 13 at 2,
which later resulted in his being charged with first degree
murder and attempted murder. *See* Pl. exh. 13 at 3.

FN6. Pl. exh. 2.

FN7. Pl. exh. 13.

Obviously, defendant Base was not present at the time of
those shootings, nor immediately thereafter. One of the
other deputies who was present, however, provided Base
with the following background information. He had seen
Blake and the other two arrestees leaving Town Court, and
"Blake [was] holding and pointing a revolver as he was
leaving the court house." Pl. exh. 13 at 2. At that point,
two other deputies at the scene "drew their weapons and
ordered Blake to drop the gun. Blake started to turn the
weapon toward them then he threw it in the snow." *Id.*
After that, Blake and the other two arrestees were ordered
against the vehicle, the position defendant Base found
them in when he arrived. *See id.*

When he learned of the shootings, defendant Base
inquired as to the whereabouts of the weapon fired by
Blake. Pl. exh. 2; and pl. exh. 13 at 2. One of the officers,
who was holding Blake and his cohorts at gunpoint,
responded that the weapon was laying in the snow
approximately twenty feet from Base. *Id.* After ordering
that the weapon be secured, Base ordered Blake and the
other two men "to lay on the ground until we had enough
assistance in handcuffing them individually and seperately

[sic]" Pl. exh. 13 at 2; and pl. exh. 2. During this
rehandcuffing process, Base testified that he instructed the
deputies to make sure that as plaintiff was laying on the
ground his head remained on the ground, turned to the
right, so that plaintiff could not observe what was going on
around him. The justification for requiring plaintiff to
place his head on the ground was "to reduce [his] ability
to determine the status of the cuffing procedure and to
thereby reduce [his] ability to resist arrest and/or attempt
to escape and/or injure another person or officer." Pl. exh.
6 (Plaintiff's Third Set of Interrogatories) at 1, ¶ answer 1.

According to Base, Blake did not obey this
straightforward command. Instead, completely
disregarding Base's order to keep his head down, midway
through the rehandcuffing process, Base testified that he
witnessed Blake lifting his head from the ground, at least
once, possibly twice. Base was in a position to observe
this process because he did not actually participate in the
rehandcuffing; he was overseeing that process. When
plaintiff started to lift his head from the ground, Base
testified that he saw one of the deputies (although he does
not remember which one), with his hands, push Blake's
head back to the ground and hold it there.

**\*3** After plaintiff Blake was separated from the other two
arrestees and individually rehandcuffed, he was escorted
to defendant Base's Sheriff Department vehicle for
transport to Sheriff headquarters. While plaintiff was
being escorted to that vehicle, Base testified that he
noticed a mark on plaintiff's left eyebrow, but he did not
observe any lacerations there. That mark, as described by
Base, was like "road rash," as if plaintiff had sustained a
scrape on the pavement. Although Base did not mention
this mark in his February 11, 1987, affidavit, it is
referenced in his affidavit sworn to on February 26, 1987.
*See* Pl. exh. 3. In that affidavit Base explained that he
observed "what appeared to be a small scrape on or near
[Blake's] left eyebrow." Pl. exh. 3. Base added:

   I was under the impression that it was an old injury, but
   it may have occurred during his handcuffing. Blake
   might have moved his head during the time deputies
   were holding him down to handcuff his arms and legs,
   or while his ankles were being tied together, thereby
   causing the injury. Blake was told not to move during

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

this procedure, but if he turned his head during this procedure, he may have scraped his face on the ground.

Pl. exh. 3.

During his questioning of defendant Base,[FN8] plaintiff tried to make much of the fact that in the just quoted affidavit Base was not absolutely certain as to how or when plaintiff sustained an injury near his left eyebrow. Plaintiff Blake also questioned Based fairly extensively as to why there is no mention in Base's February 11, 1987, affidavit of the fact that at least one deputy had to push plaintiff's head to the ground during rehandcuffing. Base believably responded that initially he did not remark on that particular use of force because there is no requirement that the same be reported, unless the force used was more than would ordinarily be used to handcuff someone. In Base's opinion the force used on Blake did not fall into that category.

> FN8. The court did appoint attorney Salvatore Pavone as *pro bono* standby trial counsel. Plaintiff Blake elected, however, to conduct the trial himself, including questioning the only witness called besides himself, defendant Terry Base. Once again, though, the court acknowledges and extends its appreciation to attorney Pavone for serving in this capacity.

Defendant Base further explained that before an injury sustained during handcuffing would have to be reported, it must be a "significant injury." Base did not believe that the injury to Blake's left eyebrow rose to that level; Blake's injury was more in the nature of a scuff or scrape which was merely incidental to the arrest. Although Base does equivocate somewhat in his February 26, 1987, affidavit, when discussing how and when plaintiff's left eyebrow was injured, that is not a sufficient reason to disregard Base's entirely plausible trial testimony as to what happened at the Town Court parking lot on February 10, 1987.

Not surprisingly, plaintiff Blake's testimony directly contradicted that of defendant Base. Blake testified that as

soon as he was ordered prone on the ground, he complied; at no time during the rehandcuffing process did he resist in any way. Plaintiff Blake maintained that he did not sustain any injury to his left eyebrow while at the Town Court parking lot, but that that injury occurred later, at Sheriff headquarters.

*4 The court would be far more inclined to believe Blake's version of events if his actions prior to this time had indicated that he was a willing and submissive arrestee. His actions, however, indicate the exact opposite. As previously mentioned, not only had Blake just shot and killed one deputy, and brutally wounded another, but, on the way out of Town Court he also pointed a revolver (taken from one of the deputies whom he had just shot) at the deputies who were accompanying him. Furthermore, a photograph admitted into evidence[FN9] plainly shows that even though plaintiff had just committed two heinous crimes, he had absolutely no remorse whatsoever. Indeed, plaintiff's facial expression in that photograph demonstrates to the court, all too vividly, that plaintiff actually took some perverse pleasure in his assault on the officers.

> FN9. Pl. exh. 5.

Against this background it is difficult, if not impossible, for the court to believe, as Blake would like, that during the rehandcuffing, he suddenly became a willing and completely docile arrestee. In fact, his actions immediately following the shootings, that is turning the weapon towards other deputies, strongly suggest that plaintiff was not acquiescing in the arrest process, but instead fully intended to continue on his shooting spree, escape, or perhaps both. Thus, in short, the court does *not* credit plaintiff Blake's testimony that he fully cooperated throughout the rehandcuffing procedure, and thus the deputies would have had no reason to force his head to the ground.

In reaching this conclusion, the court is fully cognizant of plaintiff's assertion that he sustained the injury to his left eyebrow while at Sheriff headquarters, and not in the Town Court parking lot. The court is also aware of plaintiff's contention that exhibit five, a photograph of he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

and two others apparently handcuffed together, and laying on the ground in the Town Court parking lot, supports his view that he was not injured there because, as Blake views that photograph, he does not have any marks on his left eyebrow. Plaintiff's exhibit five does not conclusively prove that plaintiff was *not* injured while laying on the ground during the individual handcuffing process, however. First of all, the photograph is a copy of very poor quality, making it impossible to discern whether or not plaintiff had any injury to his left eyebrow area at the time it was taken.

Moreover, although the court admitted that photograph into evidence, it did so primarily because the parties so stipulated and the trial was non-jury. No proof was offered, though, establishing the exact time frame of that photograph. It is the court's understanding, based upon defendant Base's testimony, that the rehandcuffing process first required that plaintiff and the other two individuals be separated from each other, and then that they each be separately handcuffed. Therefore, even if the photograph (plaintiff's exhibit five) shows, as plaintiff contends, that he did not have any marks near his left eye, it does not definitively establish that plaintiff did not sustain any injury to his left eye area while at the Town Court parking lot. Indeed, it appears, although again it is difficult to be certain because of the poor quality of the copy of the photograph, that perhaps plaintiff and the other two arrestees were handcuffed together at the time of the photograph. If that is so, then it is certainly possible that the photograph was taken before the three were separated and individually handcuffed, and it is during that process which defendant Base claims that plaintiff sustained a minor injury to his left eye area. Thus, the court finds that plaintiff has not demonstrated by a preponderance of the evidence that he was *not* injured near his left eyebrow while at the Town Court parking lot.

## II. Transport

**\*5** The second time frame which the court must consider is the transport of plaintiff to Sheriff headquarters. It is undisputed that before being taken to Sheriff headquarters, plaintiff Blake was handcuffed, with his hands behind his back, and the Welch-It device was in place. Similar to plaintiff, defendant Base described the Welch-It device as

follows: It is a piece of nylon rope, between five and six feet long, used to secure the ankles; between one and two feet of that rope are clipped to handcuffs behind the restrained person's back. Defendant Base candidly admitted that the Welch-It device is uncomfortable; it is designed for restraint, not comfort.

Base convincingly explained that it was necessary to use the Welch-It device on Blake because if a person is considered to be violent, an escape risk or dangerous to himself, then the Welch-It device is commonly applied. Here, Base testified that Blake fell into two of those three categories. Although he did not elaborate, it can easily be inferred from all of the proof that Blake was both violent and an escape risk, two factors not refuted or in any way challenged by plaintiff. Thus, the court is easily persuaded that, as Base testified, it was necessary for plaintiff to be securely restrained in the Welch-It device, as well as the handcuffs.

Defendant Base recollects that while riding in the back seat of the Sheriff vehicle, plaintiff was saying, "Ah, ah," as he struggled to free himself from the handcuffs and Welch-It device. It appeared to Base that plaintiff was trying to detach the Welch-It device. Defendant Base's suspicion was later confirmed when, as Blake freely admitted, while in the holding cell he eventually slipped the Welch-It device off his ankles.[FN10]

> [FN10.] If there was not one to two feet of nylon rope between plaintiff's feet and his hands, as Base testified, but, as Blake testified, closer to six inches, it is impossible to imagine how Houdini, let alone plaintiff, could have successfully removed the Welch-It device on his own.

Plaintiff's version of his ride to Sheriff headquarters is, not surprisingly, at odds with defendant Base's recollection of that same ride. Blake testified that the Welch-It device was pulling on the handcuffs, and the handcuffs were so tight that he was moaning. The handcuffs, plaintiff testified, were digging into his "very bone." Despite his claim that the handcuffs were too tight, plaintiff freely admitted that he never received medical treatment for that condition.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

The Onondaga County Correctional Facility Nurse's & Physician's Notes ("Nurse's Notes"), which are part of the record, comport with plaintiff's recollection on this point. *See* Pl. exh. 4. Nowhere in those notes is there any mention of plaintiff having been treated for any injury or discomfort to his wrists.

In an apparent attempt to justify his failure to seek medical treatment, plaintiff testified that in the hundred plus times he has been in handcuffs, even when his wrists are "blown up, swelled up from [the] cuffs[,]" when the handcuffs are removed, his "wrists [are] all right[,]" and in a "day or two, the redness, any bruising there goes away[,]" so he does not "usually complain about things like that." Tr. at 93-94. The purpose of this testimony is not clear to the court, but the court surmises that plaintiff has a relatively high pain threshold, a finding which does not bolster his claim that the handcuffs were so tight that they caused him pain and suffering, much less "extreme pain and suffering." *See* Complaint, "Statement of Claim." As an aside, the court observes that although there was no testimony as to exactly how long it took plaintiff to be transported from the Town Court parking lot to Sheriff headquarters, the court takes judicial notice of the fact that such a ride, particularly under these circumstances would take, at the most, twenty minutes. *See* Fed.R.Evid. 201(c) (authorizing the court to take judicial notice of adjudicative facts, "whether requested or not"). Thus, any discomfort which may have resulted to plaintiff because of the manner in which he was restrained during that ride was relatively short in duration.

*III. Sheriff Headquarters*

**\*6** Lastly, plaintiff Blake claims that excessive force was used upon him while he was at Sheriff headquarters. Plaintiff's primary claim in this regard is that he was struck by defendant Domachowski while being carried to the holding cell.

As noted earlier, defendant Domachowski is among several Sheriff Department employees whom plaintiff alleges "attack[ed] and beat[ ] [him], without cause or provocation[ ]" while he was at Sheriff Department headquarters. Complaint, "Statement of Claim." At trial,

plaintiff Blake testified that although he did not know it at the time, he now knows that it was defendant Domachowski and Deputy Fred Bragg who carried him to the holding cell.[FN11] As plaintiff recalls it, Domachowski and Bragg, one on each side of him, carried him with his head facing the ground, and his feet dangling behind his back.

> FN11. The court is uncertain as to how plaintiff learned the names of those two deputies, except perhaps he was simply repeating the testimony of defendant Base who testified prior to Blake, and who specifically identified Domachowski and Bragg as the deputies who carried plaintiff from the car to the holding cell.

While he was being carried like this in the hallway, en route to the holding cell, plaintiff Blake testified that he was struck in the face. Plaintiff elaborated:

> The only person I know for a fact who hit me was Jeff Domachowski, because the manner I was being carried, I was-- my face was pointing towards the ground so I could not see the area around me, I could only see the lower half of the two cops that were carrying me, Fred Bragg and Jeff Domachowski. And I saw Domachowski's hand hit me in the face, he's the one that split my eye, there's no doubt in my mind about that. I was also hit in the body a couple of times but I don't know by who. I don't know if it was by the officers that were carrying me or if it was by other officers present around me because I was surrounded in that hallway.

Tr. at 80. Plaintiff readily acknowledges, however, that the foregoing resulted in "only a small cut, [which] healed up fine on its own, [and that the] black eye went away before too long." Tr. at 94.

Plaintiff's recollection is consistent with the Nurse's Notes, wherein it states that at 4:00 a.m. on February 11, 1987, plaintiff had an approximately one-half inch, "non gapping" laceration to his upper left eyelid. Pl. exh. 4.[FN12] Even though plaintiff was seen on several occasions thereafter by someone from health services,[FN13] this slight

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

injury to his left eye is never again mentioned in the Nurse's Notes. *See id.* That is because, as plaintiff conceded, he only received one treatment to his eye; it was cleaned with "betadine." Tr. at 91. Furthermore, when questioned by the court, plaintiff replied that he did not require sutures to his eyebrow. *Id.* at 92. Upon close examination, the court was able to discern a barely visible, non-disfiguring line,[FN14] approximately one-half inch in length, just above plaintiff's left eyebrow.

FN12. Plaintiff's exhibit four appears to contain additional information pertaining to the condition of plaintiff's left eye at the time, but the court is unable to read that part of this exhibit. This provides a good example of why, even if the parties both stipulate to the admission of a document, sometimes it is still necessary to call a witness who can fully explain and interpret a document. Without the benefit of the testimony of the person who made this notation, these Nurse's Notes are of limited use.

FN13. Plaintiff was seen a second time on February 11, 1987, at 6:45 p.m., and on February 12, 13, and 25, as well as on March 10, 1987. Pl. exh. 4.

FN14. Given the court's inability to distinguish that line from other markings on plaintiff's face, the court is not prepared to go so far as to classify that line as a scar.

In addition to alleging that his left eyelid was injured at Sheriff headquarters, plaintiff contends that he was in pain due to the manner in which he was carried, and because defendant Domachowski and Bragg were pushing on plaintiff's lower back as they carried him. Plaintiff testified that he felt as though his shoulders were breaking, and that his "shoulders [were] going to snap out of place." *Id.* at 94. Despite this supposedly horrific pain, plaintiff sought no medical treatment for the same. Again, plaintiff's failure to seek medical treatment seriously belies his credibility in terms of the extent to which he was purportedly subjected to pain and suffering due to the way in which he was restrained. Surely if the pain was as

intense as plaintiff would like this court to believe, he would have sought medical treatment at least once, but he did not.

**\*7** In scrutinizing the exhibits, particularly the Nurse's Notes, the court observes that there are several references therein to plaintiff's complaints of pain in his right ankle.[FN15] At trial, however, plaintiff did not specifically testify to any injury or pain to his ankles. It is true that plaintiff made a passing reference, while interpreting that portion of the video tape which showed him being taken from Sheriff headquarters to Liverpool Town Court to be arraigned,[FN16] to the fact that he was limping at that time because he was so tightly shackled. Because plaintiff did not direct more of his trial testimony to this claimed pain in his ankles, and because the Nurse's Notes do not support a finding that plaintiff sustained pain to his ankles caused by the manner in which he was restrained, the court is left with only one conclusion-this pain, if indeed it was real, was insignificant, even to plaintiff himself.

FN15. For example, on February 11, 1987, at 4:00 a.m., evidently plaintiff complained of a "painful" right ankle. *See* Pl. exh. 4. The person who made that notation did not observe any marks on plaintiff's ankle, however. *Id.* Later that same day, at 6:45 p.m ., according to the Nurse's Notes, plaintiff requested an Ace bandage for his " 'painful ankles [.]" ' *Id.* Although plaintiff protested that his ankles had been "swollen since last night[,]" the person examining plaintiff plainly noted, "no swelling [.]" *Id.* Finally, a month after the events complained of herein, on March 10, 1987, plaintiff again complained of pain to his right ankle. *Id.* The notation for that date contains additional information regarding plaintiff's ankle, but because the meaning of that notation is not self-evident, and because the court did not have the benefit of hearing testimony from the author, it is practically meaningless, and does not, without more, provide support for plaintiff's or defendants' version of events.

FN16. Pl. exh. 15.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

*Conclusions of Law*

*I. Personal v. Official Capacity*

The first issue which the court must address is in what
capacity are defendants Base and Domachowski being
sued-in their personal or official capacity, or both.
Although the parties ignored this issue, the distinction is
important because the elements necessary to establish a
section 1983 claim are different depending upon which
capacity a defendant is sued.[FN17] It is unclear from plaintiff
Blake's complaint in what capacity he is suing Base and
Domachowski. "However, pro se complaints, if possible,
should be construed as asserting both claims." *Crown,
1998 WL 118169, at *1* (citations omitted). Keeping in
mind the Second Circuit's admonition in *Frank v. Relin,*
1F.3d 1317 (2d Cir.), *cert. denied,* 510 U.S. 1013, 114
S.Ct. 604 (1993)), that "a plaintiff who has not clearly
identified in her complaint the capacity in which the
defendant is sued should not have the complaint
automatically construed as focusing on one capacity to the
exclusion of the other[,]" the court will liberally construe
plaintiff's *pro se* complaint as asserting claims against
defendants Base and Domachowski in both their official
and individual capacities, and examine the record proof
accordingly. *See id.* at 1326.

> FN17. "A § 1983 claim against a municipal
> official in his official capacity is treated as a
> claim against the municipality itself." *Crown v.
> Wagenstein,* 96 CIV. 3895, 1998 WL 118169, at
> *1 (S.D.N.Y. March 16, 1998)* (citing *Brandon
> v. Holt,* 469 U.S. 464, 471-72, 105 S.Ct. 873,
> 877-78, 83 L.Ed.2d 878 (1985)). "Section 1983
> imposes liability on municipalities [and hence
> municipal officials sued in their official capacity]
> *only* when the action that is alleged to be
> unconstitutional implements or executes an
> official policy or custom." *Id.* (emphasis added)
> (citing *Monell v. Department of Social Services,*
> 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036-37,
> 56 L.Ed.2d 611 (1978)). On the other hand,
> before section 1983 liability will be imposed
> upon a defendant sued in his personal or
> individual capacity, "a plaintiff must [show] ...
> defendant's direct or personal involvement in the

alleged constitutional deprivation." *Feliciano v.
G. Goord,* 97 Civ. 263, 1998 WL 436358, at *3
(S.D.N.Y. July 27, 1998) (citing *inter alia,
Colon v. Coughlin,* 58 F.3d 865, 873 (2d
Cir.1995)).

*A. Official Capacity*

The record is completely void of any proof that these two
defendants either implemented or executed an
unconstitutional policy or custom. Furthermore, although
there is no requirement that a plaintiff "show that the
municipality had an explicitly stated rule or regulation, a
single incident ..., especially if it involved only actors
below the policymaking level does *not* suffice to show a
municipal policy." *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d
Cir.1998) (internal quotations and citation omitted)
(emphasis added). And that is precisely the position in
which plaintiff Blake finds himself; at most there is proof
of a single incident, involving actors who, based upon the
proof, or more appropriately, the lack thereof, were not
responsible for policymaking decisions in the Sheriff
Department. Thus, insofar as plaintiff's complaint can be
read as asserting a section 1983 claim against defendants
Base and Domachowski in their official capacities, the
court dismisses such claims because plaintiff's proof in
that regard is wholly lacking. *Cf. Crown, 1998 WL
118169, at *2* (dismissing official capacity claim against
correctional center's warden where the complaint failed
"to allege a municipal policy or custom that defendant was
executing, or that such a policy or custom caused the
alleged violation of the plaintiff's constitutional rights[ ]").

*B. Personal Capacity*

**\*8** Next the court will examine the evidence adduced at
trial in terms of defendants' potential section 1983 liability
in their personal capacities. As previously stated, "[a]s a
prerequisite to maintaining a Section 1983 action against
an individual in his individual capacity, a plaintiff must
[establish]... defendant's *direct or personal* involvement in
the alleged constitutional deprivation." *Feliciano, 1998
WL 436358, at *3* (citing, *inter alia, Colon,* 58 F.3d at
873) (emphasis added). That is so because "[l]iability for
damages in a Section 1983 action may not be based on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

respondeat superior or vicarious liability doctrines." *Id.* (citation omitted). "Nor may a defendant be held liable merely by his connection to events through links in the chain of command." *Id.* Thus, the court will next consider whether plaintiff Blake has come forth with sufficient proof of personal involvement on the part of defendant Base and Domachowski, so as to support a finding of section 1983 liability in their personal capacities.

*1. Defendant Base*

There is no proof that defendant Base was directly involved in the alleged constitutional deprivations which may have occurred at the Town Court parking lot, or while plaintiff was being transported to Sheriff headquarters. Therefore, in assessing whether plaintiff has demonstrated the requisite personal involvement by defendant Base, the court must consider whether there is sufficient proof to hold Base liable in a supervisory capacity. Of the five types of supervisory liability set forth in *Colon,* only two arguably apply here: "the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or ... the defendant exhibited deliberate indifference to the right of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." [FN18] *Colon,* 58 F.3d at 873 (citation omitted).

> FN18. A defendant may also be liable under section 1983 as a supervisor where "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, ...." *Colon,* 58 F.3d at 873 (citation omitted). Plainly, none of these three other means of supervisory liability are implicated here.

Close inspection of the evidence before the court demonstrates that neither of those theories of supervisory liability applies to defendant Base. Assuming *arguendo* that Base was supervising subordinates at the Town Court

parking lot, and further assuming that those subordinates committed a wrongful act, [FN19] there is no evidence in the record establishing that he was either grossly negligent or deliberately indifferent to plaintiff's constitutional rights. As already discussed, given the unique circumstances which defendant Base faced at the Town Court parking lot, it was completely reasonable for him to order the other deputies to make sure that during the rehandcuffing process plaintiff's head remained on the ground, turned away from the weapon. The court's ruling in this regard encompasses plaintiff's transport to Sheriff headquarters. Again, under *all* of the facts then known to defendant Base, and discussed at some length herein, a prudent officer confronting similar circumstances would have restrained plaintiff in the most secure and restrictive means available while transporting him to Sheriff headquarters. Accordingly, the court finds that defendant Base cannot be held liable in a supervisory capacity for his actions at the Town Court parking lot, or while transporting plaintiff to Sheriff headquarters.

> FN19. The court hastens to add that, as previously explained, the proof in this regard is to the contrary. The officers which acted on Base's order to keep plaintiff's face to the ground, turned away from the weapon, did not commit a wrongful act, but were simply following a reasonable and common sense order under the circumstances.

**\*9** However, given that defendant Base admitted that he was present when plaintiff was being carried by Domachowski and Bragg, the court is not in a position to find at this juncture that Base had no personal involvement in the alleged incident at Sheriff headquarters. *See Feliciano, supra,* 1998 WL 436358, at *3 (allegations that officer failed to protect plaintiff from attack by a fellow inmate sufficient to establish that officer's personal involvement so as to survive a motion to dismiss). The court will discuss that claim momentarily.

*2. Defendant Domachowski*

The only evidence offered by plaintiff with respect to defendant Domachowski is that allegedly he struck

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

plaintiff as he was being carried to a holding cell at Sheriff headquarters. The record is silent, though, as to whether defendant Domachowski was personally involved in any of the events at the Town Court parking lot. There is also no proof in the record that Domachowski was personally involved in either applying the handcuffs and/or the Welch-It device to plaintiff, or that he participated in any way in the decision to keep plaintiff restrained in that manner while he was confined to the holding cell. Therefore, to the extent plaintiff is seeking to recover from defendant Domachowski for his alleged involvement in the incident at the Town Court parking lot, in the initial decision to handcuff plaintiff and place him in the Welch-It device, and in keeping plaintiff restrained in that way while in the holding cell, the court rejects such claims. The only claim thus remaining against defendant Domachowski is that allegedly he struck plaintiff. The court will address that claim, as well as the claim against defendant Base arising out of his alleged failure to intervene at Sheriff headquarters, after first outlining the appropriate analytical framework for those claims.

*II. Governing Legal Standard*

" 'Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." ' *Richardson v. C.O. Castro,* 97 CV 3772, 1998 WL 205414, at *2 (E.D.N.Y. April 24, 1998) (quoting *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994)). Thus, the court must determine exactly what constitutional rights form the basis of plaintiff Blake's action herein. In his complaint, plaintiff alleges that defendants' actions violated the Eighth and Fourteenth Amendments to the United States Constitution, but he does not elaborate. *See* Complaint, Statement of Claim. Plaintiff reiterates his reliance on those two Amendments in his trial memorandum. *See* Pl. Trial Memorandum at 2, ¶ 1(F). In his pre-trial submissions, however, plaintiff added yet another Amendment as a possible basis for his constitutional claims-the Fourth Amendment. Plaintiff's Opposition to Pre-trial Memorandum, and Objections to Proposed Charge at 4. More specifically, in that memorandum, and again at the beginning of the trial, plaintiff inquired as to the governing legal standard, frankly conceding that he was "not even sure if [his] claim of being beaten should be analyzed

under the *4th,* 8th *or* 14th amendments." *Id.* (emphasis added).

**\*10** Plaintiff's *pro se* complaint can be construed in at least two different ways. First, because "[t]he Eighth Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment and prohibits the infliction of 'cruel and unusual punishment on those convicted of crimes[,]" [FN20] one plausible reading is that defendants allegedly violated the Eighth Amendment's cruel and unusual punishment clause. Plaintiff's complaint can also be read as alleging a Fourteenth Amendment claim premised upon the theory that "Due Process ... protects a pretrial detainee from the use of excessive force that amounts to punishment." *See Graham v. Connor,* 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1988); *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979) ("Due process requires that a pretrial detainee not be punished."). For the reasons set forth below, however, and as the parties were so advised at the commencement of the trial, the court has determined that plaintiff's excessive force claims should be analyzed under the Fourth Amendment.[FN21] The court recognizes, as previously alluded to, that this Amendment is not specifically referenced in plaintiff's *pro se* complaint. But in keeping with the well established principle that *pro se* complaints must be liberally construed, *see, e.g., Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 175, 66 L.Ed.2d 163 (1980) (*per curiam* ); and *Alexandre v. Cortes,* 140 F.3d 406, 409 (2d Cir.1998) (citation omitted), and "interpret[ed] to ... raise the strongest arguments that they suggest," *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.2995) (internal quotations and citation omitted), the court will read plaintiff's complaint as alleging a claim under the Fourth Amendment, even though he did not expressly rely on that Amendment therein.

FN20. *Bolton v. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998) (citing *Robinson v. California,* 370 U.S. 660, 662, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962)).

FN21. Before offering its rationale for employing a Fourth Amendment analysis in this case, the court is compelled to comment upon

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

plaintiff's status at the time of the events complained of herein. No sooner had the court advised the parties of its intent to analyze plaintiff's claims under the Fourth Amendment, then plaintiff declared that he was a parole violator at the time, and thus he believed that his claims should be analyzed under the Eighth Amendment. That was the first time that the court had been made aware of the fact that perhaps plaintiff's status was something other than a pretrial detainee. In any event, although, as will be seen, there is support for the view that the Eighth and Fourteenth Amendments are implicated by constitutional claims of detained parolees, for several reasons, the court declines to follow that approach in this case. *See, Rankin v. Klevenhagen,* 5 F.3d 103 (5th Cir.1993) (Eighth Amendment governs a section 1983 excessive force claim brought by a pretrial detainee, who at the time of his arrest was on parole from a state correctional facility, where he had been serving his sentence for an earlier burglary conviction, where that claim arose when the jailers were attempting to restore order in the jail); and *Earrey v. Chicksaw County, Mississippi,* 965 F.Supp. 870 (N.D.Miss.1997) (detained parolee claiming that he was beaten by other inmates while being detained in a county jail could pursue a "failure to protect claim" under the Eighth Amendment). *Cf. Hamilton v. Lyons,* 74 F.3d 99 (5th Cir.1996) (Eighth and Fourteenth Amendment governed conditions of confinement claim brought by parolee detained for alleged new offense); and *Crawford v. Foti,* 92-3457, 1993 WL 515760, at *4 (E.D.La. Dec.3, 1993) ("Insofar as some of the plaintiffs were already convicted or were held as parole violators, even if not yet revoked, the more appropriate avenue of scrutiny [for their condition of confinement claims] would be under the Eighth Amendment.").

First of all, the court refuses to follow the approach of these courts because they are outside the Second Circuit, and as such are not binding on this court. *See Thompson v. County of Franklin,* 987 F.Supp. 111, 119 and n. 30 (N.D.N.Y.1997) (and cases cited therein).

Second, those cases are factually distinguishable from the present case. To illustrate, although *Rankin,* like the present case, involved an excessive force claim, the parolee there had been detained for approximately two weeks when the incident occurred, whereas plaintiff Blake was detained for at most seven hours, during which time he asserts defendants used excessive force upon him. Moreover, at the time of the incident in *Rankin,* unlike the present case, a deputy sheriff allegedly used excessive force in an attempt to restore order to a county jail. *Id.* The use of force to preserve institutional security was central to the Court's decision to analyze Rankin's excessive force claim under the Eighth, rather than the Fourth or Fourteenth Amendments. *See Rankin,* 5 F.3d at 106. There is no suggestion in the record proof in the present case, however, that the alleged use of force was necessary to restore order at Sheriff headquarters.

Likewise, *Hamilton* and *Crawford* can be distinguished on their facts because in both of those cases the parolees or parole violators were challenging their conditions of confinement; they did not allege the use of excessive force, as does plaintiff Blake. In addition to these factual distinctions, plaintiff's claims also are not properly analyzed under the Eighth Amendment because that Amendment's prohibition against the use of excessive force attaches only after conviction. (*See Graham, supra,* 490 U.S. at 395 n. 10, 109 S.Ct. at 1871 n. 10 (internal quotations and citation omitted) ("After conviction, the Eighth Amendment serves as the primary source of substantive protection...in cases... where the deliberate use of force is challenged as excessive and unjustified."). Here, during the relevant time frame, plaintiff Blake had not yet been arraigned, let alone charged with the crimes of which he was later convicted. Consequently, the court declines to apply the Eighth Amendment here.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

Analyzing plaintiff Blake's excessive force claims in accordance with the Fourth Amendment actually inures to his benefit. An excessive force claim analyzed under the Eighth Amendment requires a plaintiff to establish *both* a subjective and an objective component. *See Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468 (S.D.N.Y.1998) (citing *Wilson v. Seiter,* 501 U.S. 294, 298-300, 111 S.Ct. 2321, 2323-2325, 115 L.Ed.2d 271 (1991)). "In other words, a plaintiff must prove that the punishment inflicted upon him was inflicted maliciously and sadistically for the purpose of causing harm *and* that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id.* (internal quotations and citations omitted) (emphasis added). Thus, in the present case, had the court decided to apply this Eighth Amendment standard, plaintiff Blake would have been held to a more demanding burden of proof. In short, the court abides by its original determination that the evidence adduced at trial will be analyzed under the Fourth Amendment's reasonableness standard.

At trial the court did not explain its rationale for applying the Fourth Amendment, but it will do so now. As the court explained in *Montavon v. Town of Southington,* 3-95-CV-1141, 1997 WL 835053 (D.Conn. Sept.29, 1997),* in *Graham,* "the Supreme Court ruled that in any excessive force claim under 42 U.S.C. § 1983, the analysis must begin with identifying the specific right allegedly violated by the physical force." *Id.* at *3. "In most instances, the right involved will be either the Fourth Amendment or the Eighth Amendment, the primary sources of constitutional protection against physically abusive official conduct." *Id.* The Court in *Graham* held that "a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person[ ] ... are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard." 490 U.S. at 388, 109 S.Ct. at 1868.

**\*11** But, as plaintiff Blake has repeatedly stressed, he is not claiming that defendants violated his constitutional rights during the course of his arrest; his claim is that such violations occurred *after* his arrest. Unfortunately, the *Graham* Court expressly left open the issue of "whether the Fourth Amendment continues to provide individuals

with protection against the deliberate use of excessive physical force *beyond the point* at which arrest ends and pretrial detention begins[.]" *Id.* at 395 n. 10, 109 S.Ct. at 1871 n. 10 (emphasis added). Extending *Graham* 's Fourth Amendment objective reasonableness standard to the police station, the Second Circuit in *Powell v. Gardner,* 891 F.2d 1039 (2d Cir.1989), decided later the same year as *Graham,* cautiously opined: "We think the Fourth Amendment *probably* should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer." *Id.* at 1044 (emphasis added). Thus, after *Powell* it seems that if confronted squarely with the issue, the Second Circuit would hold that when a plaintiff alleges that excessive force was used against him before he was arraigned or formally charged, the Fourth Amendment governs such a claim.

Since *Graham* and *Powell* there has been surprisingly little case law within this Circuit on whether a pretrial detainee's claim of excessive force is governed by the Fourth Amendment's objectively reasonable standard or by the more rigorous *Glick* standard, examining both subjective and objective factors. One court within this Circuit, however, has interpreted *Powell* as "requir [ing] application of the Fourth Amendment at least until plaintiff's pre-trial custody status is ordered by a judicial officer, as upon arraignment either resulting in an order of pretrial regulatory detention or the setting of bail conditions not yet met." *Freece v. Young,* 756 F.Supp. 699, 703 (W.D.N.Y.1991). The *Freece* court explained:

> It makes sense to hold the police to an objective standard of reasonableness before a judicial officer commits an arrestee to a pretrial holding facility the administration of which is customarily accorded some degree of deference by federal courts. Until the point when a judicial officer intervenes, there is little reason to add, to the Fourth Amendment objective standard of reasonableness, the additional element that the particular deprivation claimed amount to or be intended to effect punishment.

*Id.* at 703-04 (footnote omitted). This rationale led the court in *Freece* to held that the Fourth Amendment's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

objective standard of reasonableness, rather than *Glick*'s substantive due process standard, applied to an arrestee's claim that he was denied medial treatment. In light of the foregoing, the court remains convinced that plaintiff Blake's excessive force claim, occurring as it did prior to his arraignment and arising out of his treatment following his arrest, is more appropriately analyzed under the Fourth Amendment.[FN22]

> FN22. Further support for this view can be found in the Second Circuit's more recent case of *Rodriguez v. Phillips,* 66 F.3d 470 (2d Cir.1995). Although the Court there did opine that even after *Graham,* "Fourteenth Amendment substantive due process survived as a source of a federal right to be free from excessive force[,]" the Court recognized that such a right will only apply to "relatively unusual excessive force cases falling beyond the ambit of the Fourth and Eighth Amendments[,]" ... " and in the *non-seizure, non-prisoner* context[.]" *Id.* at 477 (emphasis added). As *Rodriguez* makes clear, there is a due process right to be free from excessive force, but the person claiming such a right must be a "non-arrestee/non-prisoner," not otherwise entitled to constitutional protection against excessive force under the Fourth and Eighth Amendments respectively. *Id.* So, for example, in *Rodriguez,* the Court held that the plaintiff, a non-prisoner, who claimed corrections officers used excessive force on her while she was visiting her incarcerated son, could bring a cause of action for a violation of her substantive due process right to be free from such force. *Id.* Likewise, other Circuits addressing the issue of the existence of such a due process right after *Graham* have concluded, as did the *Rodriguez* Court, that such a right survives, but only where there has not been a seizure. *Id.* (citing cases). Here, it is undisputed that during the relevant time frame, plaintiff Blake was an arrestee. Therefore, because this is not a "rare nonseizure, nonprisoner case which falls outside the realm of the Fourth and Eighth Amendment[s][,]" plaintiff Blake is not entitled to rely upon a substantive due process right to be free from excessive force. *See Montavon,* 1997 WL 835053, at *3 (citing *Rodriguez, supra,* 66 F.3d at 477).

The court is fully cognizant of the fact that there is a line of cases within this Circuit wherein several district courts have held that the *Glick* standard remains applicable to excessive force claims brought by pretrial detainees. *See Cuoco v. Hershberger,* 93 CIV. 2806, 1996 WL 648963, at *5 (S.D.N.Y. Nov.6, 1996) (applying the *Glick* subjective and objective factors to "pretrial inmate's" claim that guards used excessive force while restraining him after he flooded his cell) (citing *Rahman v. Philip,* 92 Civ. 5349, 1995 WL 679251, at *3 (S.D.N.Y. Nov.15, 1995), *aff'd without pub'd opinion,* 104 F.3d 356 (2d Cir.1996)); and *Pristell v. County of Sullivan,* 91 Civ. 6317, 1996 WL 11210, at *4 (S.D.N.Y. Jan.10, 1996)) (other citation omitted). Those cases seem to be ignoring the line drawn by the Second Circuit in *Rodriguez,* however. In none of those cases did the courts focus upon the plaintiff's status-that is whether the plaintiff was arrested or seized; after *Rodriguez* that distinction is crucial. *See Pyka v. Village of Orland Park,* 906 F.Supp. 1196, 1220 (N.D.Ill.1995) ("The majority of circuits addressing this question [whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins], have concluded that the Fourth Amendment protects a suspect from the point of the first seizure or arrest until pretrial detention begins. The determination of when pretrial detention begins, therefore, is critical."). Thus, in the present case, despite the just cited authority to the contrary, this court finds the Fourteenth Amendment substantive due process right to be free from excessive force was not implicated because although plaintiff was seized during the relevant time frame, he had not been arraigned or formally charged with any crimes. Accordingly, any protection from excessive fore to which plaintiff Blake is entitled under the Constitution is based upon the Fourth rather than the Fourteenth Amendment. *See id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

at 1225 ("The majority of circuit courts appear to be resolving the question in favor of applying the Fourth rather than the Fourteenth Amendment to conduct that occurs after the initial seizure or arrest but before a formal hearing before a neutral judicial officer.").

*12 As the court advised the parties at the outset of the trial, "[t]he Fourth Amendment inquiry is an exclusively objective one, and requires consideration of the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." Hemphill v. Schott, 141 F.3d 412, 417 (2d Cir.1998) (citing Graham, 490 U .S. at 396, 109 S.Ct. at 1872). This "reasonableness standard is an objective test, based on the perspective of a reasonable officer on the scene [.]" McLean v. City of Rome, 95CV1713, 1998 WL 312350, at *9 (N.D.N.Y. June 8, 1998). Under that standard, the inquiry is " 'whether the officer['s] actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " Id. (quoting Graham, 490 U.S. at 397, 109 S.Ct. at 1872 ). As the Supreme Court explained in Graham, "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." 490 U.S. at 397, 109 S.Ct. at 1872 (citation omitted). Keeping these general principles firmly in mind, the court will review the proof adduced at trial against the remaining defendants-Base and Domachowski.

*A. Defendant Domachowski*

Putting aside for the moment the potential liability of defendant Base for failing to intervene at Sheriff headquarters, the court turns to the issue of whether plaintiff has shown by a preponderance of the evidence that defendant Domachowski violated plaintiff's Fourth Amendment right to be free from excessive force. The court finds that plaintiff did not sustain his burden of proof in this regard.

Accepting as true plaintiff's uncontroverted testimony that Domachowski struck him in the face, nonetheless, the court finds that such force was *not* unreasonable taking into account all of the circumstances. More specifically, plaintiff had just demonstrated a complete disregard for law enforcement authority, and human life in general, by shooting and killing one deputy, and severely wounding another. Further, plaintiff had aimed the murder weapon at other deputies right after those shootings; he did not fully cooperate in the rehandcuffing process; and almost immediately after being restrained, he tried to release himself from the handcuffs and Welch-It device.[FN23] These factors, coupled with the fact that plaintiff's injuries to his eye area, supposedly as a result of Domachowski striking him, were *de minimis,* persuade the court that any force used by Domachowski was not excessive so as to give rise to section 1983 liability based upon the Fourth Amendment. Rather, accepting as true plaintiff's uncontroverted testimony that defendant Domachowski struck him in the eye, regardless of Domachowski's motivation, the court finds that that force was justifiable under all of the circumstances.

FN23. From this testimony it can easily be inferred that plaintiff was struggling not only on the ride to headquarters, but also thereafter. Indeed, so successful was his struggle, as he freely admitted, eventually plaintiff was able to release himself from the Welch-It device.

*13 There are two additional factors which influence the court's finding that defendant Domachowski did not employ excessive force against plaintiff Blake. In balancing, as the court must, "the nature and quality of the intrusion on [plaintiff Blake's] Fourth Amendment interests against the countervailing governmental interests at stake[,] [FN24] clearly the balance tips decidedly in favor of the government in this case. As the foregoing discussion demonstrates, the intrusion on plaintiff Blake's Fourth Amendment interests was relatively slight, especially when compared to the countervailing governmental interests at stake. Defendant Domachowski, and others who assisted him at Sheriff Headquarters, were responsible for safely and securely moving plaintiff Blake to a holding cell. But, as plaintiff Blake's actions on February 10, 1987, all too clearly show, he was not, in any sense, an ordinary or usual arrestee. He was extremely violent and a possible

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)
(Cite as: 1998 WL 642621 (N.D.N.Y.))

escape risk, as defendant Base testified. Moreover, it seems that he had continuously struggled to free himself from the handcuffs and Welch-It device almost from the time he was first restrained in that manner. Indeed, he was eventually successful in that regard. Therefore, the force applied by defendant Domachowski was reasonable, particularly under these circumstances.

> FN24. *Graham,* 490 U.S. at 395, 109 S.Ct. at 1871 (internal quotations and citations omitted).

Finally, it should be noted that assuming *arguendo* that defendant Domachowski struck plaintiff in the eye, it is impossible to separate any injuries which plaintiff may have sustained on that occasion from those he sustained during the rehandcuffing process at the Town Court parking lot. Plaintiff Blake, thus, did not establish an essential element of his section 1983 claim against Domachowski; that is that his injuries to his left eye area were proximately caused by the alleged constitutional violation. *See Atkins v. New York City,* 143 F.3d 100, 103 (2d Cir.1998) (citation omitted). The proof was inconclusive as to exactly where plaintiff sustained the slight injury to his left eyebrow. It is impossible to discern from the record before the court what injuries, if any, to plaintiff's left eye area were attributable to defendant Domachowski. For all of these reasons, the court finds that plaintiff Blake did not meet his burden of proving by a preponderance of the evidence that defendant Domachowski violated plaintiff's Fourth Amendment right to be free from excessive force.

*B. Defendant Base*

Nor is the court convinced that defendant Base is liable to plaintiff for what purportedly occurred at Sheriff headquarters. As the proof amply demonstrates, events transpired so quickly there that even if defendant Base should have intervened, he simply did not have enough time to prevent plaintiff from being struck. Furthermore, because it is abundantly clear that defendant Base's failure to intervene is the *only* possible basis for a finding of liability against him, the court concludes that plaintiff has also not established that Base violated plaintiff's Fourth Amendment rights in any way.

**\*14** To conclude, because plaintiff Blake did not sustain his burden of proof against either one or both of the remaining defendants, Terry Base and Jeffrey Domachowski, the court finds in favor of those defendants and against plaintiff William Blake, Jr. The Clerk of the Court is hereby ordered to enter judgment accordingly.

IT IS SO ORDERED.

N.D.N.Y.,1998.
Blake v. Base
Not Reported in F.Supp.2d, 1998 WL 642621 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Jack WILLIAMS, Plaintiff,
v.
J.P. KEANE, Superintendent, J. BUONATO,
Lieutenant, P. GIBSON, Lieutenant and J. BUMP,
Corrections Officer, Sing Sing Correctional Facility,
Defendants.
**No. 95 CIV. 0379 AJP JGK.**

Aug. 25, 1997.

*OPINION AND ORDER*

PECK, United States Magistrate Judge.

*1 In this 42 U.S.C. § 1983 action, pro se plaintiff Jack Williams has sued the Superintendent, two Lieutenants and a Corrections Officer at the Sing Sing Correctional Facility for alleged violations of due process, equal protection and cruel and unusual punishment in connection with an alleged sexual assault during a "pat-frisk," and Williams' subsequent alleged seven-day (actually six-day) keeplock confinement.

The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

Presently before the Court is defendants' summary judgment motion. Under *Sandin v. Conner* and its progeny, seven days in keeplock does not state a constitutional claim for violation of due process. Under the Second Circuit's recent decision in *Boddie v. Schnieder,* Williams' allegation of sexual fondling during a single pat-frisk is not sufficiently egregious to state a harm of federal constitutional proportions under the Eighth Amendment. Accordingly, for the reasons set forth below, the Court grants defendants' summary judgment motion.

*FACTS*

*The Alleged Incident*

On November 15, 1994, at approximately 1:15 P.M., a metal detector was set off as plaintiff Jack Williams left the mess hall with several other inmates. (Williams Dep. at 29, 43; Defs' Rule 56.1 Stmt. ¶¶ 29-33.) Williams and other inmates were ordered to stand up against the wall for a routine "pat-frisk" and search for contraband. (Williams Dep. at 29-30; Bump Aff. ¶¶ 10-13; Defs' Rule 56.1 Stmt. ¶¶ 32-33.) It is undisputed that pat-frisks are a normal occurrence in prisons, especially for prisoners exiting the mess hall where metal utensils are used. (Williams Dep. at 29-31; Williams 3(g) Stmt. ¶ 10; Gibson Aff. ¶¶ 6-7; Bump Aff. ¶¶ 5-7; Defs' Rule 56.1 Stmt. ¶¶ 11, 13-24, 34; Defs' Ex. D: DOCS Directive No. 4910.)

However, the nature and extent of defendant Officer Bump's pat-frisk on Williams is disputed. Williams testified:

> I had my hands up against the wall. He started fondling my chest. He went down, opened my pants up, put his hands down my pants, starts feeling me, but to keep repeatedly doing that. He felt my testicles, kept doing that. At the same time I was moving down the wall. I was telling him, "What are you doing?" You know, I got kind of hostile with him and other officers, they intervened and told me leave, told him to stop the procedure, told me to leave the mess hall, which I left, but I got his name before I left and wrote it up.

(Williams Dep. at 30; *see also id.* at 43-44.) In contrast, Officer Bump stated that he conducted a routine pat-frisk of Williams that involved a "limited physical touching of the inmate's groin area, from the outside with clothes on, and genitals, which is a prime spot for hiding weapons and other contraband." (Bump Aff. ¶ 13.) Bump also stated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

that "[a]t no time did I 'fondle' or touch Mr. Williams sexually." (Bump Aff. ¶ 18.)

**\*2** Later that day, Officer Bump issued a misbehavior report for Williams' hostile, aggressive, and uncooperative behavior during the pat-frisk. (Bump Aff. ¶¶ 14-15; Defs' Ex. C at p. 6: Inmate Misbehavior Report.) Officer Bump's Inmate Misbehavior Report states:

> I gave him a direct order to place his hands on the wall and spread his legs -- and he refused to comply by continuously moving down the wall, and removing his hands. He eventually did comply when an additional officer stepped to him. Inmate Williams ... repeatedly cursed me by calling me "a mother fucker and a goddamn faggot." As a result of this inmate's action this misbehavior report is submitted.

(Defs' Ex. C.) Williams admits asking whether Bump was gay, but denies cursing at him. (Williams Dep. at 44.)

The Misbehavior Report, or "ticket," was then given to defendant Lieutenant Buonato[FN1] for review. (Bump Aff. ¶ 19; Defs' Rule 56.1 Stmt. ¶ 42.) In accordance with prison policy, the "review lieutenant" determines whether the allegations on the ticket support the charge and, if so, warrant the inmate's placement in keeplock. (Buonato Aff. ¶ 5; Defs' Rule 56.1 Stmt. ¶ 43; *see* Williams Dep. at 46.) Lieutenant Buonato filed his review on November 16, 1994, concluding that the charges were adequately set forth and that a Tier II disciplinary hearing was warranted. (Buonato Aff. ¶¶ 7-10; Defs' Rule 56.1 Stmt. ¶ 43.)

> FN1. Williams named Lieutenant Buonato as a defendant because he allegedly improperly reviewed the misbehavior report and unjustifiably placed Williams in keeplock. (Cplt. ¶ IV (E); Williams Dep. at 49-50; *compare* Buonato Aff. ¶¶ 7-10.)

*Williams' Placement in Keeplock and Subsequent Hearing*

Williams was placed in keeplock on November 16, 1994,

the day he received a copy of the Inmate Misbehavior Report and the day after the incident. (Williams Dep. at 32-33, 39-40; Defs' Rule 56.1 Stmt. ¶ 44.)

Prison guidelines provide that a hearing on the charges must be held as soon as practical, but in no case longer than seven days from when the inmate is placed in keeplock. See 7 N.Y.C.R.R. § 251-5.1. (*See also* Williams Dep. at 50-51; Cplt. ¶ IV (C).)[FN2]

> FN2. Section 251-5.1 provides:
>
> > Where an inmate is confined pending a disciplinary hearing or superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said disciplinary hearing or superintendent's hearing, but, in no event may it be commenced beyond seven days of said confinement without authorization of the commissioner or his designee.
>
> 7 N.Y.C.R.R. § 251-5.1.

Williams Tier II hearing took place on November 21, 1994 at 3:00 P.M. (Defs' Rule 56.1 Stmt. ¶¶ 47, 49; Gibson Aff. ¶ 11; Defs' Ex. C at p. 1; Williams Dep. at 40.) Defendant Lieutenant Gibson[FN3] found Williams not guilty at the conclusion of the Tier II disciplinary hearing. (Defs' Rule 56.1 Stmt. ¶ 51; Gibson Aff. ¶¶ 13, 15-16; Williams Dep. at 41-42; Defs' Ex. C at p. 1.) Lieutenant Gibson stated on the record that Williams was uncomfortable with the search, especially "where he was being touched." (Gibson Aff. ¶ 15; Defs' Rule 56.1 Stmt. ¶ 53; Defs' Ex. C at p. 2.) Gibson also found that Officer Bump conducted himself within the scope of his official duties and in accordance with prison rules. (Defs' Rule 56.1 Stmt. ¶ 54; Gibson Aff. ¶ 17.) Williams characterized Lieutenant Gibson's hearing as "fair." (Williams Dep. at 58, 60; Gibson Aff. ¶ 18; Defs' Rule 56.1 Stmt. ¶ 55.)

> FN3. Williams named Lieutenant Gibson as a defendant because Williams alleges that the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

hearing should have been held within the 7-day period required by state law. (Cplt. ¶ IV (E); Williams Dep. at 51.)

**\*3** Williams was released from keeplock on November 21, 1994. (Williams Dep. at 42-43, 51, 53.) While Williams alleges that he spent seven days in keeplock (Cplt. ¶ IV(D); Williams Dep. at 51, 62; *see* Defs' Rule 56.1 Stmt. ¶ 48), it appears that Williams was in keeplock for six days (November 16 to November 21).

Williams named Superintendent Keane as a defendant, alleging that Keane did not properly train the corrections officers under his control. (Cplt. ¶ IV(E).) Keane also conducted an internal facility investigation into Officer Bump's conduct, which found that Bump complied with all prison rules. (Defs' Rule 56.1 Stmt. ¶¶ 58-59; Keane Aff. ¶¶ 11-12.)

*ANALYSIS*

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. §1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S. Ct. 2749 (1994); *accord, e.g., Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at \*4 (S.D.N.Y. March 24, 1997) (Peck, M.J.); *Morris v. Dann,* No. 95-CV-975, 1996 WL 732559 at \*3 (N.D.N.Y. Dec. 11, 1996). Proof that state procedural law was violated does not by itself constitute a deprivation of due process because "[f]ederal constitutional standards rather than state law define the requirements of procedural due process." *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir. 1990); *accord, e.g., Ruiz v. Selsky,* 1997 WL 137448 at \*4.

I. *UNDER SANDIN V. CONNER, SIX DAYS IN KEEPLOCK DOES NOT CONSTITUTE AN ATYPICAL AND SIGNIFICANT DEPRIVATION OF A PROTECTED LIBERTY INTEREST*

A. *Sandin v. Conner*

Defendants' summary judgment motion on the keeplock claim turns, in part, on application of the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S. Ct. 2293 (1995), which significantly changed the prisoner due process landscape. The Supreme Court there held:

[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.* Following *Wolff,* we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

**\*4** 115 S. Ct. at 2300 (fn. & citations omitted).

In *Sandin,* the prisoner was charged with a disciplinary infraction for physical interference with a correction officer, for using abusive or obscene language and for harassing employees. *Id.* at 2295-96. The disciplinary committee refused the prisoner's request to present witnesses, found him guilty of the alleged misconduct and sentenced him to 30 days disciplinary segregation in the prison's Special Holding Unit (SHU). *Id.* The Supreme Court found that the inmate was not entitled to the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S. Ct. 2963 (1974). *Sandin v. Conner,* 115 S. Ct. at 2302. The Supreme Court stated:

We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest. The record shows

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

that, at the time of Conner's punishment, disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody. We note also that the State expunged Conner's disciplinary record with respect to the "high misconduct" charge 9 months after Conner served time in segregation. Thus, Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction. Indeed, the conditions at Halawa [prison] involve significant amounts of "lockdown time" even for inmates in the general population. *Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.*

*Id.* at 2301 (footnotes omitted and emphasis added).

As a result of *Sandin,* the Second Circuit has announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [the plaintiff inmate] must establish both that [1] the confinement or restraint creates an "atypical and significant hardship" under *Sandin,* and that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996); *accord, e.g., Santana v. Keane,* 90 Civ. 6309, 1996 WL 465751 at *3 (S.D.N.Y. Aug. 14, 1996). A prisoner who satisfies both of these elements would be entitled to the procedural due process protections enunciated by *Wolff v. McDonnell,* 418 U.S. at 556-58, 94 S. Ct. at 2974-75, and its progeny. *See, e.g., Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 & n.4 (S.D.N.Y. Nov. 6, 1996); *Santana v. Keane,* 1996 WL 465751 at *3 & n.1.

B. *Williams' Action Fails Because It Is Based on A Miscalculation of the Time He Spent in Keeplock*

*5 Williams notes, correctly, that New York's prison regulations require a disciplinary hearing to be held within 7 days of the inmate's placement in keeplock for a disciplinary infraction. 7 N.Y.C.R.R. § 251-5.1. Williams then argues, incorrectly, that he spent 7 days in keeplock before the disciplinary hearing at which he was found not guilty and immediately released from keeplock. (*See* Williams Dep. at 50-51; Cplt. ¶ IV (C).) In fact, however, the incident occurred on November 15, 1994, Williams was placed in keeplock on November 16, and his hearing was held and he was released from keeplock on November 21, 1994. (*See* Fact section, above.) Thus, on the undisputed facts, Williams was in keeplock from November 16 to November 21, at most *six* days. Accordingly, the hearing was held and Williams was released from keeplock within the seven days required by New York's prison regulations. Since the regulations were not violated, it is not necessary to examine either prong of the two-prong *Sandin* analysis; defendants are entitled to summary judgment on the keeplock claim. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995) (even a violation of 7 N.Y.C.R.R. § 251-5.1 "alone would not be enough generally to establish a constitutional claim"); *Dudley v. Coombe,* 96 Civ. 1665, 1997 WL 423074 at *2 (S.D.N.Y. July 28, 1997) (in light of 7 N.Y.C.R.R. § 251-5.1 requiring hearing within seven days, prisoner did not have liberty interest in five-day keeplock stay without hearing).

C. *Application of Sandin to Confinement of 6 Days in Keeplock*

Even if the Court were to assume, contrary to the undisputed evidence, that Williams' keeplock stay violated state regulations, defendants are entitled to summary judgment under the first prong of the *Sandin* analysis.

In recent decisions, the Second Circuit has clearly instructed that the *Sandin* analysis requires a factual inquiry as to the length and conditions of confinement:

> The language and analysis in *Sandin* make clear that the Court did not intend to suggest that discipline in segregated confinement could never present such an "atypical, significant deprivation." ... [W]e now state explicitly: *Sandin* did not create a per se blanket rule that disciplinary confinement may never implicate a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

liberty interest.... [D]istrict courts must examine the circumstances of a confinement to determine whether that confinement affected a liberty interest.

**\*6** *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir. 1997); *see also, e.g., Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir. 1997); *Brooks v. Difasi,* 112 F.3d 46 (2d Cir. 1997).

While the courts have not yet determined what length of confinement will constitute an "atypical or significant hardship," the decisions in the Second Circuit are unanimous that keeplock or SHU confinement of 30 days or less in New York prisons is *not* "atypical or significant hardship" under *Sandin. See, e.g., Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir. 1996) (12 days in SHU); *Johnson v. Coughlin,* 90 Civ. 1731, 1997 WL 431065 at *1 (S.D.N.Y. July 30, 1997) (8 days confinement prior to disciplinary hearing); *Sullivan v. Schweikhard,* 95 Civ. 0276, 1997 WL 349983 at *3 (S.D.N.Y. June 25, 1997) (9 days in keeplock); *Duncan v. Keane,* 95 Civ. 1090, 1997 WL 328070 at *2 (S.D.N.Y. June 13, 1997) (30 days keeplock); *Harris v. Keane,* 962 F. Supp. 397, 404 (S.D.N.Y. 1997) (23 days in keeplock; the "Second Circuit's post-Sandin decisions are unanimous that keeplock of 60 days or less in New York prisons is not an "atypical hardship.'"); *Saulter v. Hanslmaier,* 94 Civ. 6855, 1997 WL 177887 at *2 (S.D.N.Y. April 14, 1997) (7 days in keeplock); *Ragland v. Crawford,* 95 Civ. 10069, 1997 WL 53279 at *3 (S.D.N.Y. Feb. 7, 1997) (1 day in keeplock); *Torres v. Keane,* 94 Civ. 4845, 1997 WL 35507 at *1 (S.D.N.Y. January 30, 1997) (21 days in keeplock); *Grant v. Riley,* 89 Civ. 0359, 1996 W1727441 at *2-3 (S.D.N.Y. Dec. 17, 1996) (10 days in keeplock, only 5 of which were served); *Barnes v. Starks,* 95 Civ. 4891, 1996 WL 648956 at *3 (S.D.N.Y. Nov. 6, 1996) (21 days in keeplock); *Santana v. Keane,* 90 Civ. 6309, 1996 W1 465751 at *5 (S.D.N.Y. Aug. 14, 1996) (9 days in keeplock during a prison sentence of at least 7 years); *Pampalone v. Young,* 95 Civ. 2348, 1996 WL 511569 at *3 (S.D.N.Y. August 7, 1996) (Peck, M.J.) (10 days in keeplock); *McAllister v. Zydel,* 929 F. Supp. 102, 104 (W.D.N.Y. 1996) (15 days in keeplock); *Chambers v. Coughlin,* 95 Civ. 298, 1996 WL 243202 at *2 & n.6 (S.D.N.Y. May 10, 1996) (7 days in SHU); *Beaty v. Scully,* 92 Civ. 3407, 1996 WL 209933 at *2 (S.D.N.Y. April 30, 1996) (11 days in SHU); *Slaughter v. Coughlin,* 94 Civ. 6734, 1996 WL 200308 at *3 (S.D.N.Y. April 25, 1996) (10 or 11 days in keeplock); *Levro v. Kennedy,* 95 Civ. 0198, 1996 WL 191741 at *1 (S.D.N.Y. April 22, 1996) (several days in keeplock); *Ramirez v. Coughlin,* 93 Civ. 0765, 1996 WL 194324 at *3-4 (S.D.N.Y. April 22, 1996) (30 days combination of SHU and keeplock); *Dawkins v. Healy,* 94 Civ. 6382, 1996 WL 145989 at *2 (S.D.N.Y. April 1, 1996) (15 days in keeplock) *judgment vacated and reconsideration in part,* 1996 WL 280737 at *2 (S.D.N.Y. May 28, 1996) (reconsideration limited to issue of retaliation); *Powell v. Scully,* 92 Civ. 5334, 1996 WL 145962 at *3 (S.D.N.Y. April 1, 1996) (7 days of cell confinement); *Benton v. Keane,* 921 F. Supp. 1078, 1079 (S.D.N.Y. 1996) (9 days in administrative confinement); *Ketchmore v. Stormer,* 94 Civ. 8271, 1996 WL 117572 at *2-3 (S.D.N.Y. March 18, 1996) (10 days of cell confinement); *Moolenaar v. Finn,* 94 Civ. 6778, 1996 WL 112200 at *3 (S.D.N.Y. March 14, 1996) (15 days in keeplock); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. dispositions); *Ahlers v. Keane,* 94 Civ. 3297, 1995 WL 375920 (S.D.N.Y. June 22, 1995) (10 days keeplock), *aff'd* (unpublished decision), 101 F.3d 684, No. 95-2454, 1996 WL 281351 at *1 (2d Cir. May 22, 1996); *Martin v. Mitchell,* 92-CV-716, 1995 WL 760651 at *3 (N.D.N.Y. Nov. 24, 1995) (30 days keeplock); *Schmelzer v. Norfleet,* 903 F. Supp. 632, 634-35 (S.D.N.Y. 1995) (11 days in keeplock); *Jackson v. Keane,* 93 Civ. 6453, 1995 WL 622593 at *3 (S.D.N.Y. Oct. 24, 1995) (14 days in SHU); *Kozlek v. Papo,* 94 Civ. 1429, 1995 WL 479410 at *2 (S.D.N.Y. Aug. 11, 1995) (10 days in SHU); *Uzzell v. Scully,* 893 F. Supp. 259, 262-63 (S.D.N.Y. 1995) (23 days in keeplock).

**\*7** Indeed, decisions in this Circuit have held that keeplock or SHU confinement of longer than 30 days does not implicate a liberty interest. *See, e.g., Frazier v. Coughlin,* 81 F.3d at 317-18 (12 days in SHU and eleven months in "close supervision unit"); *Thompson v. Keane,* 95 Civ. 2442, slip op. at 5-6 (S.D.N.Y. Aug. 6, 1997) (91 days in SHU); *Ruiz v. Selsky,* 96 Civ. 2003, 1997 WL 137448 at * 5 (S.D.N.Y. March 24, 1997) (Peck, M.J.) (192 days in SHU during 10-20 year prison sentence); *Reaves v. Williams,* 95 Civ. 0281, 1997 WL 10132 at *4-5 (S.D.N.Y. Jan. 10, 1997) (90 days of keeplock imposed, of which 69 days were served); *Odom v. Keane,* 94 Civ. 8032, 1997 WL 3262 at *1 (S.D.N.Y. Jan. 6, 1997) (46 days of keeplock); *Coleman v. Galgano,* 95 Civ. 5835, 1996 WL 715533 at *1, 3 (S.D.N.Y. Dec. 11, 1996) (60 days in SHU and 180 days in keeplock); *Whitfield v. Scully,* 94 Civ. 3290, 1996 WL 706932 at *5 (S.D.N.Y.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

Dec. 6, 1996) (60 days in SHU); *Bennett v. Dolan,* 93 Civ. 5215, 1996 WL 499519 at *1, 3 (S.D.N.Y. Sept. 4, 1996) (45 days of keeplock imposed, 24 days served); *Nogueras v. Coughlin,* 94 Civ. 4094, 1996 WL 487951 at *5 (S.D.N.Y. Aug. 27, 1996) ("210 days in SHU does not in and of itself trigger due process concerns."); *Duncan v. Keane,* 93 Civ. 6026, 1996 WL 511573 at *3-5 (S.D.N.Y. Aug. 22, 1996) (Peck, M.J.) (58 days in keeplock); *Brown v. McClellan,* 93-CV-0901, 1996 WL 328209 at *5 (W.D.N.Y. June 11, 1996) (two confinements in SHU for 60 days each); *Guzman v. Kelly,* 88-CV-1391, 1996 WL 291985 at *3 (W.D.N.Y. May 28, 1996) (8 months in SHU); *Trice v. Clark,* 94 Civ. 6871, 1996 WL 257578 at *2-3 (S.D.N.Y. May 16, 1996) (150 days in SHU); *Arce v. Coughlin,* 93 Civ. 4702, 1996 WL 252371 at *6-7 (S.D.N.Y. May 14, 1996) (120 days in SHU); *Camacho v. Keane,* 95 Civ. 0182, 1996 WL 204483 at *2 (S.D.N.Y. April 25, 1996) (90 days, only 40 days of which were served, in keeplock); *Rouccchio v. Coughlin,* 923 F. Supp. 360, 373 (E.D.N.Y. 1996) (47 days in SHU) (citing cases, including unpublished 2d Cir. decisions upholding 60 days SHU and 71 days segregated confinement); *Villano v. Irvin,* 93-CV-0196, 1996 WL 343251 at *3 (W.D.N.Y. March 18, 1996) (85 days in keeplock out of a 90-day keeplock sentence); *White v. Artuz,* 94 Civ. 4592, 1996 WL 84498 at *2 (S.D.N.Y. Feb. 27, 1996) (55 days in protective custody); *Walker v. Mahoney,* 915 F. Supp. 548, 553-54 (E.D.N.Y. 1996) (23 days in administrative segregation) (citing unpublished 2d Cir. decisions upholding 60 and 71-day confinements); *Rivera v. Coughlin,* 92 Civ. 3404, 1996 WL 22342 at *4-5 & n.6 (S.D.N.Y. Jan. 22, 1996) (89 days in disciplinary segregation; loss of good time credits reversed administratively so no effect on length of sentence); *Rosario v. Selsky,* 94 Civ. 6872, 1995 WL 764178 at *5-6 (S.D.N.Y. Dec. 28, 1995) (120 days imposed but inmate served less than 3 months in SHU during a ten-year sentence); *Tulloch v. Coughlin,* 91-CV-0211, 1995 WL 780970 at *1-2 (W.D.N.Y. Dec. 22, 1995) (180 days in SHU; loss of good time allowance restored through prior state proceeding; implies that any SHU confinement, regardless of length, is permissible under *Sandin*), *appeal dismissed on other grounds* (unpublished decision), 101 F.3d 1393, 1996 WL 414457 (2d Cir. 1996); *Morales v. Santor,* 94-CV-217, 1995 WL 760625 at *2 (N.D.N.Y. Dec. 4, 1995) (60 days in keeplock); *Ross v. Jewett,* 91-CV-1414, 1995 WL 760675 at *2, *4 (N.D.N.Y. Nov. 27, 1995) (60 days in keeplock), *aff'd* (unpublished decision), No. 96-2004, 1996 WL 304752 (2d Cir. June 7, 1996); *Zamakshari v. Dvoskin,* 899 F. Supp. 1097, 1108

(S.D.N.Y. 1995) (Peck, M.J.) (60 days in SHU); *Delaney v. Selsky,* 899 F. Supp. 923, 927-28 (N.D.N.Y. 1995) (365 days in SHU ordinarily not atypical but because plaintiff over 7 feet tall and SHU bed too small for him, summary judgment denied); *Medina v. Bartlett,* 94-CV-0358, 1995 WL 529624 at *2 (W.D.N.Y. Aug. 28, 1995) (no liberty interest created by 2,555 days in SHU); *McMiller v. Wolf,* 94 Civ. 0623, 1995 WL 529620 at *1, *3 (W.D.N.Y. Aug. 28, 1995) (365 days in SHU reduced to approximately 180 days in SHU); *Carter v. Carriero,* 905 F. Supp. 99, 104 (W.D.N.Y. 1995) (360 days reduced to 270 days in SHU); *Hutchinson v. Adorno,* 93 Civ. 3949, 1994 WL 549568 (S.D.N.Y. Oct. 6, 1994), *aff'd* (unpublished decision), No. 94-2652, 1995 WL 737493 at *1-2 (2d Cir. Dec. 13, 1995) (1 year of segregated confinement and 90 days keeplock, reduced to 71 days in segregated confinement).

**\*8** Chief Judge McAvoy of the Northern District of New York concluded that "courts in this and other districts have subsequently [to *Sandin*] ruled that increasingly lengthy periods of segregated housing did not impose an 'atypical and significant hardship' within the meaning of *Sandin*. Indeed, *it now appears that any period of segregation of one year or less affords no protected liberty interest.*" *Polanco v. Allan,* No. 93-CV-1498, 1996 WL 250237 at *3 (N.D.N.Y. May 6, 1996) (emphasis added) (365 days in SHU upheld), *reaffirmed on reconsideration,* 1996 WL 377074 at *2 (N.D.N.Y. July 5, 1996) ("the general rule of a year or less seems appropriate, absent extraordinary circumstances, which plaintiff has not offered"; 365 days in SHU was not "outside the parameters of plaintiff's sentence").[FN4]

FN4. *But see Wright v. Miller,* 96 Civ. 1224, 1997 WL 438795 at *3 (slip op. at p. 6) (S.D.N.Y. July 31, 1997) (12-15 months in SHU may create atypical and significant hardship; summary judgment denied); *Porter v. Coughlin,* 964 F. Supp. 97, 103 (W.D.N.Y. 1997) (36 months in SHU creates liberty interest; *Bishop v. Keane,* 92 Civ. 6061, 1995 WL 384443 at *3 n.4 (S.D.N.Y. June 28, 1995) (whether 87 days in keeplock imposes atypical or significant hardship is a question of fact precluding summary judgment); *Lee v. Coughlin,* 902 F. Supp. 424, 431 (S.D.N.Y. 1995) (376 days in SHU imposed an "atypical and significant hardship" for an inmate serving a 2-year

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

sentence), *motion for reconsideration granted,* *Lee v. Coughlin,* 914 F. Supp. 1004, 1005 (S.D.N.Y. 1996) (reconsideration granted for defendants to address recent *Sandin* decision); *Williams v. Fountain,* 77 F.3d 372, 374 n.3, 376 (11th Cir.) (assumes that a year of solitary confinement is a substantially "atypical and significant hardship" entitling plaintiff to due process, but finds that prisoner received sufficient due process), *cert. denied,* 117 S. Ct. 367 (1996).

Consistent with the above-cited cases, whatever *Sandin*'s outer limits, it is clear that Williams' confinement of 6 days[FN5] in keeplock does not constitute an "atypical or significant hardship" under *Sandin.*[FN6] Accordingly, the Court grants defendants' summary judgment motion on this first issue.

> FN5. The Court's analysis would be no different if plaintiff had spent 7 days in keeplock as Williams originally alleged.

> FN6. Because Williams has not established the first *Frazier* prong (that his 6 day keeplock confinement is an atypical and significant hardship under *Sandin*), the Court need not reach the second *Frazier* prong (of whether New York has granted its inmates a liberty interest in being free of disciplinary confinement).

II. *UNDER BODDIE v. SCHNIEDER, WILLIAMS' ALLEGATION OF SEXUAL ABUSE DOES NOT RISE TO A CONSTITUTIONAL DEPRIVATION*

A. *In Boddie v. Schnieder, the Second Circuit Recognized an Eighth Amendment Claim for Sexual Abuse*

*\*9* Williams' second claim, for alleged sexual abuse by Corrections Officer Bump, is governed by the Second Circuit's recent decision in *Boddie v. Schnieder,* 105 F.3d 857 (2d Cir. 1997), which recognized a § 1983 Eighth Amendment[FN7] claim for sexual abuse by a corrections officer, but also found the complaint of conduct there to

not involve a harm of federal constitutional proportions. The same is true of Williams' claim here.

> FN7. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

In *Boddie,* the Second Circuit recognized that the "Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Id.* at 861. The Eighth "Amendment proscribes more than physically barbarous punishments. The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity and decency,' against which we must evaluate penal measures." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 290 (1976) (citations omitted).

*Boddie* reiterated a two-prong, objective-subjective test for Eighth Amendment violations, including claims of sexual abuse:

> An official violates the Eighth Amendment when two requirements are met. First, the alleged "punishment" must be, "objectively, sufficiently serious." Under the objective standard, "conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Second, the prison official involved must have a "sufficiently culpable state of mind." Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.

*Boddie,* 105 F.3d at 861 (citations omitted, including to *Farmer v. Branham,* 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994)).[FN8]

> FN8. *See also Mathie v. Fries,* No. 1274, Docket 96-9138, 1997 WL 426567 at \*3 (2d Cir. July 31, 1997), *affirming* 935 F. Supp. 1284, 1299

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

(E.D.N.Y. 1996) (pretrial detainee awarded damages for sexual assault including sodomy by prison official). Decisions in other circuits similarly recognize a § 1983 Eighth Amendment claim for serious sexual abuse by prison personnel. See, e.g., Freitas v. Ault, 109 F.3d 1335 (8th Cir. 1997) (to prove a constitutional claim for sexual abuse, the inmate must demonstrate that the alleged abuse objectively caused "pain," and that the officer involved subjectively had a "sufficiently culpable state of mind."); Jordan v. Gardner, 986 F.2d 1521, 1527-31 (9th Cir. 1993) (female inmates stated valid § 1983 Eighth Amendment claim challenging prison policy allowing cross-gender clothed body searches; Watson v. Jones, 980 F.2d 1165, 1165-66 (8th Cir. 1992) (summary judgment for defendant female correction officer reversed where inmates alleged sexual harassment and sexual fondling of male prisoners during pat frisks almost daily over a two-month period); Meriwether v. Faulkner, 821 F.2d 408 (7th Cir.) (complaint that transexual inmate is regularly forced to strip before male guards and inmates states Eighth Amendment claim), cert. denied, 484 U.S. 935, 108 S. Ct. 311 (1987); Thomas v. District of Columbia, 887 F. Supp. 1, 4-5 (D.D.C. 1995) (summary judgment for defendant denied where corrections officer sexually harassed plaintiff including touching his penis and tried to coerce prisoner to have sexual relations); Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia, 877 F. Supp. 634 (D.D.C. 1994) (court found numerous violations of the Eighth Amendment for repeated rape, sexual assaults and harassment of female prisoners), aff'd in part on other grounds, reversed in part on other grounds, 93 F.3d 910, 928 (D.C. Cir. 1996), cert. denied, 117 S. Ct. 1552 (1997), on remand, CA No. 93-2052, 1997 WL 361600 at *2-3 (D.D.C. June 16, 1997) (ordering remedial measures to eliminate sexual harassment); Galvan v. Carothers, 855 F. Supp. 285, 291 (D. Alaska 1994) ("minimal standards of privacy and decency include the right not to be subject to sexual advances, to use the toilet without being observed by members of the opposite sex, and to shower without being viewed by members of the opposite sex"; nevertheless, summary judgment

for defendant on qualified immunity grounds).

*10 Objectively, "[s]exual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm," and "has no legitimate penological purpose." Boddie, 105 F.3d at 861. As to the subjective prong of the test, "[w]here no legitimate law enforcement or penalogical purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." Id.

The Second Circuit in Boddie nevertheless affirmed the district court's dismissal of Boddie's claim:

[A]llegations of sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983. However, we agree with the district court that Boddie nevertheless failed to state an Eighth Amendment claim. He asserts a small number of incidents in which he allegedly was verbally harassed, touched, and pressed against without his consent. No single incident that he described was severe enough to be "objectively, sufficiently serious." Nor were the incidents cumulatively egregious in the harm they inflicted. The isolated episodes of harassment and touching alleged by Boddie are despicable and, if true, they may potentially be the basis of state tort actions. But they do not involve a harm of federal constitutional proportions as defined by the Supreme Court.

Boddie, 105 F.3d at 861.[FN9]

FN9. The Second Circuit summarized Boddie's allegations as follows:

First, Boddie maintains that on March 3, 1993, Officer B. Schnieder, a female corrections officer, "made a statement" that Boddie believed to be "a pass" at him, but that he "could not be sure."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)
(Cite as: 1997 WL 527677 (S.D.N.Y.))

Second, Boddie claims that on the next day, Schnieder squeezed his hand, touched his penis, and said, "[Y]ou know your [sic] sexy black devil, I like you."

Third, Boddie alleges that on March 19, 1993, ... Schnieder stopped [him], accused him of wearing an orange sweatshirt, and told him to take off the sweatshirt. According to Boddie, he resisted, stating that he was a cardiac patient, that the hallway was very cold, and that he would give the sweatshirt to her when they returned to his cellblock. When Boddie began to walk past the officers, Schnieder stopped him, "bumping into [his] chest with both her breast so hard [he] could feel the points of her nipples against [his] chest." Boddie states that Schnieder did this to Boddie twice, pinning him to a door. When he tried to pass her again, Schnieder again bumped into him, this time "with her whole body vagina against penis pinning [him] to the door."

*Id.* at 859-60.

B. *Williams' Allegation of Sexual Abuse Fails to State a Valid Claim Under* § 1983

**\*11** Williams' allegations, like Boddie's, are not sufficient to state a valid § 1983 claim for sexual abuse. The conduct alleged by Williams, accepting his allegations as true, is no more egregious than the conduct in *Boddie*. Moreover, the instant case involves only a single incident of alleged abuse, whereas *Boddie* involved several. Thus, under *Boddie*, it is clear that Williams' claim does "not involve a harm of federal constitutional proportions as defined by the Supreme Court." *Boddie*, 105 F.3d at 861; *see also, e.g., Green v. Elias*, 9 F.3d 1551 (9th Cir. 1993) (affirms grant of summary judgment to defendant correction officer where male prisoner alleged female guard grabbed his genitals during a clothed pat frisk of inmates leaving the dining hall); *Kaestner v. Mitchell*, No. C 96-2370, 1996 WL 428357 at *1 (N.D. Cal. July 24, 1996) (alleged unwarranted sexual advances including touching of prisoner's buttocks "does not rise to the level of egregious, pervasive and/or widespread sexual harassment necessary

to implicate the Eighth Amendment."); *Duncan v. Keane*, 95 Civ. 1090, 1995 WL 649931 at *5-6 (S.D.N.Y. Nov. 6, 1995) (claim that correction officer felt plaintiff's rear end does not provide sufficient facts to state Eighth Amendment claim); *Friedman v. Young*, 702 F. Supp. 433, 434, 436 (S.D.N.Y. 1988) (complaint that correction officer fondled plaintiff's genitals and anus during pat search dismissed; "[a]ccepting the allegations of the complaint [as true], the line between a pat down and a fondle is too insubstantial to support the burden of supporting a claim for constitutional tort.").

Accordingly, accepting for purposes of this motion Williams' version of the facts, this isolated incident during a routine pat-frisk fails to state an Eighth Amendment claim under *Boddie*. The Court grants defendants' summary judgment motion on this second issue.

*CONCLUSION*

For the reasons set forth above, defendants' summary judgment motion is granted. The Clerk of the Court is directed to enter judgment for defendants dismissing this action with prejudice.

SO ORDERED.

DATED:

S.D.N.Y.,1997.
Williams v. Keane
Not Reported in F.Supp., 1997 WL 527677 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.